# EXHIBIT 4

## (Internal Charges Report and Recommendation)

**SERVICE EMPLOYEES INTERNATIONAL UNION**

| | |
|---|---|
| **In the Matter of the Charges Filed Against SEIU Local 1107 Officers Richard Hodgson, Cherie Mancini, Alfredo Serrano, Deb Springer, Sharon Kisling and Patricia Greaux** | **Carol Nieters**<br>**SEIU Local 284 Executive Director**<br>**Hearing Officer** |

## REPORT AND RECOMMENDATIONS TO THE INTERNATIONAL PRESIDENT ON THE INTERNAL CHARGES FILED IN REFERENCE TO SEIU LOCAL 1107

Pursuant to her authority under Article XVII, Section 2(f) of the SEIU Constitution and Bylaws, SEIU International President Mary Kay Henry assumed original jurisdiction over several internal charges filed against SEIU Local 1107 President Cherie Mancini, Executive Vice President Sharon Kisling, Trustees Alfredo Serrano and Deb Springer, and Executive Board Members Richard Hodgson and Patricia Greaux. President Henry appointed me to conduct a hearing on these charges and to make recommendations to her on the proper disposition of the charges. She also appointed me to hear and make recommendations concerning the internal needs of Local 1107 pursuant to her authority under Article VIII, Section 7(g) of the SEIU Constitution and Bylaws. My recommendations on the internal needs of Local 1107 are set forth in a separate report to President Henry and are not incorporated here.

In order of their submission, the internal charges addressed at the hearing are as follows:

| | |
|---|---|
| Charge 1<br>James Kirkpatrick (member) v. Richard Hodgson (Executive Board Member) | Submitted April 28, 2016; original jurisdiction sought on June 22, 2016; President Henry assumed original jurisdiction on October 17, 2016 |
| Charge 2<br>Sharon Kisling (Executive Vice President) and Clara Thomas (Trustee) "on behalf of the majority of the members of SEIU Nevada Local 1107's executive board" v. Cherie Mancini (President), Alfredo Serrano (Trustee), Deb Springer (Trustee) | Submitted September 9, 2016; President Henry assumed original jurisdiction on October 17, 2016 |
| Charge 3<br>Amelia Gayton (Executive Board Member) v. Sharon Kisling (Executive Vice President) | Submitted September 9, 2016; original jurisdiction sought on September 10, 2016; President Henry assumed original jurisdiction on October 17, 2016 |
| Charge 4<br>Brenda Marzan (Executive Board Member) v. Cherie Mancini (President) | Submitted September 13, 2016; President Henry assumed original jurisdiction on October 17, 2016 |
| Charge 5<br>Cherie Mancini (President) v. Sharon Kisling (Executive Vice President) | Submitted October 19, 2016; President Henry assumed original jurisdiction and consolidated with other pending charges on October 20, 2016 |

| | |
|---|---|
| Charge 6<br>Cherie Mancini (President) v. Patricia Greaux (Executive Board Member) | Submitted October 19, 2016; President Henry assumed original jurisdiction and consolidated with other pending charges on October 20, 2016 |

A consolidated hearing on the internal needs of Local 1107 and on the charges was duly noticed for October 29 and 30, 2016, in accordance with Articles VIII and XVII of the SEIU Constitution and Bylaws. The internal needs hearing was conducted in Las Vegas on the morning of October 29, followed until 9 p.m. by the internal charges hearing, at which Charging and Charged Parties had opportunity to call and cross-examine witnesses and to submit exhibits. The hearing on the charges resumed on October 30, 2016, from 9 a.m. to 9 p.m. In almost 20 hours of hearing, 24 witnesses were heard and approximately 80 exhibits, many with multiple subparts, were entered into the record.[1] I was assisted at the hearing by attorney Marnie Walfoort and SEIU Managing Counsel LaRell Purdie, who advised me on legal and procedural issues. In addition, SEIU Legal Operations Manager Lorna Abraham provided logistical support and assistance at the hearing. I kept the hearing record open until November 7, 2016, to allow the parties in the internal charges hearing to submit post-hearing responses, 18 of which were submitted and reviewed. As I had advised the parties, I did not consider evidence raised in those submissions

## I. INTRODUCTION AND GOVERNANCE STRUCTURE

SEIU Local 1107 ("Local 1107" or "Local") represents approximately 18,000 members in the public service and healthcare sectors. The members govern the Local through its Constitution and Bylaws and an elected Executive Board. The Board is comprised of At Large Officers (President Cherie Mancini, Executive Vice President Sharon Kisling, Secretary Patricia Armstrong, Treasurer Sheila Grain, Trustees Alfredo Serrano, Debbie Springer and Clara Thomas); Vice Presidents from each bargaining unit; and the Chief Stewards from each of the bargaining unit chapters (subdivisions of bargaining units) for a total of approximately 60 seats on the Board.

---

[1] Citations to the record are made as follows:

- References to the hearing transcripts are given as "Tr. 1 at ___ for the Transcript from Day 1 of the hearing (October 29) at [page number] ___" or "Tr. 2 at ___" for Transcript from Day 2 (October 30) at [page number] ___.
- "Chg" refers to Charging Party; "Chd" refers to Charged Party.
- Exhibits submitted with written charges or responses thereto are identified by charge number and the party submitting them, for example, "Charge 1 Chg Ex. 3."
- Where parties submitted particularly lengthy compilations as single exhibits (Charge 2 Chg 2, for example, is almost 300 pages long), pages within the exhibit are provided.
- Reference to minutes of the Executive Board are given as "Ex. Bd minutes" followed by the date, *e.g., "*Ex. Bd. minutes 10.28 .16."
- References to governing documents are to the Local's Constitution and Bylaws unless otherwise indicated.

The charges reflect years of division between the public service and healthcare divisions of the Local and resulting factions within the Board and staff. *E.g.,* Tr. 1 at 63, 69.[2] The immediate past President of the Local resigned his position in October 2015. Cherie Mancini, who was then serving as Executive Vice President, succeeded him as President until she was elected to a full term in June 2016. Long-standing tensions and conflicts that Sister Mancini inherited have been exacerbated by a lack of clarity in the Local's Constitution and Bylaws as to the roles and authority of the officers. A brief review of the governance structure as established by the Constitution and Bylaws of Local 1107 may illustrate how the Constitution lends itself to the subjective and self-serving interpretations of the kind that fueled these charges.

**Executive Board**. The SEIU Local 1107 Constitution and Bylaws establish the Executive Board as "the governing body of the Local Union." The Board conducts union business at regularly scheduled monthly meetings that are required to be held in accordance with Robert's Rules of Order. Article 8, Sections 1, 8. The President is authorized to call "special meetings" of the Board "as necessary." Article 7, Section 6(B)(2).

The authority of the Executive Board is set forth primarily in Article 8 of the Constitution and Bylaws and includes, in relevant part:

- Establishing policies and procedures for the direction and operation of the Local Union;
- Approving the budget, including the establishment of "staffing levels";
- Approving "the compensation, terms and conditions of employment for the staff" of the Local;
- Approving "all contracts for service" such as legal and other services and leases; and
- Establishing committees necessary to achieving the Local's purposes.

Article 15, Section 2(A) reiterates that the "Executive Board shall authorize the number of staff positions and their compensation, after consultation with the President."

Finally, Article 18 vests the Executive Board with the authority to interpret the Constitution and Bylaws of the Local.

**President**. The authority and responsibilities of the President of the Local are set forth in Articles 7, 15, and 16 of the Constitution and Bylaws.[3] Article 7 first and foremost provides that the President is "accountable to all the members of this Local Union and to the Executive Board" and "shall report to the Executive Board." Section 6(A). Section 6(B)(9) requires that the President "[make] appointments to any vacant position(s) with the advice and consent of the Executive Board." The President is also charged with performing other duties as assigned

---

[2] The citations to the testimony and the exhibits provided in this Report are illustrative and by no means exhaustive of the evidence adduced at the hearing and in post-hearing submissions.

[3] Article 14, Section 2(B)(1) also provides for appointment power to standing committees but is not relevant to these charges.

by the Executive Board (Section 6(B)(12)). Finally, Article 7 highlights one "very important duty and responsibility of the President": "to actively take part in and stay informed of bargaining in all areas and to participate with the bargaining committees." Section 6(B)(5).

The President's responsibilities particularly as to the staff of the Local are further set forth in Article 15, which first assigns the President the duty to administer the affairs of the Local and the policies set by the Executive Board and the members on a day-to-day basis. Article 15, Section 1(A). More specifically, the President's Article 15 duties that are particularly germane to these charges require her:

- To comply with the mandates of all membership votes and/or decisions of the Executive Board (Section A(1));
- To report regularly on all bargaining units to the Executive Board (Section 1(A)(2));
- To cooperate with and assist the officers of the Local in the performance of their duties, including bargaining (Section 1(A)(3));
- To "hire and fire with prior consultation with the Executive Vice President; assign and direct the Local Union's staff in accordance with . . . any staff-related policies adopted by the Executive Board; and it is recognized and understood that it is the authority and responsibility of the President to implement the direction of the Executive Board and the membership with respect to the daily affairs and business of the Local Union and to manage and supervise any and all staff" (Section 1(A)(4));
- To "assign and direct, with prior consultation with the Executive Vice President on budgetary matters, the Local Staff within an operating budget approved by the Executive Board" (Section 1(A)(5));
- To publish the Local Union newspaper and regular membership communications" (Section 1(A)(13)); and
- To "perform such additional duties as the Executive Board may direct and report other relevant activities to the Executive Board and the membership" (Section 1(A)(25)).

Section 2(B) of Article 15, governing Union Staff, also concerns the President's authority over staff: "All staff of the Local Union will work under the direction of the President, who has the authority to hire, fire, assign and supervise their work, pursuant to any staff-related policies adopted by the Executive Board."

Also relevant to these charges is the authority of bargaining committees for the bargaining units, found in Article 16 on Collective Bargaining. Section 6 of Article 16 essentially reiterates the duties of the President that are set forth in Article 7, Section 6(B)(5):

> The authority to bargain collectively for this Local Union shall be vested in a Bargaining Committee . . . . The Local President, or designee, shall be the chief spokesperson for this Local Union in all collective bargaining with any employer. The President of this Local Union shall serve as an ex-officio member of all bargaining

> committees of the Local Union and it is the very important duty and responsibility of the President to actively take part in and stay informed of bargaining in all areas and to participate with the Bargaining Committees.

**Executive Vice President.** In Article 7, Section7(A), the Constitution and Bylaws first provides for the accountability of the Executive Vice President by specifying that she "shall be accountable to all the members of the Local Union and to the Executive Board and shall report to the President of this Local Union."

Section 7(B) next defines the duties of the EVP, which in relevant part provide that she shall:

> 1. Report to the President on his/her activities;
>
> . . . . and
>
> 3. Serve in the absence of the President and perform Presidential duties at such time.

**Trustees.** The duties of the at-large Trustees, as set forth in Article 7, Section 10 of the Local 1107 Constitution and Bylaws include in relevant part that they shall:

> 1. Act as guardians of the welfare of the Local Union; [and]
>
> 2. See that the Officers fulfill their duties and obligations and that the Local 1107 Constitution and Bylaws are followed and that parliamentary procedure is adhered to.

**Bargaining Committees.** As already indicated, Article 1, Section 6 of the Local 1107 Constitution and Bylaws provides that "[t]he authority to bargain collectively for this Local Union shall be vested in a Bargaining Committee elected/selected under written procedures determined by the individual Bargaining Unit and/or the Executive Board." Article 16 further provides in Section 4 that "[c]ollective bargaining is intended to involve members directly and actively in determining their wages, hours and working conditions."

## II. FINDINGS AND RECOMMENDATIONS ON THE INTERNAL CHARGES

With the exception of Charge 1, the charges set forth an array of separate but related allegations against five current officers of the Local, including mutual charges by the two highest-ranking officers. Because there is so much overlap in Charges 2 through 6, I have exercised my discretion to address related allegations together, rather than in the chronological order of submission, to avoid unnecessary repetition. I begin, however, with Charge 1, which is unrelated to the others.

### A. Charge 1: James Kirkpatrick against Richard Hodgson

In Charge 1, Brother Kirkpatrick, a member in the Department of Aviation bargaining unit, charges Brother Hodgson, Chief Steward of the non-supervisory unit, with violation of Local 1107's Constitution and Bylaws, Article 6, Section 3 (terms and conditions of membership) and Article 7, Section 12(B) and (C) (accountability and duties of Chief Stewards). Charge 1 Chg Ex. 1. He alleges that Brother Kirkpatrick (a) threatened to bar organizers who might campaign for then-candidate Cherie Mancini from airport property, and (b) engaged in direct bargaining with management over splitting up a shop at the airport.

Although Brother Hodgson was present and ready to defend against the charges, Brother Kirkpatrick failed to appear on either day of the hearing, to seek a continuance for any reason, or to submit any evidence to support his charges. Therefore, it appears that Brother Kirkpatrick abandoned his charges.[4]

Accordingly, it is my recommendation that the charges against Brother Hodgson be dismissed.

### B. Charges 2 and 4: Sharon Kisling and Clara Thomas against Cherie Mancini, Alfredo Serrano and Deb Springer; Brenda Marzan against Cherie Mancini

In Charge 2, Executive Vice President Sharon Kisling and Trustee Clara Thomas bring, purportedly "on behalf of a majority of Executive Board members," a collection of charges against President Mancini and Trustees Alfredo Serrano and Deb Springer. Charge 2 Chg Ex. 1. In Charge 4, Vice President Brenda Marzan also brings a number of charges against Sister Mancini. Charge 4 Chg Ex. 1. Although the charges are not identical, for purposes of discussion there is enough overlap that I will combine Charges 2 and 4 as they affect President Mancini. Following that, I will address the charges against the Trustees.

#### 1. President Cherie Mancini

The charges against President Cherie Mancini are numerous and wide ranging, consisting of allegations of violations of seven Articles of the Local 1107's Constitution and Bylaws. Although I took all allegations into consideration, particularly as they may have contributed to any pattern of conduct, I focus in this Report on the allegations that raise more serious breaches of duty, and I do not discuss separately each and every conclusory statement or minor allegation.[5] Moreover, I took the liberty of summarizing or paraphrasing some of the allegations.

---

[4] I note that Article XVII, Section 4 of the SEIU Constitution and Bylaws allows a ***charged*** party to submit a written statement in lieu of an appearance, consistent with the right of the accused to due process. That provision does not extend to a ***charging*** party like Brother Kirkpatrick.

[5] For example, I do not separately address charges which, even assuming them to be true, reflect poor administrative practices, mere differences in opinion, or possibly a culture of disrespectful treatment. These may represent less than best practices, but I do not find that they rise to the level of "gross inefficiency" or "failure to perform duties" within the meaning of

(Cont'd . . .)

In both the SEIU and Local 1107 Constitutions, the grounds for charges begin with violation of specific provisions of the Constitution and Bylaws of the International or Local Unions. Article XVII, Section 1(1) of the SEIU International Constitution and Bylaws; Article 21, Section 3(1) of the Local 1107 Constitution and Bylaws. Because the cited provisions of the SEIU Constitution and Bylaws generally do not affect the analysis under the corresponding provisions of the Local 1107 Constitution and Bylaws, I will focus on the Local's constitutional requirements.

**a. Usurpation or Disregard of the Executive Board's Authority in Violation of the President's Duty to Be Accountable and Report to the Board, and To Perform Other Duties as Assigned. *Article 7, Section 6(A) and (B)(12)***

**(1) Disregard of Specific Directives from the Board.** Sister Mancini is charged with defying specific instructions from the Board and, more generally, with usurping or disregarding the Board's authority despite her constitutional duty in Article 7, Section 6(A) to be accountable to the Board. Charge 2 Chg Ex. 1.

Two examples of Sister Mancini's alleged defiance of the Board's instructions cited by the Charging Parties are her alleged failure to re-negotiate the retainer for the Urban Law Firm and her submission of four cases to mediation after the Board voted to arbitrate them.

As to the negotiation of the law firm retainer, the evidence established that the Board wanted to re-evaluate the retainer with the Urban Law Firm in view of high costs and changing circumstances in the Local and directed Sister Mancini to undertake that re-negotiation. Ex. Bd

---

(. . . cont'd)

the SEIU or Local 1107 Constitutions and Bylaws, nor do they constitute cognizable charges thereunder. Illustrative examples in Sister Mancini's case include allegations of failing to prepare for or conduct Executive Board meetings to the satisfaction of Charging Parties (*e.g.*, Tr. 1 at 35-37); failing to adopt or advance recommendations from advisory committees like the Staff Hiring Committee (e*.g.*, Tr. 1 at 127-29); declining to implement background checks on prospective employees (*e.g*., Tr. 1 at 127-28); failing to respond, or respond as promptly as the Charging Parties would like, to emails from fellow officers, members, staff and even employers (e*.g.,* Tr. 1 at 148, 217); and failing to take sufficient action, in the eyes of the Charging Parties, in response to unfortunate events like robberies and other loss of property from the Local. Tr. 1 at 189-91. Moreover, certain allegations must be deemed too vague or subjective to support the charges, for example, "allowing" staff to "show disrespect" to other officers (e*.g.,* Tr. 1 at 215-16, 234). Finally, I do not address charges that are more appropriately pursued in forums better tailored for their resolution, such as grievances, claims, and complaints filed with the National Labor Relations Board, the U.S. Department of Labor, the Nevada Office of the Labor Commissioner, and the Local itself. *E.g*., Charge 2 Chg Ex. 2 at 23-29. Likewise, the interpersonal hostilities that have resulted in actions filed in court are best left to that forum for adjudication. *E.g*., Tr. 2 at 123, 126-27; Charge 3 Chg Ex. 8

minutes 2.24.16; Tr. 2 at 39. Sister Mancini testified credibly that she consulted with International Union representatives about the issue and discussed the terms of the agreement with Michael Urban of the law firm. Tr. 2 at 39-40. They evidently reached agreement to continue the current agreement with a small increase while the Local continued to assess its reduced need for legal services. That course of conduct does not demonstrate a flouting of the Board's directive.

Nor does the allegation that Sister Mancini disregarded the Board's directive to move four cases to arbitration in favor of mediation have merit. Sister Mancini testified, uncontradicted, that the Board subsequently approved a proposal from her to mediate the cases to save the cost of arbitration. She may have lobbied the Board to change its initial instruction, but once the Board approved the mediation, she acted in compliance with its instructions. Tr. 2 at 87, 97.

Under these circumstances, I recommend that the charges that Sister Mancini violated Article 7(6)(A) by defying direct instructions from the Board be dismissed.

(2) **Disregard of Board's Authority Regarding Staff and Contracts.** Sister Mancini is charged with several instances of disregarding or circumventing the Executive Board's responsibility to review and approve "the compensation, terms and conditions of employment for the staff of the Local Union" and "all contracts for services rendered such as legal, auditing or payroll services, member benefit programs or office leases." Article 8, Section 2(C).

Regarding individual employment contracts, Charging Party Sharon Kisling maintains that the Constitution requires their submission to the Board for its review and approval. Charge 2 at 2, and on one occasion advised Sister Mancini to that effect in writing. Charge 2 Chd Ex. 9 at 24. Sister Mancini acknowledged that she did not submit several employment contracts to the Board and maintained, in fact, that she was not required by the Constitution to do so. The Board's authority, in her view, was limited to establishing "staffing levels" and the overall budget for personnel, pursuant to Article 8, Section 2(B). Tr. 1 at 127; Tr. 2 at 30-31.

The dispute over employment contracts illustrates how the lack of clarity and shared understanding of the Local's Constitution and Bylaws contributes to the high level of discord in this Local. Both parties can cite specific constitutional provisions in support of their respective positions. But any reading of a constitution and bylaws must interpret specific provisions in the context of the constitution as a whole. In this case, the Local 1107 Constitution and Bylaws sets in place a governing structure that establishes the Executive Board as the highest governing authority of the Local, after the members. The Board is provided authority for setting direction and policy and approving the budget and expenditures of the Local. The Board is also charged with establishing "staffing levels" as part of its budget process; "approv[ing] the compensation, terms and conditions for the staff of the Local"; and "approv[ing] all contracts for services rendered." Article 8, Section 2(B) and (C).

The President, in contrast, is charged with administering the affairs of the Local on a day-to day basis and, more specifically, with hiring, firing, directing and assigning staff – but all within financial parameters approved by the Executive Board and any staff-related policies

adopted by the Executive Board. Article 15, Section 1(A)(4) and (5). The President is also authorized to "make appointments to any vacant positions with the advice and consent of the Executive Board." Article 7, Section 6 (B)(9) (emphasis added).

Accordingly, the Constitution appears to contemplate a scheme in which the President hires staff and supervises it on a day-to-day basis, but staffing levels, overall budget, and staff-related policies are set by the Board. The President has no explicit authority to set compensation, even for individual employees.

To be sure, neither does the Constitution explicitly set forth that the Board's authority over "compensation, terms and conditions" of employees is intended to apply at the individual employee level as well as the overall budgetary level. But in this particular area, the Constitution and Bylaws, although far from a model of clarity, establishes authority in the Executive Board for approving the expenditure of funds for staff hires (among other financial expenditures) and, in fact, for approving their "terms and conditions" as well. To give full effect to all the provisions of the Constitution, the authority of the President to hire individuals onto the staff must be considered subject to the Board's authority to approve or reject the contracts offered those individuals. The inclusion of establishing "the terms and conditions" of staff within the Board's authority and the requirement that it "consent" to appointments to vacant positions support the conclusion that the Board was intended to exercise oversight of wages and working conditions of the staff, individually as well as collectively. The Board retains oversight responsibility for the day-to-day supervision and management of the staff that resides in the President, and her actions are reviewable by the Board.

At the hearing, Sister Mancini acknowledged that she hired quite a number of staff members and consultants without submitting their contracts to the Board for approval. Tr. 1 at 141-43.[6] Some of these were "refills" of positions that had previously been approved by the Board and accounted for in the budget, Tr. 2 at 30-31, but in some cases both the employee and the position were new. Tr. 2 at 30-31; Charge 2 Chd Ex. 9 at 24-26. This distinction may not be important, however, because even in the case of filling open positions, Article 7, Section 6(B)(9) of the Constitution requires the President to secure the "advice and consent" of the Board before making appointments to vacant positions. Furthermore, the evidence established that in some cases, Sister Mancini did seek approval for a new hire, suggesting that she may have been aware of the appropriate process to use. The minutes of the Board meeting of October 28, for example, show that Sister Mancini intended to obtain approval from the Board for the contract of Dolores Bodie but went ahead with it unilaterally when the lack of a quorum prevented her from obtaining approval at that meeting. Tr. 2 at 29; Ex. Bd minutes 10.28.15.

---

[6] *E.g.*, John Archer (Tr. 1 at 143; Tr. 2 at 30; Charge 2 Chg Ex. 2 at 18); Andrea Bond (Tr. 1 at 143; Tr. 2 at 26, 30; Charge 2 Chg Ex. 2 at 19); Dolores Bodie (Tr. 1 at 141; Tr. 2 at 29; Charge 2 Chg Ex. 2 at 13); Bruce Boyens (Tr. 2 at 30, 56; Charge 2 Chg Ex. 2 at 14); Cheryl Bunch (Tr. 1 at 141; Tr. 2 at 29; Charge 2 Chg Ex. 2 at 12); Dana Gentry (Tr. 1 at 143; Tr. 2 at 30; Charge 2 Chg Ex. 2 at 16); Peter Nyugen (Tr. 1 at 142-43; Tr. 2 at 30; Charge 2 Chg Ex. 2 at 15).

Given the conflicting interpretations of the Constitution and Bylaws, it was natural to wonder what the practice regarding individual employment contracts had been under previous administrations in the local. Unfortunately, the inconsistent evidence on this point was not sufficient to establish a past practice. *E.g.,* Tr. 1 at 139, 160-61; Tr. 2 at 56, 60. Thus left with the language of the governing provisions of the Constitution, it would have been prudent for Sister Mancini to defer to the Board on the compensation, terms, and conditions of individual employees. Even if Sister Mancini found it impractical or onerous to submit all contracts to the divided Board, her remedy was to seek to amend the Constitution, not to disregard it entirely.

Moreover, individual employment agreements are not the only contracts Sister Mancini regularly executed without consultation with the Board. For example, she failed to submit for the Board's approval the collective bargaining agreement for the staff union. Tr. 1 at 146, 162-63; Tr. 2 at 32-33, 46. That contract certainly goes beyond individual employment and, in fact, commits the Local to a significant expenditure for a number of years.

She also did not submit to the Board the contracts entered into for services rendered to the Local, such as IT services (Tr. 1 at 136; Tr. 2 at 28; Charge 2 Chg Ex. 2 at 6-8, Ex. 2(A) at 1-5); and services for negotiating contracts. Tr. 1 at 142. In the case of those vendors, the language of Article 8, Section 2(C), charging the Board with approving "all contracts for services rendered" to the Local, is clear enough to require Sister Mancini to give the Board an opportunity to review and approve them. She did not.

Another specific instance that proved to be a battlefield between the parties was Sister Mancini's unilateral authorization of the publication of a magazine for employees in the entire bargaining unit at a cost of $15,000. Although Sister Mancini has express authority to publish the Local's newsletter and regular communication to members, Article 15, Section 1(A)(13), the evidence at the hearing established that this particular magazine was not a regular membership publication. Tr. 2 at 121-22, 152-55; Charge 2 Chg Ex. 2 at 279-85, 292-98. Accordingly, to the extent that the publication of the magazine is deemed a contract for services, that contract should also have been submitted to the Board for its review. It is undisputed that it was not. Tr. 2 at 154-55.

The controversy over the magazine demonstrates, again, the trouble that arises from differing defensible interpretations of ambiguous provisions in the Local 1107 Constitution and Bylaws. And the provisions governing the ongoing issues of hiring, management, and compensation of staff are so susceptible to conflicting and self-serving interpretations that dysfunction seems almost inevitable. What does seem clear about the Constitution, however, is that it contemplates a collaborative effort between the Board and the President, and that in this case, the President was not prepared to accept the restrictions of what she could do without the approval of the Board.

Sister Mancini's course of conduct in subverting the Board with regard to employment agreements and contracts for services was not an acceptable practice in light of the constitutional language prescribing an active oversight role for the Board. Unquestionably, Sister Mancini faced challenges in view of the difficulty of reconciling the provisions of the Constitution and the roadblock of a divided Board. But Sister Mancini's role in the Local, and responsible exercise of leadership more generally, require her to find a way to establish a

working relationship with the Board. Especially since the Board was explicitly provided the authority to interpret any unclear provisions of the Constitution and Bylaws, Article 18, Sister Mancini could not unilaterally resolve the limits of her authority and discretion in her own favor.

Under the circumstances presented in the hearing, where the breakdown in governance is not attributable to only one party, I am not comfortable in recommending severe disciplinary measures for Sister Mancini's disregard of the Board's constitutional role. However, I do recommend that Sister Mancini be reprimanded for her failure in this regard and that she be required to undertake leadership development training provided by the International Union if and when she assumes a role as an elected leader in the future.

**b. Alleged Financial Misfeasance. *Article 21, Section 3(5)***

Sister Mancini is charged with financial misfeasance based in part on the "general concerns" of the Local's Treasurer, Sheila Grain, "about the financial health of SEIU Local 1107," which Sister Grain conveyed to the Executive Board in monthly reports and in every Executive Board meeting. Tr. 1 at 237-38, 244. At the hearing, Treasurer Grain also raised a question of possible "double dipping" on the part of staff who may have improperly charged the Local for gas when they already had a car allowance to cover that expense. Tr. 1 at 240.

A charge of financial malpractice is a very serious allegation that warrants specific and probative evidence. The evidence produced by the Charging Parties does not meet that standard. Sister Grain does appear to have regularly advised the Executive Board as to the state of the Local's reserves and other red flags she wanted them to be aware of, Tr. 1 at 238, 244, but there was no connection made specifically and exclusively to Sister Mancini. Nor was Sister Grain able to explain certain unclear pieces of evidence she proffered, such as a 2015-2016 LM-2 report that was too ambiguous to support any conclusions. Tr. 1 at 236, 242-43; Charge 2 Chg Ex. 16. The fact that the Local was in financial straits, according to the Treasurer's assessment, does not approach the standard of proof that financial misconduct of a particular individual is the cause.

Nor is it clear how Sister Grain's contention that some staff members might be "double dipping" is chargeable to Sister Mancini. Sister Grain could only say that two or three people had raised the issue of staff possibly getting double reimbursement but admitted that she had not yet "researched" the question. She allowed that she should investigate the situation and, indeed, expressed confidence that she would have Sister Mancini's cooperation in the matter. Tr. 1 at 241. I concur that the Treasurer should investigate such activity and in fact am somewhat concerned that she had not made any effort to find the facts even though the issue "keeps coming up." Tr. 1 at 241. In any event, without evidence showing any direct connection to Sister Mancini, the charge cannot be sustained.

**c. Derogation of Duty to Officers and Bargaining Committee Members*. Article 7, Section 6(B)(5); Article 15, Section 1(A)(3); Article 16, Sections 4 and 6;* Article XVII, Section 1(3) of the SEIU Constitution/ Article 21, Section 3(3) of the Local 1107 Constitution**

The Charging Parties presented a litany of instances in which they, as Executive Board members, officers, and bargaining committee members, believe they were marginalized, ignored, or circumvented by their President as they tried to carry out their constitutionally prescribed duties. They charge Sister Mancini with disregarding her constitutional duty to "cooperate with and assist them in the performance of their duties." Article 15, Section 1(A)(3). Charging parties who are members of Bargaining Committees further charge that Sister Mancini impeded the exercise of their authority to bargain collectively for their members and neglected what the Constitution establishes as her "very important duty and responsibility . . . to actively take part in and stay informed of bargaining in all areas and to participate with the Bargaining Committees."

Vice Presidents from each bargaining unit have the duty to "attend any meetings with administrators or executive management in their respective Bargaining Units" and to serve on the Bargaining Committee if that unit is in negotiations. Article 7, Sections 11(C)(2) and (4). Yet according to the credible evidence presented by the Charging Parties, Sister Mancini frequently:

- did not include them in meetings she held with administrators or executives (Tr. 1 at 150-53; Tr. 2 at 93, 106);
- excluded them from review of written material for their members or the media (Tr. 1 at 149-50; Tr. 2 at 100-101; Charge 4 Chg Ex. 5);
- disregarded specific requests to be included in communications from Sister Mancini to their members (Tr. 1 at 149-50; Tr. 2 at 88-91; Charge 4 Chg Ex. 4);
- excluded them from notice of and participation in settlement agreements that affected their bargaining units (Tr. 2 at 88-94; Charge 4 Chg Ex. 3); and
- failed to notify certain Vice Presidents in notice that a location for a stewards' meeting had changed. Tr. 1 at 12, 149-50.

Sister Mancini's inclination to simply run the Local single-handedly is demonstrated starkly in the email she sent to all staff on July 14, 2016, advising them that "any direction given by any Officer of the Union must be approved by the President before the assignment is to be completed." Tr. 2 at 43; Charge 2 Chg Ex. 2 at 300. This communication may have been sent out of impatience with what she saw as the over-involvement of the EVP in staff activity, Tr. 2 at 43, but a rational leader must realize that attempting to funnel all activity of the Local through one individual runs counter to the democratic processes that the membership preserved in their Constitution and Bylaws. Moreover, this email demonstrates the utter breakdown in communication within the leadership, so that Sister Mancini risked incapacitating the entire staff rather than resolving differences directly with a sister officer.

As a general matter, I regard development and empowerment of other leaders in the Local as one of the hallmarks of an effective executive officer. And I acknowledge the frustration of the Vice Presidents charged with serving as the voice of their constituent members in their

bargaining units who believe their efforts are being stymied by a President more concerned with internal politics than the welfare of their members. However, I thought it important to consider whether the charged conduct amounts to carelessness, discourtesy, or frustration with constant "push back" from other officers, rather than a more significant failure. Tr. 2 at 55. As to that point, I might agree as to any individual instance, but not as to the cumulative effect. The overall pattern that emerges from the evidence is one of a President willing, and even inclined, to sideline her fellow officers so that she can function autocratically or, at best, with a small cadre of staff whose hiring was never even approved by the Board. Her conduct is not to be condoned.

Nevertheless, there is great difficulty and potential mischief in applying the rather vague, subjective and general provision that the President must "cooperate with" and "assist" the officers. Paralysis could easily result if a charge could be sustained every time one officer perceived another to be failing to "cooperate with" or "assist" him or her. I am disinclined to uphold a charge and to recommend disciplinary measures based on anything less than evidence of conduct that severely undermines the functioning of Local officers to demonstrable injury to the Local and its members. The examples given above, while indicative of a striking deficiency in leadership and a very poorly functioning Local, are not sufficient to support a violation of the Constitution and Bylaws.

**University Medical Center**. Of far greater concern, however, is the conduct of Sister Mancini regarding the negotiations at University Medical Center, one of the Local's biggest bargaining units, Tr. 1 at 21-22, 24-25, 28. In Charges 2 and 4, Sister Mancini is alleged to have violated Article 7, Section 6(B)(5) of the Constitution and Bylaws, which sets forth very explicitly the duty of the President to "actively take part in and stay informed of bargaining in all areas and to participate with the bargaining committees." In fact, the provision highlights that this is a "very important duty and responsibility" of the President. And the critical nature of that duty is further emphasized when it is repeated verbatim in the provisions concerning collective bargaining. Article 16, Section 6. Presumably, placing responsibility for bargaining in the hands of those individuals closest to the affected members implements the stated objective of Section 4: "to involve members directly and actively in determining their wages, hours and working conditions." Finally, Article XVII, Section 1(3) of the SEIU Constitution, which has its corresponding provision in Article 21, Section 3(3) of the Local 1107 Constitution and Bylaws, prohibits gross disloyalty and conduct unbecoming a member.

The evidence was conflicting on whether and when Sister Mancini attempted to exercise her constitutionally mandated role on the bargaining committee. She may have made some early, if unavailing, efforts to participate, but the credible evidence suggests that she was largely absent from the negotiations that took place on a regular basis between March and July 2016. I cannot avoid the conclusion that she did not take adequate steps to ensure that she fulfilled the mandate to actively participate in bargaining that the Constitution enshrines – twice – as her "very important duty and responsibility." Article 15, Section 6(B)(5); Article 16, Section 6.

Most critically, what the evidence established is that as bargaining neared its conclusion in late July, Sister Mancini was advised by Patricia Greaux, Chief Auxiliary Steward at UMC for the nonsupervisory unit and one of the leads on the bargaining committee, that the bargaining

committee wanted to notify the members and schedule the ratification vote. Tr. 2 at 72-73; Charge 4 Chg Ex. 6. Notices that voting on the agreement would be held on July 27, 28, and 29 were placed in UMC's internal newsletter. Sister Greaux testified as to perceived pressure to finalize the agreement quickly because UMC had advised that a change in the law at the end of June would prevent UMC from continuing certain pay increases and benefits in the absence of a finalized agreement to replace the one that had expired. Tr. 2 at 66-74.

At that point, in late July, Sister Mancini finally became engaged in the bargaining. However, she did not include or consult with the bargaining committee as she launched into action. Instead, on July 25, she unilaterally reduced the proposed three-day voting period to a single day. Brother Nguyen followed up with an email to John Espinoza, UMC's Chief Human Resources Officer and bargaining committee member, that he was "officially empowered to speak on behalf of SEIU Nevada with regard to the forthcoming contract ratification process and this communication supersedes all prior communications on this subject." He further advised that UMC should "direct all further communications on this matter to [him]," thereby preempting the role of the bargaining committee in any further negotiations. Charge 4, Chg 13 at 3.

The next day, without any notice to the bargaining team, Sister Mancini communicated directly to the UMC membership and to the employer that she was canceling the ratification vote entirely.[7] Her cited reason was "to prevent potential irreparable harm to the bargaining unit" – harm that she did not further describe or explain.

In her July 26 letter, she went on to state that

> SEIU Nevada is investigating allegations against members of the bargaining team, including, but not limited to:
>
> - Violation of fiduciary duty
> - Acting against the best interest of members
> - Behavior inconsistent with the mutually agreed upon interest based bargaining process
> - Failing to conduct bargaining in a prudent manner
> - Being derelict in their duty to properly communicate with members and the Union.

Charge 4 Chg Ex. 11.

In addition, Director of Organizing Peter Nguyen advised UMC directly that the scheduled ratification vote was unilaterally canceled. Charge 4, Chg Ex. 7 at 6. In his email to UMC, Brother Nguyen further requested the employer to distribute Sister Mancini's letter of

[7] Although the letter is dated June 25, it is not disputed that it was actually disseminated on July 26. *E.g.,* Tr. 2 at 68.

July 26 to members "via your internal email system," thus ensuring wide dissemination of the accusations.

At the hearing, Sister Mancini explained credibly that her actions were in response to her belated realization that the bargaining committee had agreed to a reduction in the union's access to UMC workers. Tr. 2 at 83. Although the evidence did not establish clearly the point in time when Sister Mancini became aware of that term in the tentative agreement, it appears that the provision was negotiated in the first days of bargaining, Tr. 2 at 80, and that information about the negotiations would have been readily available from members of the bargaining committee had she sought it between early March and the end of July. At the very least, Sister Mancini could have reviewed the updates provided to members of the affected bargaining unit via the UMC employee newsletter. Tr. 2 at 69; Charge 4 Chg. Ex. 8-10.

As a union leader, I am enormously sympathetic to Sister Mancini's concern. Access is a vital issue for unions. I can appreciate her strong reaction to the reduction in access her bargaining committee members accepted, even if they were well-intended and attempting to accommodate their members' professed preference. Tr. 1 at 99, Tr. 2 at 82-83. But her precipitous cancelation of the ratification vote directly through the employer, without even communicating with the bargaining committee, effectively circumvented the democratic process set in place by the Constitution, which vests the authority to negotiate in the bargaining committee presumably so as "to involve members directly and actively in determining their wage, hours and working conditions." Article 16, Sections 4.

Not surprisingly, Sister Mancini's action not only came as a shock to the bargaining committee, it also stunned the employer. UMC's response to Sister Mancini's unilateral cancellation of the ratification vote was strong and immediate. On July 28, UMC's Chief Human Resources Officer Espinoza emailed Sister Mancini with an attached letter dated July 27 from the UMC Chief Executive Officer. In his letter, the CEO refused the request to distribute the July 26 letter on the Local's behalf, advised Sister Mancini that the parties had negotiated an agreement in good faith, objected to the abrupt cancelation of the ratification vote, and warned that the matter could be referred to the Employee-Management Relations Board, presumably as a bad faith bargaining charge. Charge 4 Chg Ex. 2 at 10.

Ultimately, Sister Mancini restored the ratification vote, and the agreement was approved by the members. Tr. 2 at 75. However, Sister Mancini's rash unilateral action demonstrated a fundamental misunderstanding of the democratic process, jeopardized the interests of the members, caused at least a temporary loss of faith in their leaders, and impaired the Local's relationship with the employer.

This scenario is undeniably disturbing. However, even acknowledging that Sister Mancini failed to perform her "very important [constitutional] duty and responsibility" during the course of the negotiations, her eleventh-hour intervention could nonetheless be seen as a genuine, if misguided, effort to preserve the Local's access to the work site. Her conduct is mitigated by her motivation and may not warrant the serious discipline sought by the Charging Parties.

But any latitude for Sister Mancini in the UMC matter does not extend to additional actions she took. Sister Mancini made a very public announcement – without any explanation or evident justification – that the bargaining committee had violated its fiduciary duty to the members. Her accusation impugned the integrity of the bargaining committee members and their loyalty to their members, and put the Local and its entire membership in a terrible light with the employer and the community. The UMC bargaining committee members were understandably outraged at the unfounded implication of the letter. Within hours they gathered 400 signatures for a petition to advise SEIU International President Mary Kay Henry that Sister Mancini had "done great and unforgivable damage to the SEIU-UMC bargaining team by making false allegations" against them via official SEIU communications and social media. Charge 4 Chg Ex. 11 at 2.

Despite the wide broadcast of those accusations, there was no evidence presented that any investigation was ever undertaken or that any breach of duty by the bargaining team was found. Generally, the negotiation of an arguably unwise contract term does not qualify as a breach of fiduciary duty. The resulting damage to the reputation of the Local, as well as the individual members of the bargaining unit, was self-inflicted and unnecessary.

Collective bargaining is one of the fundamental purposes of a labor union. It is in the collective bargaining process that members exert their collective strength to make changes to benefit themselves and their co-workers. The integrity of the collective bargaining process is crucial, and a local officer has a fiduciary duty to represent her members in the process. The failure of a local union President to respect that process is detrimental to the union. The fact that a President would do injury to the process is a serious breach of duty violating the trust of the membership.

Sister Mancini subverted the bargaining committee duly authorized to represent members of the bargaining unit in contract negotiations when she intervened unilaterally and directly with the employer without involving them at all. She further abused the power of her office to make and broadcast unfounded, disloyal, and derogatory accusations against the members of the committee. This course of conduct, demonstrating a derogation of the democratic process and a lack of presidential leadership and temperament, does warrant disciplinary measures. For her violation of her "very important duty and responsibility" set forth in Article 7, Section 6(B)(5) and Article 16, Sections 4 and 6, and for her disloyal and conduct unbecoming an officer in violation of Article 21, Section 3(1), I recommend that Sister Mancini be removed from her position as President of Local 1107 effective immediately and barred from holding office in SEIU for a period of one (1) year. In addition, she should be suspended from membership in Local 1107 for a period of six (6) months. Because I have already recommended above that she have leadership development training before returning to any office in the Local, I will not recommend that again for this violation.

In sum, I recommend that the charge that Sister Mancini failed to submit employment contracts and contracts for services to the Local to the Board for its approval and the charge concerning the UMC bargaining should be sustained, with appropriate sanctions imposed. As to all other charges against Sister Mancini in Charges 2 and 4, I recommend that they be dismissed.

### 2. Trustees Alfredo Serrano and Deb Springer

Regarding the charged Trustees, there was a dearth of specific evidence as to chargeable offenses. Tr. 2 at 35-37. Instead, the Charging Parties rely on Article 7, Section 10(A)(2), which gives Trustees the duty to:

> [S]ee that the Officers fulfill their duties and obligations and that the Local Union Constitution and Bylaws are followed and that parliamentary procedure is adhered to.

Tr. 2 at 35-37.

Starting with a specific area that indisputably could have used more oversight – the procedures and conduct at the Executive Board meetings – the evidence established unquestionably that the meetings of the Executive Board were chaotic and unproductive and, to say the least, were conducted in complete disregard of *Roberts Rules of Order*. Tr. 1 at 13-15, 35. To the extent that the Trustees have the obligation to see that parliamentary procedure is followed, Article 8, Section 8, they have clearly failed in their duty. It cannot be disputed, however, that their capacity to bring the meetings under better management was severely limited as long as the rifts and hostilities among Board members remained as rampant as they appear. I do not believe the Trustees can be held solely responsible for the breakdown in Executive Board functioning.

Regarding their more generalized duty to see that officers fulfill their duties and comply with the Constitution and Bylaws, it follows logically that if charges are sustained against Sister Mancini or any other Charged Party, the Trustees must have been derelict to some degree in their duty to ensure that the Constitution and Bylaws are observed by fellow officers. But so broad and general a duty as "seeing that officers fulfill their duties and comply with the Constitution and Bylaws" is very difficult to apply, and it is unlikely that the provision was intended to make the Trustees the enforcers of all conduct of the officers. Instead, the intent of the provision was more likely to establish a general oversight role for the Trustees and to recognize them as part of the checks and balances needed for accountability.

In the totality of circumstances presented in this case, the Trustees do not appear to me to have intentionally or recklessly violated their constitutional responsibility. Instead, they seem to have been misguided in accepting the conduct of their President as within the bounds of her authority. Moreover, it seems unfair and unrealistic to place on the Trustees exclusive responsibility for the conduct of an errant chief executive office or credit them with the ability to control her even if they had wished to do so. For those reasons, I recommend that the charges against Trustees Serrano and Springer be dismissed.

### C. Charge 3: Amelia Gayton against Sharon Kisling

In Charge 3, Sister Gayton, a member of Local 1107's Executive Board, charges Sister Kisling with violation of numerous specific provisions of the Local 1107 Constitution and Bylaws, primarily Article 7, Section 7(A); Article 15, Section 1 (A)(4) and (5), and Section 2(B); Article 21, Section 3(1),(3),(4), (5) and (9). Charge 3 Chg Ex. 1. I have taken the liberty of

grouping related charges together to avoid repetition and confining my discussion to those allegations that at least arguably rise to the level of constitutional violation.[8]

### 1. Alleged Financial Malpractice and Wrongful Taking of Property. *Article 21, Section* 5

My earlier admonition that an allegation of the very serious charge of financial malpractice requires concrete and substantive evidence applies here as well. That standard of evidence was not presented in the charges concerning Sister Kisling's alleged financial misfeasance: authorization of a false time card and misleading the Board as to the status of interns. The alleged authorization of false time cards by Christina Breeden is rejected for the reasons given in the discussion in Section 2(b) below. Regarding the allegation that Sister Kisling misrepresented the status of interns that she hired, there was little or no evidence that she intentionally misled the Board as to the cost to the Local of hiring them or had a personal motivation for doing so. It appears as likely that she was simply mistaken or unclear about the need to compensate interns.

The charges as to wrongful taking of union property, Article 21 Section 3(9), also have no merit:

- The allegation that Sister Kisling directed an individual who was serving as a staff member at the time to request confidential member data (Tr. 2 at 206-207) does not reflect any misconduct on her part;
- Her alleged "improper removal" of confidential information from the Renown facility was credibly explained as an attempt to address what she saw as a vulnerable situation at that location (Tr. 1 at 261-64); and

---

[8] I reiterate here the caution of note 5 above: Allegations of conduct that reflect the internal politics and interpersonal hostilities in this Local but that do not qualify as breaches of constitutional duties are not addressed in this Report. Although accusations and counter-accusations of a lack of professionalism are fully borne out by the evidence and implicate obligations of leadership, they are not necessarily constitutional obligations. Similarly, charges arising from petty conduct are not included. To cite just one example in Sister Kisling's case, the allegation that she misused resources of the Local by causing it to incur the expense of a re-booked flight for the Director of Organizing after his employment was reinstated, Tr. 2 at 144-45, even if assumed to be true, simply does not rise to the level of financial malpractice or any other constitutional violation. Minor departures from established procedures are also not included in this discussion.

Moreover, to the extent that Sister Gayton alleges violations of officers' oath of office, Article 21, Section 3(2), and assuming she was referring to officers' installation obligations in the 2016 SEIU Constitution and Bylaws, I have duly considered these allegations in the context of the appropriate charges under the Local's Constitution and Bylaws and have taken them into account in this Report.

- The allegation that she wrongfully confiscated Brother Nguyen's computer and cell phone is subsumed in the discussion of her unacceptable conduct in Section 2(c) below.

Finding no probative evidence of financial misconduct, I recommend that the charges of financial malpractice and wrongful taking of property against Sister Kisling be dismissed.[9]

**2. Improper Personnel Actions. Article 15, Section 1(A)(4), (5); Article 7, Section 7(A)**

As discussed at length above, there is no question that the Constitution and Bylaws provide the President the authority to hire and fire, direct and assign, manage and supervise the staff of the Local on a day-to-day basis. Article 15, Section 1(A)(4) and (5). Nor is there any question that the Executive Vice President is accountable to the President and charged with reporting to her. Article 7, Section 7(A). Sister Gayton alleges that Sister Kisling violated these provisions by regularly attempting to direct staff; by retaining and directing another employee, Christina Breeden, after Sister Mancini had allegedly released her from the Local; and, more significantly, by wrongfully taking the opportunity while Sister Mancini was on vacation to terminate an employee on whom Sister Mancini relied heavily.

a. **<u>Regular Interference</u>.** It was virtually undisputed that the Executive Vice President was indeed regularly directing, instructing, and assigning staff. It was also clear that she and Sister Mancini were perennially locking horns on dealing with the staff, which had gathered into opposing camps. Although there can be no doubt that the Local's Constitution places the authority for daily management of staff with the President, such personnel matters of the kind raised in this proceeding do not ordinarily rise to the level of a chargeable course of conduct.

Instead, I interpreted the massive amount of testimony reflecting staff discord, partisanship, and possible misunderstandings as a reflection of the state of affairs in the Local generally. It reflected the inability or unwillingness of the leadership of the Local – that is, the President, the Trustees, and the Board members, as well as the Executive Vice President – to break out of their divisive cycle of allowing both major and petty differences to derail the effective functioning of the Local. This unhealthy syndrome is illustrated, to cite a few examples, by Sister Mancini's treatment of the Clark County and UMC bargaining committee members, Sister Kisling's treatment of the Director of Organizing and the Director of Communication, and the email described above, in which Sister Mancini instructed all staff not to accept direction from anyone but herself. Tr. 1 at 12, 24; Tr. 2 at 43, 122-27, 159.

In this environment, I find that the efforts of the Executive Vice President to direct staff may represent one element in the disruptive internal politics in the Local, but I do not believe that that they represent a violation of the Constitution.

---

[9] Although considerable testimony was devoted to the allegation that Sister Kisling misused her position as EVP to consult the Local's attorney about a personal disciplinary matter, that conduct was not specifically charged and is therefore not addressed in this Report.

b. **<u>Termination of Christina Breeden</u>.** Sister Gayton also charges that Sister Kisling wrongfully continued to employ part-time staff member Christina Breedon against the wishes of Sister Mancini in violation of Article 7, Section 7(a). This charge proceeds from an email Sister Breedon received from Sister Mancini on August 10, advising her that "after today, you will not need to report to work here at the Union hall until further notice from myself." Tr. 1 at 186-87, 201-202; Charge 2 Chg Ex. 11. For the next two weeks, Sister Breeden continued to work from home under the direction of Sister Kisling. Tr. 1 at 202-205.

This charge rests on Sister Gayton's inference that the August 10 email was a notice of termination. However, the email sent by Sister Mancini is not sufficient to establish the permanent dismissal of Sister Breeden, even if that was Sister Mancini's intention. Sister Breeden testified credibly that she had been told on previous occasions that she did not need to report to the union office – meaning that she should work remotely rather than physically in the union hall, not that she was no longer employed. Tr. 1 at 186, 204-205. Under those circumstances, it was not unreasonable for Sister Breeden to interpret the email advising that she did not need to "report <u>to the Union hall</u> until further notice from the President" (emphasis added) as direction to work from home instead of the hall until she was instructed otherwise. According to Sister Breedon, she "never had an understanding that [she] was not an employee" after that email. Tr. 1 at 193. For that matter, the email tells her to expect "further notice" from the President. At the time of the hearing, Sister Breedon testified that she still had not received further instructions or a formal notice of termination. Tr. 1 at 208.

To the extent that Sister Kisling authorized the payment of time cards from Sister Breedon during this time, hours of time actually worked were duly recorded and therefore payable by the Local. The charge that Sister Kisling authorized Sister Breedon to submit fraudulent time cards does not withstand scrutiny.

As to the question of whether Sister Breedon was properly paid for the time she continued to work, her claim for unpaid wages was pending at the Office of the Labor Commissioner at the time of the hearing. The hearing was not deemed the proper venue for resolution, and I defer to the State agency on that question.

c. **<u>Termination of the Director of Organizing</u>.** Sister Gayton also charges Sister Kisling with improper termination of Peter Nguyen, the Director of Organizing, in violation of Article 7, Section 7(A); Article 15, Section 1(A)(4) and (5) and Section 2(B); Article 21, Section 3(3). The facts relevant to this charge, which at their core are not disputed, are that on the afternoon of August 17, 2016, when Sister Mancini was on a two-week vacation in Hawaii, Sister Kisling sought Brother Nguyen out at the union hall and demanded to meet with him. Along with staff members Malesia Britt and Christina Breeden (supporters on Sister Kisling's side), they adjourned to the conference room, where Brother Nguyen advised Sister Kisling that he wished to have Executive Board member Amelia Gayton (a supporter of Sister Mancini) present. At the outset, Sister Kisling stated that she called the meeting to investigate concerns about his conduct and performance. Brother Nguyen objected to the presence of Sisters Britt and Breeden, and from there things escalated rapidly to the point where assistance of law enforcement was needed.

By way of background, it is no secret in the Local, and the evidence confirmed, that the relationship between Sister Mancini and Peter Nguyen is a close one and that Sister Mancini leans heavily on Brother Nguyen to carry out her policies in the Local. It is also common knowledge that the relationship between Brother Nguyen and Sister Kisling is severely strained, even hostile. But the attempted termination of Brother Nguyen in August goes beyond even the customary animosities between them.

Two aspects to this charge that Sister Kisling attempted to terminate Brother Nguyen must be addressed. The first is whether Sister Kisling was authorized to take that action. The second is the manner in which Sister Kisling conducted herself during this episode.

**(1) Authority to Take Action**. On the first question, I reiterate that the Constitution and Bylaws gives Local 1107 Sister Mancini responsibility for hiring, firing, assigning, and directing Local staff. The Constitution also authorizes the Executive Vice President to "serve in the absence of the President and perform Presidential duties at such time." Article 7 Section 7(B)(3). Management of employees, including terminating them, falls within the realm of "Presidential duties" so that it is the Executive Vice President's duty to exercise those duties in the absence of the President.

However, it must be emphasized that the "absence" of the President in this instance was a two-week vacation. No rational reading of the Constitution and Bylaws can stretch this provision to allow the second-in-command to completely inhabit the President's role every time she steps away from her office for a matter of days. Where a President is unable to perform her duties for an extended period of time – whether due to death, disability, or resignation – the provision can be invoked to achieve continuity and the orderly progress of the Local's operations during a prolonged absence. However, that rationale has no application to a transfer of authority away from the President simply because she is on a scheduled vacation. Further, in this case, the undisputed evidence was that Sister Mancini was accessible by phone and email and, indeed, was in contact with the Local as needed during her vacation.

Nor did Sister Kisling establish that any emergency or exigent circumstances compelled her to act on Brother Nguyen's employment at that precise time instead of waiting a few days for the return of Sister Mancini. Had Sister Kisling confronted an urgent situation, she would be on firmer ground in invoking the authority to take the contested action in Sister Mancini's stead. As it was, the inference seems unavoidable that Sister Kisling artificially seized the opportunity of Sister Mancini's brief absence from the office to achieve an ulterior goal – the removal of Brother Nguyen from the Local.

Moreover, any doubt Sister Kisling may have had concerning her authority should have been resolved, at least until the Executive Board could supply an interpretation of the Constitution pursuant to Article 18, by the advice she received from the Local's attorney that day. According to a memo that attorney Sean McDonald sent to Sister Mancini and Sister Kisling on August 17 at 5:32 p.m., they had separately contacted him that afternoon to seek his opinion on the authority of the EVP to terminate employees during Sister Mancini's vacation. Charge 3 Chg Ex. 10. His "nonbinding" opinion was that under the circumstances presented, the EVP did <u>not</u> have that authority.

The following day, August 18, with Sister Mancini still on vacation, Sister Kisling called an "emergency meeting" of the Executive Board for August 20, presumably relying on the authority of the President to call "special meetings" of the Board "as necessary." Article 7, Section 6(B)(2). Sister Kisling may have intended to obtain an interpretation from the Board under Article 18 that the EVP did have the authority to act while the President was absent for vacation. But for the same reason that she did not have the authority to effect the termination of an employee during this time, she lacked authority to call an "emergency meeting" of the Board before Sister Mancini returned a day later. Essentially, there was no emergency that required action at that precise moment. In any event, the "emergency meeting" was protested by some of the Board members, described as a "hijacking of the Executive Board" by one, and "dissolved" before any business was accomplished or any votes taken. Tr. 2 at 198-200; Charge 3 Chg Ex. 4 at 1-2.

In sum, Sister Kisling's actions in attempting to terminate Peter Nguyen amount to an abuse of her position and a blatant attempt to aggrandize to herself the authority of Sister Mancini long enough to rid herself of an individual staff member who had long been a thorn in her side. Such conduct cannot be countenanced.

**(2) Manner in Which Action Was Taken.** As to the second point, Sister Kisling compounded her offense against Brother Nguyen and, in fact, the entire Local, by the manner in which she effected her attempted termination. Sister Kisling accosted, hounded, berated, and threatened Brother Nguyen. Even without his testimony,[10] a picture emerged of an elected officer clearly enraged, out of control, and behaving so belligerently that local law enforcement was called to the office to restore the peace.

In addition to the two participants, at least seven officers or staff were in the office to witness Sister Kisling's appalling conduct, several of whom submitted written statements or gave testimony about the events and their effect on themselves. I draw on the testimony and written submissions of these witnesses, including Sister Gayton. They variously describe her as "yelling," "shouting," "out of control", verbally attacking Brother Nguyen, approaching "within inches" of him, putting her finger in his face, swinging her arms around, stomping, following him from one conference room to another to his office, trying to force herself into the room he occupied, and ordering him to "get out of my union hall."[11] According to her credible testimony, Sister Gayton twice physically inserted herself between the combatants out of a professed fear that Brother Nguyen was in danger of violence from Sister Kisling, and she was not alone in fearing physical harm. Charge 3 Chg 1 at 1(6); Tr. 2 at 186-87.

---

[10] Brother Nguyen was prevented from testifying in person by the pendency at that time of a temporary protective order (TPO) he obtained after the incident to prohibit Sister Kisling from being in the same room with him. I do not rely on his written statement in support of the Charge, Charge 3 Chg Ex. 1 at 8-11, so as not to deprive a charged party of the right to examine the witnesses against them. This Report does not express any opinion about the TPO itself or Brother Nguyen's professed need for protection, as those are for the court to resolve.

[11] Tr. 2 at 159, 165-67, 173-75, 185-87; Charge 3 Chg Ex. 1 at 5-7, 12-23 (six witness statements).

Before it was over, three staff members, two trustees and Sister Gayton had tried to intervene. Sister Kisling began to calm down after Brother Nguyen started recording her on his phone video. Tr. 2 at 187-88. Nevertheless, she confiscated Brother Nguyen's keys, phone, and computer before the police officer she had summoned arrived and escorted Brother Nguyen from the premises. Tr. 2 at 145, 175, 187.

Several staff members testified or submitted statements as to the effect of the events of August 17 on the staff. Although there were statements that the staff described themselves after the events as "okay" and did not appear to be scared or upset, Charge 3 Chg Ex. 1 at 30, 37, in their testimony and written statements, the witnesses described themselves as "very scared," "distraught," "confused and worried," "appalled," "extremely frightened," "shocked," "fearful" "very upset," and "visibly shaken." Tr. 2 at 165-66; Charge 3 Chg Ex. 1 at 13-20. Even allowing for partisan hyperbole, I have no trouble finding that Sister Kisling's tirade was disturbing to staff.

Altogether, I find that Sister Kisling's conduct regarding Brother Nguyen on August 17 constitutes usurpation of the role of the President, egregious bad judgment, and conduct unbecoming an officer in violation of Article 7(A) and Article 21, Section 3(3) of the Local's Constitution.[12] In view of her unauthorized exercise of presidential authority to terminate a staff member, compounded by her sustained abusive conduct toward that staff member, I recommend that Sister Kisling be removed from her position as Executive Vice President of Local 1107 effective immediately and barred from holding office in SEIU for a period of one (1) year. In addition, she should be suspended from membership in Local 1107 for a period of six (6) months. Finally, I recommend leadership training for Sister Kisling before she returns to any Local leadership position.

**D. Charges 5 and 6: Cherie Mancini against Sharon Kisling and Patricia Greaux**

In these charges, Sister Mancini alleges that Sisters Kisling (Charge 5 Chg Ex. 1.) and Greaux (Charge 6 Chg Ex. 1) violated Article 21, Section 3(7) of the Local's Constitution and Bylaws by advocating or engaging in dual unionism or secession. Sister Mancini further charges Sister Kisling with violation of Article 21, Sections 3(3) and (5) of the Local's Constitution and Bylaws, alleging that she exhibited gross disloyalty or conduct unbecoming a member and engaged in financial malpractice. Clearly, these are very serious charges that, if supported, would warrant serious consequences.

---

[12] I do not separately discuss the alleged disruption of operations in the aftermath of the events of August 17, such as the failure of staff to perform certain duties (*e.g.*, cancellation of a bargaining team training and several meetings with members and stewards, interference with efforts to organize leave time donations). Although they were an unfortunate byproduct of the incident, I do not find that they separately constitute "gross inefficiency" within the meaning of the Constitution and Bylaws or the officers' oath not to harm members. Article 21, Section 3(4).

**1. Dual Unionism or Secession.**

It is not disputed that there was agitation at UMC for members to drop their SEIU membership, seek the decertification of SEIU as bargaining representative, and/or to join another "association." Information and notices about those efforts were "rampant" and "all over the hospital," a matter of common knowledge. Tr. 2 at 86-87, 278-79. Those efforts included the establishment of a website advocating decertification of SEIU and promoting the Clark County-UMC Public Employee Association (referred to in this Report as the "secession web site"). Tr. 227-29, 261, 275-57; Charge 6 Chg Ex. 1. It was not established at the hearing which, if any, members were behind these efforts or who supported them.

Sister Mancini implicates Sister Kisling in the secession efforts based on the appearance on the secession web site of a copy of Sister Kisling's letter dated September 9, setting forth her charges against the President and two trustees (Charge 2). The inference that Sister Kisling is the only person who could have posted her charges of the web site is sheer speculation, given how many individuals had access to the September 9 letter and to the web site. Tr. 2 at 260–268. There was no direct evidence linking Sister Kisling, who vehemently denied the charge, to the posting. To the contrary, the only evidence at the hearing specifically addressing this question was the testimony of Vice President Marzan that she was told by the previous and disaffected Local 1107 President and former SEIU member, Martin Bassick, that he had developed the web site. Tr. 2 at 84-98: 275-76.

As to Sister Greaux, the inference that she must have participated in the secession efforts relies on her prominence on the UMC bargaining committee and her failure, as a Chief Steward at UMC, to communicate the decertification activity underway at UMC to Sister Mancini. This inference is not supported by more than Sister Mancini's speculation and suspicion of those that oppose her leadership.

The evidence does establish that Sister Greaux did not bring to Sister Mancini's attention the significant decertification efforts at UMC. Tr. 2 at 278-79. However, this fact, without more, does not establish Sister Greaux's involvement in secession efforts. Although I do not in any way condone a failure on the part of any experienced steward to convey to a union president the threat of a decertification effort, even when that threat is widely known throughout the facility, it is quite clear that communication between Sister Mancini and Sister Greaux was minimal or even hostile. Tr. 1 at 98, 148. The failure of Sister Greaux to directly advise Sister Mancini of decertification efforts at UMC is evidence of the very troubling internal politics and breakdown in communication on the Executive Board and within the Local – for which Sister Mancini shares responsibility. It is not sufficient evidence that Sister Greaux was herself engaged in secessionist activity.

Regarding the petition to the International President, it is no violation of the Constitution and Bylaws for members to seek the intervention of the International Union to redress a perceived injury. Sister Greaux's participation in that petition is not relevant to the charge of dual unionism in the absence of any evidence that Sister Greaux was responsible for the secession documents or the website itself. Moreover, the claim that the petitioners criticized the lack of response from the International President does not appear to me to be either defamatory or relevant to the charge.

In sum, these charges are not supported by probative or substantial evidence. I recommend that this portion of Charges 5 and 6 against Sister Kisling and Sister Greaux be dismissed.

### 2. Alleged gross disloyalty, conduct unbecoming, and financial malpractice

Sister Mancini's charges of gross disloyalty and conduct unbecoming a member against Sister Kisling arise from an incident in October 2016 in which Sister Kisling was observed passing to a steward at the Government Center a petition to recall Sister Mancini as President, along with an allegedly "very slanderous" statement about Sister Mancini and Brother Nguyen. The evidence developed at the hearing demonstrated that there was some confusion about the distinction between a recall petition (which is not a subject of this charge and would not violate the Constitution and Bylaws) and a secession petition (which is and does). Once it was established that what Sister Kisling gave to the steward was a petition to recall the President, this charge essentially was moot.

As to the financial malpractice allegations, Sister Kisling is accused of handing out the petition while she was on union bank time and permitted to engage only in official union business. Sister Kisling testified credibly, however, that she was waiting for the start of a stewards meeting, which, as it happens, had been re-located to another site without notice to her. Tr.1 at 149-50. Therefore, her action in handing a petition to one steward while she was waiting for the meeting, even if she was on union bank time, must be considered incidental and woefully insufficient to support a charge of financial malpractice.

Finally, the statements that Sister Mancini deems "very slanderous" appear to represent Sister Kisling's opinion of the reasons why a recall effort was justified rather evidence of gross disloyalty or conduct unbecoming a member. Union officers and members must have wide latitude in expressing their views – especially on a matter as important as the leadership of the local – and must not be constrained because another member or officer may disagree with them, even vehemently, or be offended. A union president may understandably dislike criticism, but it is necessary for her to suffer the opinions and views of members who oppose her for the sake of the robust debate that is essential to protect and promote Local Union democracy.

Accordingly, I recommend that the remainder of Charge 5 against Sister Kisling should be dismissed.

## III. SUMMARY AND CONCLUSION

Pursuant to her authority under Article XVII, Section 3(f) of the SEIU Constitution and Bylaws, SEIU International President Mary Kay Henry appointed me to conduct a hearing on consolidated charges filed against officers of SEIU Nevada, SEIU Local 1107. Having conducted the appropriate proceedings and reviewed the extensive record in this matter, I submit this Report and Recommendations.

A summary of my Recommendations follows:

| | |
|---|---|
| **Charge 1**<br>James Kirkpatrick (member) v. Richard Hodgson (Executive Board Member) | I recommend that the Charge be **dismissed** for the Charging Party's failure to pursue it. |
| **Charge 2**<br>Sharon Kisling (Executive Vice President) and Clara Thomas (Trustee) "on behalf of the majority of the members of SEIU Nevada Local 1107's executive board" v. Cherie Mancini (President), Alfredo Serrano (Trustee), Deb Springer (Trustee)<br><br>and<br><br>**Charge 4**<br>Brenda Marzan (Executive Board Member) v. Cherie Mancini (President) | • I recommend that the charge that Cherie Mancini violated Article 8, Section 2(C) of the Local 1107 Constitution and Bylaws by failing to submit employment and services contracts to the Executive Board for approval be **sustained** and that Sister Mancini be given a reprimand and required to undertake leadership development training if and when she serves as an officer of Local 1107.<br><br>• As to the charge that Sister Mancini violated Article 7, Section 6(B)(5); Article 16, Sections 4 and 6 of the Local's Constitution and Bylaws; and Article XVII, Section 1(3) of the SEIU Constitution (which has its counterpart in Article 21, Section 3(3) of the Local 1107 Constitution and Bylaws) by the manner in which she turned on the UMC Bargaining Committee, effectively removed them from their bargaining duties, and widely disseminated unfounded, grossly disloyal, and disparaging allegations against the members of the Committee, I recommend that the charge be **sustained** and that Sister Mancini be removed from office effective immediately and barred from holding office for a period of one year and that she be suspended from membership in Local 1107 for a period of six months.<br><br>• I recommend that all other charges against |

| | |
|---|---|
| | Sister Mancini be **dismissed.**<br><br>• I recommend that the charges against Trustees Serrano and Springer be **dismissed.** |
| **Charge 3**<br>Amelia Gayton (Executive Board Member) v. Sharon Kisling (Executive Vice President) | • As to the charge that Sister Kisling violated Article 7, Section 7(A); Article 15, Section 1(A)(4) and (5) and Section 2(B); and Article 21, Section 3(3) of the Local 1107 Constitution and Bylaws by her unauthorized exercise of presidential authority to terminate Director of Organizing Peter Nguyen in a manner that was abusive, grossly disloyal and unbecoming an officer, I recommend that the charge be **sustained** and that Sister Kisling be removed from office effective immediately and barred from holding office for a period of one year and that she be suspended from membership in Local 1107 for a period of six months. Finally, Sister Kisling should be required to undertake leadership development training before she returns to office in Local 1107.<br><br>• I recommend that all other charges against Sister Kisling be **dismissed**. |
| **Charge 5**<br>Cherie Mancini (President) v. Sharon Kisling (Executive Vice President) | I recommend that all charges against Sister Kisling be **dismissed.** |
| **Charge 6**<br>Cherie Mancini (President) v. Patricia Greaux (Executive Board Member) | I recommend that all charges against Sister Greaux be **dismissed.** |

On a personal note, I would add that I have also submitted a Report to President Henry on the internal needs of Local 1107 this date. It is my sincere hope that for the sake of its members, Local 1107 will address its long-standing dysfunction successfully and find a path to a more united and constructive future.

Carol Nieters, Hearing Officer
April 26, 2017