# EXHIBIT 5

## (Internal Needs Report and Recommendation)

**SERVICE EMPLOYEES INTERNATIONAL UNION**

| | | |
|---|---|---|
| **In the Matter of the Internal Needs of SEIU Local 1107** | ) | **Carol Nieters, SEIU Vice President Hearing Officer** |

**REPORT AND RECOMMENDATIONS TO THE**
**<u>INTERNATIONAL PRESIDENT ON THE INTERNAL NEEDS OF SEIU LOCAL 1107</u>**

## I. INTRODUCTION AND PROCEDURAL BACKGROUND

Pursuant to Article VIII, Section 7(g) of the SEIU Constitution and Bylaws, I was appointed by SEIU International President Mary Kay Henry as Hearing Officer to hear and make recommendations on the internal needs of SEIU Local 1107 ("Local 1107," "Local Union" or "Local"), and on what, if any, remedial actions should be implemented by the International Union to ensure effective democratic governance at the Local, promote and protect the interests of Local 1107 members, and build power for working people in Nevada. The hearing was conducted on October 29, 2016. (Hearing Officer Exh. 3).[1] The hearing was open to Local 1107's officers, Executive Board members, and members. Twenty-four witnesses presented testimony in person and several people submitted post-hearing statements on the internal needs of the Local Union. In formulating the recommendations contained in this report, I also considered relevant evidence that I received in connection with the hearing that I conducted on internal charges filed against several Local 1107 members on October 29-30, 2016, as requested by President Henry pursuant to her authority under Article XVII, Section 2(f) of the SEIU Constitution.[2]

President Henry appointed me as Hearing Officer to conduct a hearing on the internal needs of Local 1107 after she received numerous communications from Local 1107 members during the summer and fall of 2016 indicating that the democratic process and basic governance of Local 1107 had broken down, that the Local Executive Board was incapable of functioning and that divisions among various factions in the Local were impeding the Local's essential work. At the hearing and in the correspondence received

---

[1] Exhibits entered into the record during the internal needs hearing are identified as: "Hearing Officer Exh. __" or "[Member's Last Name] Exh. ___." References to the transcript of the internal needs hearing are identified as "Tr. Day 1 at [page number(s)]".

[2] My Report and Recommendations to the International President on the Local 1107 Internal Charges is incorporated herein by reference. References to the transcript of the internal charges hearing are identified as "Tr. Internal Charges Day 1 at [page number(s)]" or "Tr. Internal Charges Day 2 at [page number(s)]" as appropriate. Exhibits entered into the record during the internal charges hearing are identified as: "Hearing Officer Exh. __ (Internal Charges)" and exhibits submitted with written charges or responses thereto are identified by charge number and the party submitting them, for example, "Charge 1 Chg Ex. 3." "Chg" refers to Charging Party; "Chd" refers to Charged Party.

from Local 1107 members in advance of the hearing, Local members requested guidance and assistance from the International Union with the problems being experienced at the Local. (Hearing Officer Exh. 3).

It was clear from both the internal needs and internal charges hearings that Local 1107 has suffered a breakdown in internal union governance and democratic procedures that has interfered with its ability to serve its members and properly negotiate and enforce its collective bargaining agreements. Without immediate intervention, the Local Union will remain in crisis at the expense of its membership. Because the circumstances as they were presented to me at the hearing fully justify the imposition of an emergency trusteeship, I recommend that President Henry consult with counsel and consider that course of action.

## II. FINDINGS OF FACT

Local 1107 is a local union with passionate, engaged members and elected representatives, with a proud history, and with immense potential for success. The twenty-four members who spoke during the internal needs hearing expressed their deep concerns regarding the internal governance and current functioning of the Local, but they also forcefully expressed their pride in and passion for their Local and a desire to see it flourish.

### A. Serious Breakdown in Internal Union Governance and Democratic Procedures

The record clearly demonstrates that there has been an on-going and serious breakdown in internal union governance and democratic procedures at Local 1107 for some time, stemming from conflicts among warring factions on the Local Executive Board.[3] While different views were expressed about who bears ultimate responsibility for the current conflicts, all parties seem to agree that the persistent infighting has been interfering with the Executive Board's ability to function in a democratic manner for some time. Moreover, the inability to maintain order and resolve even routine conflict prevents Local 1107's leaders from completing the core work that Local 1107's members have elected them to do.

The hearing record indicates that Local 1107's Executive Board meetings regularly deteriorate into chaotic, bitter confrontations; indeed, name calling and shouting matches appear to be commonplace. At other times, elected leaders on one side or the other of a dispute have chosen to leave a board meeting in order to deprive the remaining Board members with whom they disagree of a quorum to vote on an issue in dispute. This pattern not only hobbles the governance of the Local but also deprives Local 1107 members of meaningful participation in the business of their union. During the hearing, Local 1107 members testified about the extensive dysfunction that characterizes the Local's Executive Board Meetings and how it harms the Local and its members. Some of that testimony is detailed below.

---

[3] These factions appear to be divided along sector lines, with one side consisting of public sector members and leaders and the other of healthcare sector members and leaders.

Brenda Marzan, a current Local 1107 Executive Board member who has been a member of the Local since 1988, testified that in many months the Board cannot complete its meetings, preventing the Local from managing its business and, ultimately, harming the members:

> The inability to get through our monthly Executive Board meetings [is] preventing us from doing the business of the local. The meetings have become abusive. There is profanity, name calling across the table, interruptions throughout each report and such a tug-of-war on each item that what should be a simple discussion and vote turns into a 30-minute war. I do not believe that over the last year we've gotten through an entire agenda. This demonstrates our inability to govern ourselves. The members' needs are not being fulfilled. …
>
> When we are not fulfilling the obligation of the representation to our members, and human resources and management reach out to the officers asking for our help, it is a very bad day. When over 50 percent of the hearings are rescheduled due to the inability to communicate between the hall and elected officials and stewards, we're doing an injustice, and not only to the members needing our help, but to the Local as well. I have never been involved with a more unprofessional organization. I'm begging for help. Unfortunately, I have looked a lot at trusteeship, and I think that's the only answer to this at this point.

(Tr. Day 1 at 35-37).

Sheila Grain, a Clark County employee and elected Treasurer of Local 1107, testified about the chaos at Board meetings. She said that meetings deteriorate to the point of shouting and emotionally charged interactions between Board members. For example, at the July 2016 Board meeting, the Board did not complete its business because of the meeting's lack of order, which Sister Grain explicitly attributed to Local 1107 President Cherie Mancini's failure to control the Board meetings. In addition, at the October 2016 Board Meeting, the financial reports were not reviewed or approved because of chaos and confusion and failure to adhere to the meeting agenda. (Tr. Day 1 at 12-14).

Patricia Greaux, Chief Steward of Ancillary at University Medical Center ("UMC"), testified to the "unprofessionalism" of Board members and asserted that President Mancini has participated in and instigated such behavior:

> At this E-Board, it's been totally unprofessional. You have people wanting to fight each other, cussing each other out, in each other's faces, which is totally unprofessional. And you have the President of Local 1107 also participating in that type

> of behavior. How can she run any local when she's part of that problem also? …
>
> As E-Board members, we have forgotten that we were the elected officials to represent every shop that is part of Local 1107. And that's why I'm asking for this to be trusteed from the International.

(Tr. Day 1 at 22-23).

Even President Mancini, who chairs the Executive Board meetings, admitted that at "[t]he last E-Board meeting, when the people who stood up here and talked didn't like what [they] heard, they decided they would get up and leave." Although President Mancini denied that this amounted to dysfunction because a quorum remained, the incident is part of a pattern that makes effective self-governance impossible—as shown by meeting minutes submitted by President Mancini following the hearing. (Tr. Day 1 at 73:20-26). For example, the October 28, 2015 Board Meeting Minutes reflect that there was no quorum to vote on Delores Boadie's contract. And the August 31, 2016 Meeting was not adjourned by motion, rather it dissipated and collapsed due to what the minutes describe as "situations."[4]

### B. Leadership Conflicts Cause Instability and Interfere with Local 1107's Ability to Carry Out its Collective Bargaining Responsibilities Properly and Effectively

The leadership conflicts in the Local are at the root of a pattern of instability and uncertainty that interferes with Local 1107's ability to carry out its most basic collective bargaining responsibilities properly and effectively. President Mancini's supervision of bargaining at UMC, one of Local 1107's largest and most significant employers, with over 3,000 represented workers, best exemplifies the breakdown in the Local's collective bargaining. The testimony showed that in July 2016, when Local 1107 members working at UMC were preparing to ratify the renewal of their collective bargaining agreement, President Mancini, who had not actively participated in the months-long bargaining process in spite of her constitutional obligation to do so,[5] nonetheless abruptly and unilaterally canceled the ratification vote by posting the cancellation on a public website. She did so without consulting the Bargaining Committee, and without regard for the fact

[4] President Mancini did not submit meeting minutes for all of the Board meetings between October 28, 2015 and September 28, 2016. No minutes were submitted for the March 2016, Board meeting. Additionally, some of the Board meeting minutes submitted were not dated.

[5] Under Article 16, Section 6 of the Local Constitution, the "authority to bargain collectively… [is] vested in a Bargaining Committee," and under Article 6, Section 6.B.5, the President, as spokesperson, is required to "actively take part in and stay informed of bargaining in all areas and to participate with the bargaining committees." (Hearing Officer Exh. 2).

that the affected members had already been notified of the date for the vote. (Tr. Day 1 at 19-23; Tr. Internal Charges Day 2 at 71-72). This episode is set forth in detail in my Report and Recommendations regarding the internal union charges against President Mancini.

In her cancellation notice, President Mancini announced that there would be an investigation into charges that the UMC Bargaining Committee had breached their fiduciary duty and failed to represent their members by agreeing to contract language that President Mancini found objectionable. (Tr. Day 1 at 28-29). In addition to violating her Constitutional duties as a member as set forth in my Report on the internal union charges, her conduct undermined the bargaining team's authority. President Mancini's unilateral actions caused bargaining unit members to question the judgment of the Bargaining Committee members, thereby damaging their reputations,[6] and her actions harmed all bargaining unit members by potentially delaying the implementation of hard-earned raises and longevity bonuses as provided for in the CBA that members were prevented from ratifying at that time.

Importantly, President Mancini's conduct signals to employers the union's lack of unity, thereby weakening the union's stature and damaging its ability to effectively advocate for and represent its members. Finally, although President Mancini eventually relented under pressure from members and leaders at UMC and the contract was ratified, the delay in ratification meant delayed longevity pay and raises for Local 1107 members. (Tr. Day 1 at 24).

The hearing record creates little doubt that the conflicts between the public and healthcare factions, which have been simmering for many years, have reached a boiling point, and have culminated in a set of actions and a pattern of conduct that is preventing the union from carrying out its most basic representational and collective bargaining duties.

### C. Failure to Adequately Communicate with the Membership Interferes with Local 1107's Collective Bargaining Responsibilities

In addition to the problems caused by conflicts among leadership, a wider communication breakdown in the Local has interfered with the ability of members and leaders to carry out their collective bargaining duties properly. The Chief Steward at Dignity Health, Krystal Shen, complained that the lack of effective communication in the Local has impeded her ability to perform her steward duties:

---

[6] One bargaining team member, Elizabeth Bolhouse, testified that President Mancini's public cancellation of the vote "was an embarrassment to me and also defamed me." (Tr. Day 1 at 28). She said that, as an attorney licensed to practice in Nevada, she was particularly nervous that President Mancini's claim that the bargaining team had breached their duty to represent their members would put team members at risk legally. (Id.)

> It's pretty much the same complaints that I have had for so long, a lack of communication. I actually find out more from my members than I do from my union. The information comes to the union. It's their responsibility to let us know, and it's just not happening. When I complain, I'm met with hostility and retaliation. It got so bad where I actually started sending members to the hall to let them tell their story because they didn't want to listen to me. I even had to have a meeting with members present to let them know what was going on with one of the staff members in which a roomful of members came to that meeting with [the] previous president, Martin [Bassick], to tell them that there was no support….
>
> I'm left at my shop basically with no help. I can't get any help from people at the union. I don't get a call back. If I write an e-mail or complaint, I get no response. So I've been left to pretty much just write grievance after grievance after grievance. … [W]hen you have validity to the complaints, something needs to be done. I mean, there's paper trails, but they don't go anywhere. And instead, we're just left by ourselves, not able to give a presentation to the members because we have no support.

(Tr. Day 1 at 29-31).

To support her claims, Sister Shen submitted e-mails showing that she had attempted to communicate with leaders of the union, but did not receive responses adequate to enable her to execute her representation responsibilities. (Shen Exh. 1). And, although the union continued to hire more staff, Sister Shen di not get the help she needed to represent herself and her colleagues. She did say, however, that Executive Vice President Sharon Kisling offered to help her work through grievances. (Tr. Day 1 at 29-31).

Sister Shen submitted for the record a letter from a member in her bargaining unit (Catherine McKendrick) in which Sister McKendrick complained that, during a contract ratification vote held last year, she learned about the vote only when she happened to see handmade signs about it hanging on the walls at work; she had not received an e-mail or any other notification of the vote. She said that when she asked to review the proposed contract, she was told that she could not take a copy of it with her because the language had not been finalized and, when she read the contract, she found errors in the proposal pertaining to raises:

> The percentages listed were much higher than what was actually negotiated. … I am sure that many people voting did not know this and took the contract at face value. It was nearly a year later before we actually got a copy of the final contract. During this time there [were] no contracts available to

> determine seniority for reduction in force situations, among other things. I am dismayed that our local leaders asked us to vote on a fluid document and then did not even insist on the final version for almost a year. … [Shen's] efforts to represent members are met with contempt. … Why do our senior union leaders act so threatened by someone who is concerned about preserving the rights of our members?

(Shen Exh. 1).

Sister Marzan, long-term member and Executive Board member, testified about not receiving information about the job classifications within the bargaining unit that she represents or receiving information so late that it resulted in the untimely performance of her duties as a steward. (Tr. Internal Charges Day 2 at 149-153, 155-156; Charge 2 Chg Exh. 6; Charge 2 Chg Exh. 7; Charge 4 Chg Exh. 3). Sister Marzan testified and submitted evidence regarding difficulty that she had communicating with union leadership, especially President Mancini. (Charge 4, Chg Exhs. 3, 5, 7 (Email from UMC stating that they had tried several times to reach President Mancini regarding the cancellation of the CBA ratification vote), 13 (emails between Patricia Greaux and President Mancini regarding UMC)).

In addition, Sister Grain, the local Treasurer, testified that President Mancini unilaterally changed the location of steward meetings without notifying all of the stewards, which prevented stewards from participating in monthly meetings as required by the Constitution and Bylaws. (Tr. Day 1 at 12).

### D. Inadequate Communication Impeded Staff Oversight and the Work of the Local, and Runs Afoul of Democratic Procedure

The record also shows that inadequate communication has caused confusion and impeded staff oversight. Christina Breeden, who worked at the Local's front desk performing administrative functions, testified that she worked for the Local until August 10, 2016 when she "received an e-mail letter from Cherie Mancini that said that I would no longer be needed at the hall. I was asked to do work for Sharon Kisling after that, which was not uncommon for me to do. And I did that for two weeks following that. I have not received a termination letter. So I'm still not aware of what my status is with SEIU, and I have not received my last check." (Tr. Internal Charges Day 1 at 186:7-14).

She also testified that "Peter kept saying I was a terminated employee, and there was a later e-mail that Cherie had sent to me that acknowledged that I was still an employee. And I never had an understanding that I was not an employee. That's what really led to this big escalation." (Tr. Internal Charges Day 1 at 193:15-23).

Maleisa Britt-Williams, who also worked at the Local's front desk performing administrative functions, testified that it was not clear from whom she was to receive instructions. "Direction came from just about everyone else that was full time. So as a part-time staff, your direction came from everyone. And your consequences came from

everyone. I didn't feel like there was a governing system as far as [a standard operating procedure], so I didn't necessarily know how I was protected so, yeah." (Tr. Internal Charges Day 1 at 216:1-7).

Indeed, neither President Mancini nor Executive Vice President Sharon Kisling denied the communication breakdowns in the Local. And some of their testimony demonstrated how they each have contributed to the dysfunction, and demonstrated that it extended to staff oversight as well. Some examples are given below.

President Mancini admitted to instructing all Local officers to seek approval from her before giving Local staff direction or an assignment. (Tr. Internal Charges Day 2 at 43).

> [On] July 14th . . . I provided an interoffice memo in regards to direction given by staff. And that's based upon the fact that Sharon Kisling was calling in every day to the part-time people and basically giving them instruction in what she wanted them to do. …
>
> [The July 14] memo was "effective immediately, any direction given by an officer of the union must be approved by the President before the assignment is completed."
>
> [T]his was just based upon the fact that there was extra duties being done that were tak[ing] away from what the duties were of the hall.

(Tr. Internal Charges Day 2 at 43).

Sister Mancini explained that, in her estimation, this instruction was given in response to Sister Kisling assigning Local staff extra duties that were detracting from the union's business. (Id.). Sister Kisling routinely tried to direct and assign staff so that, in her contrary estimation, work to meet the needs of the members would get accomplished. Sister Mancini, rather than working with her sister officer to resolve this recurring conflict, attempted to regain control by sending the aforementioned email to all staff on July 14th.

According to Trustee Clara Thomas, "[Staff] are told not to do anything or answer any questions from elected officials unless President Mancini or Peter [Nyugen] gives permission." (Tr. Internal Charges Day 1 at 128:25–129:4).

For her part, Sister Kisling admitted to calling an emergency Executive Board meeting while President Mancini was on vacation (Tr. Internal Charges Day 2 at 197-202), which I concluded in my Report on the internal union charges she lacked the constitutional authority to do.

Adequate and effective communication is necessary for the proper and efficient functioning of the Local. Without such, staff are left without clear direction on the work

duties they are required to perform, to whom they should report, and from whom they will receive feedback. This type of confusion detracts from staff expending resources and energy working towards the goal of serving the membership.

Equally important, as I have set forth elsewhere, a leader attempting to funnel all activity of the Local through one individual runs counter to the democratic processes that the membership preserved in their Constitution and Bylaws. Indeed, as a practical matter, if officers are not allowed to direct staff without the President's authorization, one may fairly presume that when the President is unavailable for any amount of time, no work at all may be performed on behalf of a local's members.

The testimony outlined above demonstrates the utter breakdown in communication within the leadership and the chaos and confusion that that breakdown created with respect to staff supervision and effective and efficient operation. A local's democratic processes and governance cannot and should not function in this way.

### E. Executive Vice President Usurped Constitutional Authority of President

As detailed in my Report on the internal union charges, Sister Kisling violated the Local Union Constitution by usurping President Mancini's authority to hire and fire Local staff when she attempted to terminate a Local staff person while the President was on vacation, further undermining democratic governance in the Local.

The running undercurrent of discord concerning staff came to a head on August 17, 2016, while Sister Mancini was on a two-week vacation in Hawaii. That afternoon in the union hall, Sister Kisling sought out Peter Nguyen, the Director of Organizing, and demanded to meet with him about certain issues she had with his job performance. The meeting, which was witnessed by at least seven staff members, began as a confrontation and escalated to the point of where Brother Nguyen was terminated and law enforcement was summoned.

There is no debate that the Local 1107 Constitution and Bylaws provides the President with authority to hire, fire, assign and direct the Local's staff, in consultation with the EVP and subject to the staffing levels and policies set by the Executive Board. (Article 15(A)(4) and (5); Article 8(2)(B) and (C)). Sister Kisling does not dispute the authority of the President to terminate an employee, but she relies on Article 7 Section 7(B)(3), which authorizes the EVP to "serve in the absence of the President and perform Presidential duties at such time," to justify her assuming the role of President on August 17.

It must be emphasized that the "absence" of the President in this instance was a two-week vacation. No rational reading of the Constitution and Bylaws can stretch this provision to allow the second-in-command to assume full authority over the operations of the Local every time a President steps away from her office for a matter of days. Where a President is unable to perform her duties for an extended period of time – whether due to death, disability, or resignation-the provision would make more sense as a means of ensuring continuity and order in the Local's operations. However, that rationale does not

justify a transfer of authority away from the President simply because she is on a scheduled vacation. Further, in this case, it was clear that Sister Mancini was accessible by phone and email and, indeed, was in contact with the Local as needed during her vacation.

Nor can Sister Kisling claim that any emergency or exigent circumstances compelled her to act on termination at that precise time instead of waiting a few days for the return of Sister Mancini. It appears instead that Sister Kisling seized the opportunity of Sister Mancini's vacation for the purpose of removing Brother Nguyen, on whom Sister Mancini relied to carry out her policies in the Local and with whom Sister Kisling had long been at odds. In doing so, Sister Kisling created confusion and uncertainty about who in fact was the rightful president of the Local Union.

Further, the manner in which Sister Kisling conducted herself during this incident compounded the disruption in the Local. According to the Charge that was filed by Executive Board member Amelia Gayton, at least seven officers and staff members, including Brother Nguyen, described Sister Kisling as "out of control" and behaving so belligerently that local law enforcement was called to the office to restore the peace. (Tr. Internal Charges Day 2 at 177, 187). In their own words, the witnesses observed Sister Kisling "yelling," "shouting," verbally attacking Brother Nguyen, approaching "within inches" of him, putting her finger in his face, swinging her arms around, stomping, following him from one conference room to another to his office, trying to force herself into the room he occupied, and ordering him to "get out of my union hall." Sister Gayton twice physically inserted herself between the combatants out of fear that Sister Kisling would do violence to Brother Nguyen. Before it was over, three staff members, two trustees, and Sister Gayton had tried to intervene. Sister Kisling began to calm down after Brother Nguyen started recording her on his phone video, but she maintained that he was no longer working for the Local, confiscated his keys, phone and computer, and saw him escorted from the premises by the police she had called. (Charge 3 Chg Exh. 1).

The following day, Trustees Clara Thomas and Alfredo Serrano called an all staff meeting to discuss the incident. It does not seem to have allayed the fear and suspicion that had developed among the staff.

Meanwhile, with Sister Mancini still on vacation, Sister Kisling - again relying on her assertion that she had the authority to perform the duties of the President in Sister Mancini's absence - called an "emergency meeting" of the Executive Board for August 20. (Article 7, Section 6(B)(2) authorizes the President to call "special meetings" of the Board "as necessary.") (Charge 3 Chg Exh. 4). If Sister Kisling intended to obtain the Board's agreement that the EVP had the authority to terminate an employee while the President was on vacation, she was acting too late, having already moved to terminate Brother Nguyen's employment. Moreover, it is difficult to locate any "emergency" that required a meeting the day before Sister Mancini was due back.

Members of the Board were understandably confused about the purpose of the "emergency meeting" and the emergency that justified it. It was protested by some of the Board members and described as a "hijacking of the Executive Board" by one. In what was

clearly a contentious and chaotic meeting, no agenda was presented, no business conducted, and no minutes taken before the meeting disbanded. (Charge 3 Chg Exh. 3).

There is no justification, in the Local's Constitution or elsewhere, for the events of August 17 and 18.

And the subsequent "emergency" board meeting seems to have made matters worse. No resolution of the question of Sister Kisling's authority or shared understanding of why the Board was called into session was reached; hostilities between Sister Kisling and Sister Mancini were fully on display; and the meeting only heightened the divisions within the Board and unsettled the democratic underpinnings of the local's functioning.

Several staff members described the events of August 17 and 18 as "frightening," "shocking" and "appalling." (Charge 3 Chg Exh. 1). Four or five grievances were filed by staff members against Sister Kisling, and Brother Nguyen successfully sought a protective order that barred Sister Kisling from entering the Local Union's office or being within a certain distance from him personally. It is hard to imagine how the needs of the members can be served in a local that has lost its way so fundamentally and is as demoralized and destabilized as Local 1107 is described by its members.

The attempted usurpation of August 17, 2016, and its aftermath contributed to a breakdown of democratic procedure and instability in the Local. Indeed, it is plain that the Executive Board is at times so entrenched in the Mancini versus Kisling camps that it cannot conduct business or even see its required meetings through to successful completion. It further appears that Local staff are substantially divided into the same camps and are at a loss to know who is in charge of what or accountable to whom.

As detailed elsewhere in this report and in my Report on the internal union charges, President Mancini believed that it was appropriate to require all work of the staff be authorized and supervised by her alone and that she could run the Local single-handedly or, at best, with a small cadre of favored staff. For her part, EVP Kisling believed she could exercise the full authority of the presidency if the President was on vacation but in contact with the Local, and attempted to seize the occasion of the President's vacation to accost and attempt to terminate an employee she disliked, resulting in a thoroughly demoralized staff and a court order preventing a key local leader and staff member from even being in the same room with each other.

### F. Local Constitution and Bylaws Contains Conflicting Provisions

While not an excuse for the conduct discussed here and in my Report and Recommendations on internal union charges, it is clear that the often conflicting provisions of the Local's Constitution and Bylaws concerning exactly what authority is held by the various Local officers and Executive Board members significantly contribute to the confusion around governance and democratic procedures. During the hearing, several members commented on the inadequacy of the Constitution and Bylaws. (Tr. Day 1 at 16). Even a superficial reading of the Constitution and Bylaws confirms this observation.

For instance, one constitutional provision states that the Executive Board approves staffing levels, compensation, and terms and conditions of employment for staff. Another provision states that the President shall hire and fire staff with prior consultation with the Executive Vice President and shall assign and direct staff. Yet another provision states that the Local President shall assign and direct staff "with prior consultation with the Executive Vice President on budgetary matters." A fourth provision provides that "[a]ll staff of the Local Union will work under the direction of the President, who has the authority to hire, fire, assign and supervise their work, pursuant to any staff-related policies adopted by the Executive Board."[7]

The existence of multiple, conflicting provisions on this subject is not unique; it is a problem that exists on multiple topics throughout the Local Constitution. A Constitution should be a local union's "rules of the road" for self-governance. In this instance, the rules not only do not help to clarify answers to important questions, they actually contribute to the ongoing conflict and confusion within the local. In an ideal circumstance, the elected leaders of the local union could embark on a project to revise and clarify their governing documents with the input of and in service to their members. Since the governing body of this Local can scarcely complete its regular business in executive board meetings, it is hard to imagine how it can engage in the kind of work, together and with SEIU members, to revise and improve its Constitution and Bylaws.

Further, the Local Executive Board does not, apparently, make use of the tools at its disposal to navigate conflicts that arise during Executive Board meetings. Specifically, the Local's Constitution incorporates Robert's Rules of Order as a procedural framework for conducting Executive Board meetings, but a review of Board meeting minutes shows that the Board does not rely on those rules to conduct their meetings.[8]

While they are not always "user friendly," Robert's Rules of Order, when deployed during a contentious meeting, can help to resolve some of the ambiguities and conflicts that arise from time-to-time in every democratic organization. (Tr. Day 1 at 33). It is not unusual, nor is it problematic, for a local union's elected leadership to express differing views, even in a heated and passionate manner, during an Executive Board meeting. But in the heat of disagreement, having a system by which the conversation is moderated can contain conflict before it reaches a boiling point and up-ends the entire gathering, as it apparently does so often at Local 1107.

## III. RECOMMENDATIONS AND CONCLUSION

Having carefully reviewed the hearing record, I have concluded that immediate intervention in the Local – ideally in the form of an International Union trusteeship – is

---

[7] SEIU Local 1107 Constitution, Article 8, Section 2 and Article 15, Sections 2, 4 and 5 (Hearing Officer Exh. 2).

[8] (Id. at Article 8, Section 8).

necessary to assure the performance of Local Union collective bargaining duties and functions, restore effective democratic procedures in the Local, protect the interests of the Local and the membership, and otherwise carry out the legitimate objects of the International Union.

It is clear from the testimony and evidence presented at the internal needs and the internal charges hearings that Local 1107 is a union in crisis. Because of the internal conflicts that have spilled over into the Local's governance and collective bargaining processes, the Local is not functioning effectively and is not carrying out its collective bargaining and other representational duties properly. In short, it is not able to conduct itself in a manner that protects the most basic interests of SEIU Nevada membership.

In addition, as detailed in my Report on internal union charges, local union officers and some Executive Board members appear to operate outside of established constitutional requirements. If Local 1107 members cannot rely on the structures and procedures created in the Local Constitution, there is no way for them to exercise their rights, participate in the democratic governance of the Local Union, and properly engage in the collective bargaining process with their employers.

The failure and inability of Local 1107 to function properly has had a negative impact on its membership. For instance, Sister Marzan lamented that responding to the crisis in the Local and preparing for the internal needs and internal charges hearings had distracted her from focusing on the impending elections and the union's political program:

> The members' needs are not being fulfilled. We are in the middle of an election that can make or break us. I, for one, am spending so much time on these hearings, e-mails, trying to take care of union business, covering the butt of the local, inciting [sic] with other members of the local and staff, that I extend no time phone banking, walking for candidates, canvassing, et cetera. This is itself is a disservice to the working class. We are not protecting our membership. … Our lack of a political program is a grave concern for me.

(Tr. Day 1 at 35-36).

It is my firm belief that without immediate and drastic intervention, the Local Union will remain in crisis at the expense of its membership. The circumstances fully justify the imposition of an emergency trusteeship, and I recommend that President Henry consult with counsel and consider that course of action. It is my belief that nothing short of a trusteeship can restore effective governing procedures in the Local, assure the performance of the Local's collective bargaining duties and functions, protect the interests of the Local and the membership, and allow the Local to become a high-functioning, democratic organization with leadership that encourages healthy discourse while moving Local 1107 forward.

I acknowledge that this is a very serious remedy that is warranted in cases, such as this, where elected leaders have seriously lost their way and are not able to protect their members from attacks on their union representation, advance their interests with employers, and/or conduct the business of the local union in conformity with the democratic principles of self-governance that its members have adopted.

I am confident in the resilience and resourcefulness of Local 1107's members. It is clear that they have built an incredible local of which they are very proud, and I believe they deserve the opportunity to engage with their union in the critical fights of our day – for justice and dignity in their workplaces and in our country – rather than being captive to leadership conflicts that overshadow their needs. It is my recommendation that a trusteeship be imposed to restore their ability to participate in a democratic local union and protect the standard for which they have fought so hard over the past several decades.

Respectfully submitted,

Carol Nieters /dP

Carol Nieters, Hearing Officer

Dated: April 26, 2017