# EXHIBIT A –

## Transcript of Proceedings, U.S. District Court, District of Nevada, June 7, 2017, Judge Andrew P. Gordon, Presiding

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| RAYMOND GARCIA, et al., Plaintiffs, vs. SERVICE EMPLOYEES INTERNATIONAL UNION, et al., Defendants. | Case No. 2:17-cv-1340-APG-NJK<br>Las Vegas, Nevada<br>Wednesday, June 7, 2017<br>Courtroom 6C, 9:06 a.m.<br>MOTION HEARING<br>O R I G I N A L |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

BEFORE: THE HONORABLE ANDREW P. GORDON, UNITED STATES DISTRICT JUDGE

APPEARANCES:

See next page

COURT REPORTER:

Heather K. Newman, RPR, CRR, CCR #774
United States District Court
333 Las Vegas Boulevard South, Room 1334
Las Vegas, Nevada 89101
(702) 471-0002

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

APPEARANCES:

For the Plaintiffs:

MICHAEL JULIAN MCAVOYAMAYA, ESQ.
4539 Paseo Del Ray
Las Vegas, NV 89121
(702) 299-5083

For the Defendants:

ROTHNER, SEGALL & GREENSTONE
BY: GLENN ROTHNER
JONATHAN MICHAEL COHEN
510 South Marengo Avenue
Pasadena, CA 91101-3115
(626) 796-7555

CHRISTENSEN JAMES & MARTIN
BY: EVAN JAMES
7440 West Sahara Avenue
Las Vegas, NV 89117
(702) 255-1718

LAS VEGAS, NEVADA; WEDNESDAY, JUNE 7, 2017; 9:06 A.M.

--oOo--

P R O C E E D I N G S

COURTROOM ADMINISTRATOR: All rise.

THE COURT: Thank you. Please be seated everyone.

COURTROOM ADMINISTRATOR: Raymond Garcia vs. Service Employees International Union, et al., 2:17-cv-1340-APG-NJK.

Counsel, please note your appearances.

MR. MCAVOYAMAYA: Michael Mcavoyamaya for the plaintiff.

THE COURT: Good morning.

MR. ROTHNER: For the defendants, Glenn Rothner and Jonathan Cohen, Rothner, Segall, Greenstone, and Evan James is our local counsel.

THE COURT: Good morning to the three of you.

MR. JAMES: Good morning, Your Honor.

THE COURT: I set this for a hearing on an expedited basis because there was a Motion for Temporary -- or Preliminary Injunction first. Obviously there was a TRO motion following that and I denied that given that this hearing was already set.

I have read through the filings and so, please don't repeat your arguments from the papers because I've gone through them, but if there are things you want to highlight or some issues you want to address, I'll let you go ahead and start

argument and I've got some questions I'll interrupt you with, but, counsel, you're first.

MR. MCAVOYAMAYA: Thank you, Your Honor.

Where would you like to start? Would you like to start on the Preliminary Injunction or the remand?

THE COURT: Let's deal with the remand first. The jurisdiction's got to take precedence. We'll deal with that first.

MR. MCAVOYAMAYA: Okay, Your Honor.

Jurisdiction -- subject matter jurisdiction in federal district court is not proper in this action because my client is not a labor organization -- or because Local 1107 is not a labor organization within the meaning of the Labor-Management Relations Act. The public employ -- the Labor-Management Relations Act defines an employer as -- as anyone who employs employees and includes an exception for any state or political subdivision thereof. That means that any employees that are employed by political subdivision of a state are excluded and any labor organization that represents employees that are public -- that are public employees of a state are excluded. Every time this public employee exclusion is raised under the Labor-Management Relations Act the ruling is always the same. There is no subject matter jurisdiction.

Defendants, in their opposition, they have not -- they addressed this clear jurisdictional defect in this case by

trying to do patchwork legal theory. They're trying to get the Labor Management Reporting and Disclosure Act an exception that -- under that act for mixed unions and they're trying to apply it to the removal under the Labor-Management Relations Act. This is impermissible. Every single time that this has been -- that this argument has been raised when a party has asserted lack of subject matter jurisdiction under the public employee exclusion, under the Labor-Management Relations Act, they have always ruled that you cannot use the exception in the subsequently enacted Labor Management Reporting and Disclosure Act as a basis to keep it in federal court. Thus, the only way that you can get in federal court is if you actually remove it under the Labor Management Reporting and Disclosure Act, which defendants did not do.

However, for the sake of argument, even if they did, it wouldn't apply here. In -- if you take a look at their opposition, in the Preliminary Injunction, on Page -- let's see, 3 -- oh, wait. No. No. It's going to be Page 2.

Sorry about that, Your Honor. I'm sorry.

On Page 1, at Line 10, "It is undisputed that Local 1107's Affiliation Agreement with SEIU specifically authorized Local 1107 to vote for imposition of trusteeship by SEIU and that Local 1107's Executive Board voted to do so."

What they're saying right there is an admission that this trusteeship was not imposed under the international

Constitution; this trusteeship was imposed under the Affiliation Agreement. The only provision of the LMRDA that could be considered even remotely applicable to this case is the trusteeship provisions of that act. That provision -- and I can quote you that right now -- is concerned solely with . . . sorry, Your Honor . . . it's concerned solely with the imposition of a trusteeship in accordance with the international union's Constitution.

Now, for this argument, even -- despite the fact that they didn't raise this argument on removal, even if they try to raise this argument now, it doesn't matter because if you're looking at the international union's Constitution, you must look at it as though the trusteeship provisions do not exist. And the reason why is because this union entered into their Affiliation Agreement, a separate document, aside from the international union Constitution and they expressly waived those provisions. So they don't exist. So there are no provisions under the international Constitution which would fall under the LMRDA. They can't use the exception for their LMR -- for the LMRA claims. Thus, subject matter jurisdiction in this case is completely improper.

I have numerous cases that I can give you, Your Honor, if you'd like to read them. I've printed them out with regards to application of this mixed union exception and the LMRDA. The ruling's always the same. There has never been

a single case in which the mixed union exception has been applicable to LMRA claims. So they had do it under the LMRA, they didn't do it properly, and there is no jurisdiction in this Court, Your Honor.

THE COURT: You would agree that both organizations, the international and the local, represent both public and private employees?

MR. MCAVOYAMAYA: That's correct.

THE COURT: Is Mr. Garcia a public employee or a private employee?

MR. MCAVOYAMAYA: I believe he is a private employee, Your Honor.

THE COURT: A private employee?

MR. MCAVOYAMAYA: Yes.

THE COURT: Yet that doesn't hurt your argument?

MR. MCAVOYAMAYA: No, it does not, because every single time -- I can go through the case law with you, Your Honor.

THE COURT: Well, I've read the cases that you've cited to and I don't know that they necessarily hold the way you do.

Let me ask you a slightly different question.

Has either side, at this point, invoked the arbitration clause of the Affiliation Agreement?

MR. MCAVOYAMAYA: No, Your Honor.

THE COURT: Do you agree with that, counsel?

MR. ROTHNER: Yes.

THE COURT: Okay. All right. I just wanted to make sure because that would potentially divest me of jurisdiction if there's an arbitration claim made.

All right. So you . . .

MR. MCAVOYAMAYA: I would like to turn the Court's attention to *Ayres v. International Brotherhood of Electrical Workers*. In that case, relying on public entity status, the plaintiffs had sued the public employer as well as their -- their union and the international union. All the defendants, not -- and the claims against the union, the two unions were pursuant to the Constitution -- to the union Constitution.

THE COURT: Okay.

MR. MCAVOYAMAYA: In that case, all defendants were dismissed because they raised the public union -- this public employee exception and . . . it was granted because the labor -- they are not labor organizations within the meaning of the Act. And in that case they were suing the International Brotherhood of Electrical Workers. That is a mixed union. They represent both public and private employees.

THE COURT: They were also suing a public employer; correct?

MR. MCAVOYAMAYA: I believe so, yes, but the -- the -- even if the employer was dismissed, it still would

have -- the jurisdiction still could have been conferred with the unions. And the unions were dismissed on top of that. And the same thing happened in *Paulsen vs. International Board of Teamsters*. Same thing, public employee exception is raised. It's a mixed union situation and the -- and the labor unions get dismissed.

In *Williams*, same thing. In *Hadley*. It's -- every single time this is raised, a labor organization that represents public employees is not with -- is not a labor organization within the meaning of the Act. That's the rule, Your Honor. And if -- if -- if defendants sought to use the -- the exception -- the mixed union exception under the LMRDA, they should have removed it under the LMRDA.

THE COURT: The cases you cite, for instance, *Richards* and *Pacific Marine* and *Cunningham* generally flow out of a dispute regarding the union's negotiation of a specific contract with a public employer. For instance, that certainly was *Richards* and *Cunningham,* where there's a dispute about the negotiations with -- in *Richards*, it was with the City, *Cunningham,* same thing. There was a dispute arose about the negotiations with a public employer. Here we don't have that; correct? Here we have a dispute between the local and the international about how the local was being governed, how it was running. It's an internal issue; correct?

MR. MCAVOYAMAYA: Um . . . yes, Your Honor.

THE COURT: Okay. And -- and so whether or not there were negotiations going on with the City, this problem would still exist; right? Because the union -- international came in and said president and vice president, two factions. We got a war -- internal war going on. We're going to come in and clean house, to use a bad term, but we're going to bring peace to the valley. We're going to put a trusteeship in place. We're going to get this house in order.

It had nothing to do involving a dispute involving negotiations with the City; correct?

MR. MCAVOYAMAYA: No, Your Honor.

THE COURT: That's wrong?

MR. MCAVOYAMAYA: No. I'm saying that that is correct, Your Honor.

THE COURT: Okay. All right. And so that's why I'm not sure that I agree that *Richards* and *Cunningham* and *Pacific Marine*, the other cases you cite are necessarily applicable because in those cases there is some relationship to a public employer related dispute.

I look at the statutory definition, these are two labor organizations. They both have employee participants. Both of them exist to bargain with employers. There's no public sector agreement being challenged in this case. Rather, the allegation is that the international has breached the Affiliation Agreement and that would be an agreement between

two labor organizations. And so, the dispute here seems to me different than those in the cases you cite and thus, I'm having a hard time seeing . . .

MR. MCAVOYAMAYA: Your Honor, if you take a look at the mixed union exception cases, those cases are brought under the -- those cases are brought under the union's Constitution.

THE COURT: Okay.

MR. MCAVOYAMAYA: Because they brought claims under both the LMRDA and -- let me see, let's take a look at *Bell*, was brought both under the LMRDA and the LMRA. This involved TriMet, which was a public employer, but the public -- the employee that sued was a private employee.

THE COURT: Okay.

MR. MCAVOYAMAYA: And they sued both the union and the employer and both were dismissed. And they tried to apply the mixed union exception to the LMRA -- RDA, the LMRA claims and it was dismissed anyway.

The same thing happened -- and I have that case if you'd like to look at it, Your Honor.

THE COURT: That's all right.

MR. MCAVOYAMAYA: Same thing happened in *Richards*.

THE COURT: I have looked at *Richards*.

MR. MCAVOYAMAYA: And *Cunningham*. Every time --- it has to do with the definition, Your Honor. If the union represents public employees, it's outside the purview. It's --

it's not within the definition. I mean, there's clear -- it's a clear rule. In fact, there was a case cited. I didn't use it extensively because it was a bit of a complicated issue involving the constitutionality of acts passed by a state legislature that they held were unconstitutional. It is -- sorry, Your Honor -- it's an Arizona case. Let's see . . . it's an Arizona Federal District Court case where they -- and this is a quote from the case when they're dealing with the fact that -- actually, SEIU was a partner to this. It was an SEIU local affiliate and when addressing that case, they -- they announced expressly the rule. "The LMRA expressly does not apply to public sector unions." That's the rule from the case. This is a public sector union.

THE COURT: It's a mixed union.

MR. MCAVOYAMAYA: It is a mixed union, but the mixed union exception falls under the LMRDA and every single case that has dealt with that rule has said that that exception is not applicable to LMRA claims. They've removed this under the LMRA, so the only way that they can get into federal court outside this public exception, public union exception is if they do it under the LMRDA and there is no claim under that. And the reason why is, like you said, the Affiliation Agreement is what they used to impose the trusteeship. The LMRDA's trusteeship provisions exclusively deal with the international Constitution. This document is not the international

Constitution. They did it under the Affiliation Agreement. Because it's under the Affiliation Agreement, it is a contract between unions. There is no contract between unions provision of the LMRDA. That is under the LMRA. Like I said, they're trying to do patchwork legal theory. They're trying to take the contract between unions provision of the LMRA and apply it to the LMRDA and in reverse, they're trying to use the public mixed union exception and apply it to LMRA -- to a removal under the LMRA. Neither is proper here.

THE COURT: All right. Let me -- let me shift gears slightly, staying under the jurisdictional issue.

On the breach of fiduciary duty claim, I wasn't quite sure if you're alleging that the actions taken post-trusteeship, such as expelling the staff members, using the local union funds, appointing a new negotiator, are all of those themselves breaches of fiduciary duty or are you saying those are evidence of the harm caused by the breach when the union came in?

MR. MCAVOYAMAYA: Oh, no. That's evidence of the harm, Your Honor.

THE COURT: Okay. All right. So that's the harm. That's -- I kind of interpreted it that way, but I wanted to make sure.

All right. Let me turn to Mr. Rothner, on the jurisdictional issue.

MR. ROTHNER: Thank you, Your Honor.

I just want to start by talking about the LMRDA, which is a side issue, but I want to explain why we referred to the LMRDA and why we did not remove on the basis of the LMRDA.

The LMRDA is the federal labor law that does provide some regulation regarding the process for implementing trusteeships and their review, including the hearing before members, which in this case will happen very soon.

It has an anti-preemption provision in it, meaning that there is jurisdiction in state court, there is jurisdiction in federal court to challenge the trusteeship as a matter of the violation of the procedural restrictions under the LMRDA unless and until the secretary of labor issues a complaint under his authority and then that is the exclusive vehicle for litigating the matter and it becomes preempted and a matter of jurisdiction in the federal court.

So, we're not there yet. Nothing in that regard has happened. We didn't choose to go under the LMRDA. The only reason we refer to the LMRDA in our papers is that LMRA and the LMRDA share the same definition of labor organizations, employers engaged in commerce and so on under Section 152, 29 U.S.C., and we simply cited a case which stands for the proposition that they can be referred to. And that definition is really the important part of this. So I'm going to leave behind the LMRDA for just a moment.

Counsel has omitted a critical piece of the definition. And the definition regarding a labor organization is one that deals with employers, that is, employers in the private sector, employers engaged in commerce, concerning grievances, labor disputes and so on. But the part that counsel omitted is that it's such an organization that, in whole or in part, deals with employers engaged in commerce regarding wages, hours, and working conditions. So, this is an organization, both organizations, deal, in part, with employers engaged in commerce and, in part, with public sector employers.

I don't have much to respond to in what counsel has said except to try to characterize the categories of cases that counsel has relied on and there really are two. There are, under Section 301, a handful of cases in each category, counsel cites, that either concern public employees and/or their union suing or being sued concerning rights under a Collective Bargaining Agreement between the employer, the public employer of those public sector employees, and then there is the category of cases like *Richards* and *Cunningham* in which public employees are suing their union for matters having to do with ratification of their purely public sector Collective Bargaining Agreement with a public employer.

It's not surprising, that because that is the locus and focus of those cases, that the courts have said we see no federal question jurisdiction here. Section 301 was not

designed to cover relations entirely within the sphere of public employees and their public sector Collective Bargaining Agreement and employer. That surely is not the case in regard to private sector employees such as the plaintiff who, by the way, is indeed a private sector employee. He works for one of the St. Rose Hospitals. I believe it's St. Rose Sienna. I have a declaration about this if the Court needs it, but there's been a concession so I don't think the Court needs it. And he is a chief steward for Environmental Services at his St. Rose Hospital, operated now by Dignity Health.

So, what Congress did with Section 301 is, is enact what the Supreme Court tells us is the most powerful sort of preemption and it's the sort of preemption that the courts have characterized as complete preemption, meaning that unlike in less powerful preemption cases, the plaintiff is not the master of his own complaint. They established the artful pleading doctrine so that the courts could look beyond the four corners of the complaint in order to ensure that there either was or there wasn't federal question jurisdiction. And what animated Congress in that regard was a), providing a forum -- federal courts -- for such disputes between organizations in this circumstance, and ensuring consistency of outcomes; that is, application of developing federal common law to promote stability in labor relations and industrial peace.

So, taken as plaintiff does, taking simply the

factual scenarios out of cases and then concluding that any time a random -- a union includes both public and private sector employees it somehow is swept out of this very powerful preemption doctrine would lead logically to the following scenario:

That Mr. Garcia and his employer, St. Rose, just by virtue of the randomness by which the union organized workers at that hospital and at public entities throughout this valley, would not have access to federal court, would not realize the consistency of outcomes and stability that Congress intended by that random question of how this union decided to have two parts.

In fact, leading to an even more absurd result of this logic, if another union came to the St. Rose campuses and organized nurses whereas, this union, let's say, was limited to non-nursing staff, that union, in its relations with St. Rose, if it limited itself to the private sector, would realize consistency and application of federal common law, even under similar language that those parties negotiated at the bargaining table with an employer who presumably was looking for efficiency and proposed various contract provisions that those two unions accepted. That outcome is -- is really striking in terms of the congressional goal of consistency of outcomes and promotion of stability and industrial peace.

So, the only other thing I wanted to say was about

the *Bell* case. I wanted to make sure the Court understood that counsel, in his brief filed yesterday afternoon and in argument today, was referring to a magistrate's report, not to the district court's decision. I can give the Court the citation to the district court's decision. It is --

THE COURT: Did the district court adopt the magistrate judge's position or was it changed?

MR. ROTHNER: It's changed.

THE COURT: All right.

MR. ROTHNER: It's 2012 Westlaw 3144046.

And just to be clear --

MR. MCAVOYAMAYA: Do you have a copy of that case?

MR. ROTHNER: I have my one copy that I brought, but I'd be happy to share it with you in just a moment.

The district court, at Page 3 of the slip opinion, says as follows:

"The Court concludes and the parties agree plaintiff cannot, without more, bringing in -- bring an action under Section 301 against TriMate -- TriMet -- I'm sorry -- a public entity, to enforce a contract between TriMet and the union because TriMet is not an employer within the meaning of the statute." That's not a remarkable outcome, and that is the district court's opinion, not the magistrate judge's opinion.

And then as regards *Ayers*, in fact, as I think the Court understood, *Ayers* was, indeed, a case that involved a

dispute between a plaintiff public employee and his public employer, a public utility district in Clark County, Washington. Indeed, the Ninth Circuit's recitation of the factual background, in the second paragraph -- and by the way, this was a breach of the duty of fair representation case. Again, not surprising that when -- regardless of whether it's a mixed union or not, when a public sector employee claims that his public sector employer violated the Collective Bargaining Agreement and his public sector union didn't fairly represent him in challenging that violation, that that is not a matter within the jurisdiction of a federal court under Section 301. There is no employer engaged in commerce. There is no employee engaged in commerce. But the Court begins as follows:

"William Ayers is employed by the Clark County, Washington Public Utility District in its meter department. His employment is governed by a Collective Bargaining Agreement between the district and Local Union 125. The local was affiliated with the International Brotherhood of Electrical Workers." I think that's all that needs to be said about the *Ayers* case. It is the sort of case that I described in the categories I was describing and that the court described in its own analysis of the cases with which he's been presented.

THE COURT: Thank you, Mr. Rothner.

Mr. Mcavoyamaya, anything else?

MR. MCAVOYAMAYA: Yes, Your Honor.

I would just like to bring your attention to the initial argument that they made before they led into the other argument and that was that the definition provisions between the LMRA and the LMRDA should be able to be shared. If you take a look at *Williams v. Durham*, I'm going to -- I'm just going to read this, like, completely. "By the plain" -- "By the plain unambiguous language of the LMRA, the definition of labor organizations excludes an organization of employees of a political subdivision of a state analyzing the relationship between subchapters of the LMRA and determining that the definition of employer contained in -- in that section doesn't apply." Sorry about that. It's in *Cunningham* now that I believe -- I believe where they talk about the relationship between the LMRDA and the LMRA.

THE COURT: You would agree they have a virtually identical definition?

MR. MCAVOYAMAYA: Yes, but the exception in the LMRDA is in the LMRDA and it is not -- it has never been able -- like, all the case law, like, regardless of who the parties are, every single time the mixed union exception is brought up saying that the mixed union exception to the LMRDA applies to the LMRA, every single time that that happens, it -- the ruling is always the same. There isn't a single case out there that has allowed anyone, any party, whether it's the plaintiff or defendant, to apply that exception to the LMRA. It's, like,

remarkably consistent, Your Honor. It's never been anything otherwise. The LMRDA -- the exception in the LMRDA doesn't apply to the LMRA. And so, their -- the basis of their entire argument is based on the premise that that exception can apply to LMRA claims, and it cannot. It cannot apply to that.

THE COURT: Is there a case saying it cannot --

MR. MCAVOYAMAYA: Yes, there is.

THE COURT: -- as opposed to just a case saying it has -- as opposed to just saying it has not been applied.

MR. MCAVOYAMAYA: I will -- if you just give me a moment, Your Honor, I will find that case for you.

Here it is. And it is the *Bell* court. "The LMRDA was enacted after the LMRA" --

THE COURT: Wait. Wait. Wait. Wait. Wait.

MR. ROTHNER: The *Bell* case?

MR. MCAVOYAMAYA: Yes.

THE COURT: The magistrate judge's ruling or the district judge's ruling?

MR. MCAVOYAMAYA: The district judge's ruling said that he couldn't bring it because the employer was an employer. That does not change the fact that the ruling -- that -- that the subsequent ruling didn't do anything with regards to the Court's analysis of whether or not the mixed union exception applied. And essentially in that case, in *Bell*, the mixed union exception didn't apply, like, he raised that he should --

like, the plaintiff in *Bell* raised that he should be able to use the mixed union -- his mixed union status to maintain a claim against TriMet and the -- the magistrate judge ruled that he couldn't and the -- the subsequent opinion that opposing counsel read does not disturb that fact. And here is the -- the -- the quote from that case. "The LMRDA was enacted after the LMRA to eliminate or prevent improper practices on the part of labor organization employers which distort and defeat the policies of the LMRA and implementing regulation explains that in the case of a national, international, or intermediate labor organization composed of both government and locals, a non-government or mixed union parent organization is subject to the Act." Now that's the LMRDA.

The LMRA claim -- oh, here we go. In *Cunningham*, sued under the Constitution . . . in *Cunningham*, "If the plaintiffs were private employees, no doubt it would apply."

In *Richards*, "While the mixed union exception flows logically from the underpinnings of the LMRDA, the same exception has no application to the prior enacted LMRA whose emphasis is on union's relationship with its employer, not its individual members." That is a quote from the case.

THE COURT: That's from *Bell*?

MR. MCAVOYAMAYA: That is from *Richards*.

THE COURT: *Richards*.

If the dispute involves a mixed union and a private

employer, isn't that covered by the LMRA?

MR. MCAVOYAMAYA: No, Your Honor, it would not be. Because the LMRA -- the second that that -- the party -- the union invokes that -- that public employee exception, we represent public employees, we're not a labor organization, the other side would have to bring it under the LMRDA --

THE COURT: So if there's --

MR. MCAVOYAMAYA: -- because you can't -- the mixed union exception just doesn't apply.

THE COURT: So if there is one public employee, or two public employees and a hundred thousand private employees, LMRA doesn't apply? That's your position?

MR. MCAVOYAMAYA: Yes. That's what the definition says, Your Honor.

And actually, in addition to that, there are cases -- I haven't brought them here today, I can submit them to the Court later -- there's another exception under the LMRA. It's, like, the Railroad Disclosure Act. There was a case where 80 percent of -- where there was, like, 80 percent of the union represented railroad employees and the other percentages were private and they tried to invoke the mixed union -- you know, like, they tried to argue that it didn't apply because they -- for the same argument that they're saying here, that the fact that they represent private employees should mean that they should be able to get it and in that particular situation it

was -- it was overturned as well. I believe, actually, the case is cited in --

THE COURT: All right. Let's turn --

MR. MCAVOYAMAYA: -- in *Pacific Marine*.

THE COURT: Let's turn to the Preliminary Injunction request, in the event I find I have jurisdiction.

MR. MCAVOYAMAYA: Okay, Your Honor.

THE COURT: Was there a hearing held regarding the imposition of the trustee?

MR. MCAVOYAMAYA: There has not been a hearing held regarding the imposition of the trusteeship, no.

THE COURT: Post-trusteeship, has there been a hearing regarding that?

MR. MCAVOYAMAYA: Not yet.

THE COURT: Mr. Rothner?

MR. ROTHNER: The union has 30 days to do so. It has not taken place yet. It will take place.

THE COURT: That 30 days has expired, however, by now; correct?

MR. ROTHNER: No, it has not.

THE COURT: Wasn't the trustee imposed late April?

MR. ROTHNER: No. The trusteeship was imposed around the middle of May. I can give you a precise date if the Court's concerned.

MR. MCAVOYAMAYA: That -- I don't believe that that

is the case, Your Honor.

THE COURT: My recollection was it was, like, April 28th, but maybe I'm mistaken on that.

MR. ROTHNER: I can . . .

MR. MCAVOYAMAYA: I believe it was April 25th, Your Honor.

THE COURT: Well, April 26th the Report and Recommendation that Ms. Mancini and Ms. Kisling be removed was submitted by Ms. Nieters.

MR. MCAVOYAMAYA: And that was the day of the vote, Your Honor.

They sent -- they did not even notice the members about this, Your Honor. They -- they -- they issued the Report and Recommendation the day that the -- that the local union had its monthly board meeting, the monthly board meeting that is typically open to all members. They closed the board meeting to members --

THE COURT: I -- I got that from your brief.

April 28th, Ms. Henry entered and disseminated an Order of Emergency Trusteeship --

MR. ROTHNER: Okay. I'm sorry, Your Honor. I stand corrected, but --

THE COURT: -- at least according to the plaintiff.

I'm sorry?

MR. ROTHNER: I know that they have been working on

getting it scheduled. I do believe there are provisions under their Constitution for getting it scheduled within 30 days, but there are possibilities for extending that.

THE COURT: All right.

Mr. Mcavoyamaya, it's your motion, so let me hear from you on that.

MR. MCAVOYAMAYA: Okay. So, Your Honor, number one, if they -- even if they -- so now, if they succeed on the international Constitution argument, they're still in violation of their own Constitution and even if the LMRDA did apply, then it would be removed -- it would be -- the trusteeship would be removed because of that. They violated their Constitution without -- because they didn't hold a hearing.

THE COURT: Why is that the -- why is that the necessary remedy?

MR. MCAVOYAMAYA: Because they had -- they -- they didn't follow their own -- they didn't follow their own Constitution. So even if they win in this situation, saying that the international Constitution, that they were permitted to impose it under the international Constitution, they still violated it because it's past 30 days.

THE COURT: Why does a violation equate to the death penalty as a remedy as opposed to some other remedy?

MR. MCAVOYAMAYA: Because that -- because that is what the LMRDA requires. It is expressly -- that they have to

follow all the provisions -- they have to follow to a "t" the provisions of their Constitution.

It's our position that that doesn't -- that is in opposite because it doesn't -- those provisions were expressly waived anyway and the Affiliation Agreement was designed to prevent SEIU from coming in and doing this. I mean, they -- the contract expresses the clear intent of SEIU 1107 -- or Local 1107 to insulate themselves from the jurisdiction of the international union. That was -- that was the entire basis of that Affiliation Agreement. A lot of time and effort went in to doing that and they said that they could -- that they could impose it at the request of the board, but the board's power and rights and responsibilities are not granted to the board by the Affiliation Agreement; it's the local Constitution and the local Constitution creates exclusive jurisdiction and bars any member from taking any action to displace the local union -- which is its members, not the board -- as collective bargaining representative. What did --

THE COURT: And -- wait. And the local union voted for a trusteeship.

MR. MCAVOYAMAYA: They did not have the power to vote for that because the local union Constitution bars any action by any member to displace the local union as collective bargaining representative, and that's what's happened here today. They've sent down a representative from -- who is on

the board of the international union who was acting at the behest of the international union president and who is making collective bargaining decisions without the input from the members. And --

THE COURT: The board is prohibited from voting to dissolve or disestablish and your argument in your papers was that the appointment of the trusteeship involved -- is a disestablishment of the union. I disagree with that.

MR. MCAVOYAMAYA: As collective bargaining representative, not a disestablishment from the international.

THE COURT: The union -- the local union is still in negotiations with the County; right?

MR. MCAVOYAMAYA: The trusteeship is -- the trustee is appointed -- is making all the decisions.

THE COURT: Mr. Urban is negotiating on behalf of the local --

MR. MCAVOYAMAYA: He was appointed -- yes. He was hired and appointed by the trustee.

THE COURT: It's an easy question.

MR. MCAVOYAMAYA: Yes.

THE COURT: Mr. Urban is negotiating on behalf of the local; correct?

MR. MCAVOYAMAYA: That's correct.

THE COURT: Okay. The local has not been disestablished; correct?

MR. MCAVOYAMAYA: The local union members have. The union is the members, not the board, Your Honor.

THE COURT: And the union votes for the board. And the union members empower the board to take certain actions.

It's just like the United States. I don't go to Congress and vote on every bill; I nominate and I vote for my representative to go to D.C. and take action on my behalf and I vest them with authority to do that. It's representative democracy.

Isn't that the same thing here? The union members vote for the board; the board goes in and makes decisions. You may disagree with the board's decision, but it has made decisions.

MR. MCAVOYAMAYA: With all due respect, Your Honor, legislators in our government, the decisions that they vote on get overturned in the courts all the time.

THE COURT: Correct.

MR. MCAVOYAMAYA: And that's the situation here. This was an illegal vote. It was in contravention of the local Constitution. The board didn't have the power to do it. They --

THE COURT: Why?

MR. MCAVOYAMAYA: They did it under false --

THE COURT: Why?

MR. MCAVOYAMAYA: Because it disestablishes the

members, who are the union, as the collective bargaining representative.

THE COURT: Define for me what you mean by "disestablish." Maybe that's where we're having a difficulty.

MR. MCAVOYAMAYA: They are not -- the trustee is not permitting the local members to make the decisions.

The local members of the Clark County bargaining unit, and I actually have a -- I actually have a signed -- a signed letter, because the e-mails that they allege they're not admissible, I actually have a signed letter from Syed -- his name's Syed Hyder, I believe, that demonstrates the collective bargaining unit for Clark County's desire to have Mr. Nguyen represent them and that removing him from that -- from that position has frustrated the negotiations.

THE COURT: Let me stop you. Here's a hypothetical. If the board didn't like what its negotiator was doing, couldn't the board replace that negotiator?

MR. MCAVOYAMAYA: Right now?

THE COURT: Any time. Last month. The month before.

MR. MCAVOYAMAYA: If the board had power to -- if the board had the power to do it right now. The board has no power.

THE COURT: Let's take a hypothetical.

MR. MCAVOYAMAYA: Okay.

THE COURT: So we're going to step out of this

world --

MR. MCAVOYAMAYA: Yes, the board could do it. Yes.

THE COURT: Okay. So the board has the authority to replace its negotiator?

MR. MCAVOYAMAYA: Yes.

THE COURT: Okay. A trustee, standing in place of the board, has the same authority then. Yes or no?

MR. MCAVOYAMAYA: If the trusteeship is legal, yes.

THE COURT: Okay. So --

MR. MCAVOYAMAYA: It is illegal in the sense, though, that's our position.

THE COURT: So, the focus is obviously on whether the imposition of the trusteeship was proper.

MR. MCAVOYAMAYA: Yes.

THE COURT: That trusteeship was voted upon by the board.

MR. MCAVOYAMAYA: Under false pretenses, Your Honor.

THE COURT: It was voted upon by the board. Yes?

MR. MCAVOYAMAYA: Yes.

THE COURT: So the issue is, then, backing up further, were false pretenses, were false representations made to the board.

MR. MCAVOYAMAYA: Yes.

THE COURT: And your argument is that the board was strong-armed and said we don't have any options, we were told

by the international we don't have any options and so we have to vote for a trusteeship?

MR. MCAVOYAMAYA: Yes. And I think it's pretty evident -- I think it's pretty evident from the facts of the case. I actually have here --

THE COURT: All right. Let me stop you. Let me stop you. Because I don't know that it is pretty evident.

MR. MCAVOYAMAYA: Okay.

THE COURT: You had a vote of 17 to 7 with 5 abstentions; correct?

MR. MCAVOYAMAYA: Yes.

THE COURT: So at least 7 -- at least 12 people thought they had options to either abstain or to vote "no"; correct?

MR. MCAVOYAMAYA: Yes, Your Honor.

THE COURT: And setting it aside. Slightly different argument.

The members of the board, we can presume, understand what their Constitution means, can't we?

MR. MCAVOYAMAYA: Um . . . I don't believe so because they sent an attorney -- like -- like I said, Your Honor, in -- in --

THE COURT: Wait.

MR. MCAVOYAMAYA: -- I have right here about four cases -- I can give copies to opposing counsel -- in which SEIU

International imposed a trusteeship on a local union. Not one time did they ask to do it, which means they knew the Affiliation Agreement before they came down to the meeting.

THE COURT: Sounds like they asked here because there was a vote of the board.

MR. MCAVOYAMAYA: They did not inform -- they sent a legal representative to represent to them interpretation of their Constitution --

THE COURT: Okay.

MR. MCAVOYAMAYA: -- and who failed to apprise them of their rights under the agreement.

THE COURT: Okay. Okay.

MR. MCAVOYAMAYA: That's --

THE COURT: But the board -- well, somebody comes to me and gives me advice, I don't necessarily have to agree or follow it. If somebody comes to the board and says, I'm the lawyer from the international union, here's some things, the board doesn't have to follow it. In fact, 12 of the 29 voters didn't follow it, because they either said "no" or they abstained.

MR. MCAVOYAMAYA: They abstained because they felt they needed more information. The other members of the board felt coerced into doing it. They felt that they had no option and that is under false pretenses. It was -- it was based on -- their imposition of it was based on a -- a factually and

legally false representation that the local Constitution did not provide for a way to replace the president and vice president. That alone shows -- shows that it was illegal; the vote itself was made on false pretenses.

THE COURT: You may, at some point, be able to prove that through a trial in this case. The issue in front of me right now on emergency relief is, is there a likelihood of success on the merits of that allegation.

Now, you're saying, when you allege that there was a false representation made by the lawyer, obviously under Nevada law to show false -- to prove a false representation claim you're going to have to show that the board was lied to, misrepresentations were made. You've made that allegation. You have to prove that the board reasonably relied upon those representations in taking its action. That's where there's some -- I think, some potential trouble. Because why can't I presume that the board members know their rights -- they're on the board -- they know their Constitution? So if someone comes in and says your Constitution says this, why would it be reasonable for the board member to rely upon someone saying something that doesn't jive with my understanding of my Constitution?

MR. MCAVOYAMAYA: Because numerous of the board members have stated that and I provided, when I filed the complaint, statements from them, stating that they felt coerced

and they didn't understand their rights. They didn't understand what was going on. The international came down as though it had the authority to close the -- the -- the meeting. They closed the meeting from the members and they -- they -- they coerced the board into making this decision that night. They didn't give them separate representation. The attorney that they brought with them didn't identify the clear conflict of interest in having the local union turn over all property to the international union. There was so many things done wrong in this particular situation that just -- it -- it's clear, and members of the board will come to testify and they will come to -- to state that fact. That is what happened here and that is why we -- we have a highly, highly likely success on the merits because they sensed -- like, they -- in no other case where they imposed a -- a involuntary trusteeship did they ask, did they send an attorney down to give them advice regarding the local union Constitution or anything. Here, they did it intentionally because they knew of the Affiliation Agreement. There was a conflict of interest with the attorney that they brought down here, Steve Ury, and in his representation of the local, in its transfer of property and all the power from the local union to the international, clear conflict of interest and he misrepresented a contract entered into under Nevada law.

THE COURT: All of that's in your papers. I get the argument.

Address this for me. There were 29 people that voted -- or were present at that board meeting; 17 voted "yes," 7 voted "no," 5 voted abstention. That's 29. If there were no misrepresentations -- hypothetical again. You're not conceding any points, so don't worry -- hypothetically, if there were no misrepresentations made, a majority vote of the 29 could impose a trusteeship, if there were no misrepresentations made. You would agree with that, or no?

MR. MCAVOYAMAYA: I don't agree with that because I believe the collective bargaining -- the exclusive jurisdiction reserved in the -- in the Affiliation Agreement, exclusive jurisdiction over employees, over members, and as exclusive collective bargaining representative as well, I think that those provisions clearly provide that -- and then on top of that --

THE COURT: Clearly provide what? Finish that sentence.

MR. MCAVOYAMAYA: Clearly prove that . . .

THE COURT: That the board didn't have authority to impose a trusteeship?

MR. MCAVOYAMAYA: That the intent of the contract was to keep SEIU International from being able to impose a trusteeship and that the local union Constitution affirms that by barring any action by any member to displace the local union as collective bargaining representative.

Now, the --

THE COURT: But what -- hold on.

Isn't the board entitled -- the local board -- entitled to self-governance?

MR. MCAVOYAMAYA: Yes.

THE COURT: That's your whole argument. Local board gets self-governance. If the local board says the best interest of our self-governance is to impose a trustee over us because we've got two factions fighting, we can't get along, we've got a problem, we need a neutral third party to come in and help us out, couldn't they do that, with -- barring any misrepresentations or lies or anybody else, couldn't they do that?

MR. MCAVOYAMAYA: It is -- it is our position that they couldn't, but even if they could, I'm going to go with your -- with your position here.

THE COURT: Okay.

MR. MCAVOYAMAYA: Let's go to -- let's take a look at the harm to the international.

If you impose the Preliminary Injunction, we can hold another board meeting and see -- with efficient notice and so the board has legal representation, they can meet again and -- and with all members, with sufficient notice to all the board members to show up to the meeting and they could vote again to impose the trusteeship if that is really what they want, and

that's what we're asking here for.

THE COURT: Okay. But -- but -- but I have to have a sufficient legal and factual basis before I can impose a Preliminary Injunction and what you're saying is that the board vote was improper and that you've got affidavits or witnesses will come in, board members will come in and say we felt we were pressured, we were coerced, we didn't have options.

Agree or disagree with me. You would have to have a majority of those 29 board members come in and say that. In other words, you would have to have -- my math's going to be bad here -- half of 29 is 15. You've got to have 15 board members come in and say I was coerced, I was misrepresented to, I reasonably relied upon that and -- to my detriment because if you don't have a majority, let's say you have 10 come in, the others could still vote and outrule [sic] the 10 and there still would be a trusteeship put in place.

MR. MCAVOYAMAYA: That's -- that, of course, relies on the interpretation of local union Constitution and if the local union Constitution's bar on members taking actions to displace the local union as the collective bargaining representative, that is determined that -- that -- that the trustee is not -- that that doesn't count as a displacement of them as collective bargaining representative, then . . . then yes, I guess in that hypothetical that's possible.

THE COURT: I mean, your whole argument is

self-governance and the international shouldn't come in and beat up on the local. Well --

MR. MCAVOYAMAYA: Well, the other argument is, is that the local specifically negotiated the Affiliation Agreement to prevent that.

THE COURT: Okay.

MR. MCAVOYAMAYA: And that -- that because of the way that the defendants have -- have done this was improper. But on top of that, like you brought up with the -- with the fact that they violated their own Constitution for not holding the hearing, that is also, as far as taking it to the National Labor Relations Board, always ends up overturning it. There are cases out there that is immediately overturned if they don't hold the hearing within the sufficient amount of time.

THE COURT: It's certainly troubling --

MR. MCAVOYAMAYA: Yes.

THE COURT: -- to me.

MR. MCAVOYAMAYA: So that would be a likelihood of success as well.

MR. ROTHNER: Your Honor, I made a representation about the Constitution and I'd like to be very specific about it. It's in the record.

THE COURT: Okay.

MR. ROTHNER: In fact, it's Docket No. 117, Page 21 of 242 I think it is, and that constitutional provision says

the following:

"These time limits may be extended by the international president for good cause, which a decision shall be final and binding."

MR. MCAVOYAMAYA: They haven't made that decision, Your Honor.

THE COURT: Mr. Rothner, has that decision been made?

MR. ROTHNER: Well, it's been made de facto because it hasn't been held yet. I know they've been looking for a venue and they've been trying to schedule it. I know it's going to happen some time soon, but it has not been scheduled yet.

THE COURT: All right.

MR. MCAVOYAMAYA: Your Honor, they just admitted that the decision was not made before the 30-day mark, which --

THE COURT: I heard him.

MR. MCAVOYAMAYA: -- can be inferred that they made the decision just because they let the time bar go out. It should have been made and noticed to members that it would be extended and it was not.

THE COURT: Tell me this. One of the factors I have to address in the Preliminary Injunction standard is if I don't find that you have a likelihood of success on the merits, I can still issue an injunction if I find that serious questions are raised and that the balance of hardships tips sharply in your

favor. The defendants argue that, in a sense, what you're doing here, much as you say I want to invoke and enforce self-determination or self-governance, you're actually doing the contrary because you're trying to overturn a decision made by a majority of the board and so you're actually trying to displace self-governance and therefore, the balance of hardships should not tip in your favor.

Help me with that.

MR. MCAVOYAMAYA: Well, Your Honor, if you issue -- like I was talking before, if you impose this Preliminary Injunction, the board can go back and vote to impose a trusteeship again in which case our suit would be gone. It would be done. And so, there is no hardship on that side for allowing the board to have a full -- full membership, like, discussion about it and having a full -- you know, full amount of the board present to vote on it.

THE COURT: And so -- and so --

MR. MCAVOYAMAYA: There's no hardship to them.

THE COURT: And so that vote happens, as you predict and --

MR. MCAVOYAMAYA: And we predict that it would be against it.

THE COURT: -- the vote's changed.

MR. MCAVOYAMAYA: Yes.

THE COURT: And the vote's changed and it goes the

other way and then the losing party comes in and files a lawsuit and seeks a TRO saying we were misrepresented, and so, therefore, undo that vote because there were misrepresentations made about our authority because we disagree with your interpretation of our local Constitution and so, therefore, we're back here again. And what's to stop it every time from happening?

MR. MCAVOYAMAYA: Because there will -- because there won't be the same kind of factual situation where there was no notice, they came down the same day that the Report and Recommendation was -- was pushed out, which meant that a number of the board members could not show up. It will be a full -- a full panel of the board. A full panel of the board will -- like, if that happens, then -- and they vote for the trusteeship again, then the -- the argument is over and there won't be any other -- any other actions under this.

I also wanted to address another thing with regards to the -- like, who the plaintiff is with the -- just to go back to the LMRA thing real quick. I was just thinking about it. When it was earlier, I forgot to bring it up then.

It doesn't make sense that an employee has to be the employee of a public employer because if that was the case, all we would have to do is voluntarily dismiss the complaint, go get a Clark County member, a member that works for Clark County and file this action again, with them, and it would be out of

this court.

THE COURT: I'm not saying it's the touchstone. I was just curious about that.

MR. MCAVOYAMAYA: Yeah, I was just -- so there's that issue. But as far as the harm issue, like, there is no harm in allowing the board to come back in and make an informed decision on this. They have no harm to them. There is -- they can't demonstrate anything.

THE COURT: Well, the harm you cited to to get to me here today was that this contract's got to be negotiated by the end of this month and we're already on June 7th.

MR. MCAVOYAMAYA: That is the harm to the local. That's not the harm to the -- we're talking about the balance of equities. That's not the harm to them. The harm to the local is if they make concessions that the membership doesn't want and they're making decisions that without -- without the input of the collective bargaining units, for Clark County, and there's no harm to them because they're not going to have to deal with that --

THE COURT: But -- but --

MR. MCAVOYAMAYA: -- the local union would.

THE COURT: But there's a harm to your client if this is delayed because that's why we're here.

MR. MCAVOYAMAYA: Yes.

THE COURT: And so -- and so that's -- that's my

point is, I've got to consider that hardship, too. If I impose this injunction, in a sense it puts a hardship on both because now you've got to re-notice a board meeting, you've got to get everyone there, you've got to have a vote and in the meantime, the clock's ticking to June 30th. That's a hardship to your client as well.

MR. MCAVOYAMAYA: And they are already ready for it and these negotiations have been negotiated and have been entered into already by -- by Peter Nguyen and he is perfectly prepared to come step right in and finish this up in accordance with what the members want. That is the harm.

THE COURT: You raise --

MR. MCAVOYAMAYA: The members want it.

THE COURT: You've, a couple of times, raised an interesting point. You say that the members want this and that the board isn't doing what the members want and that the board is, in a sense, disassociating or disestablishing the members. Well, there's a mechanism. The members vote the board out. Why isn't that a sufficient remedy? Have a vote and vote the board members out.

MR. MCAVOYAMAYA: Because -- because the -- there is -- there is no provision -- way we can do this because the trustee has taken over power. There is -- they have removed all power of the board, all power to -- to hold a vote. They're refusing to hold that vote. And because of that,

that's the democratic process issue. If you issue a Preliminary Injunction now, they can come back in and they can make the decision about their union and whether or not they want the international doing this. And that is what we hope we can achieve here.

THE COURT: Article 20 of your local document, it's Docket No. 5-3, this is your local Constitution, I believe, and I'm looking at Page 57. Article 20 refers to the initiative and referendum process. "Section 1. Definition. The initiative and referendum process is a means by which the membership may overturn decisions of the Executive Board, or bring to the attention of the membership and take action on other issues of concern." And there's -- talks about a petition, you need a certain percentage and then you go. Now, a trusteeship is put in place, doesn't overturn the constitutional referendum or initiative process. Why can't you follow that process and --

MR. MCAVOYAMAYA: Because the board -- they have removed the board from power and the board cannot call that vote now.

THE COURT: Well, but if -- you can vote to overturn the board's decision to appoint a trustee. Why can't you have an initiative process to overturn the board's decision to appoint a trustee and therefore the trusteeship is dissolved by that?

MR. MCAVOYAMAYA: Because you would need the board to start the meeting and to hold the vote and there is no board right now. And so, the only person who can actually hold that vote and who can get the members to come in under their referendum, if they asked for it, would be the trustee. And the trustee isn't going to do that. They've demonstrated clear intent that they're not going to do that. That is a -- a remedy that --

THE COURT: Has it been attempted?

MR. MCAVOYAMAYA: No, it has not, but they've displaced completely the ability of the board to make that decision or to hold any kind of voting anything and . . . yeah.

THE COURT: Well, if a trustee's been put in place, it seems to me, in Section 2(B) of Article 20, that the trustee stands in the shoes of the Executive Board or the president -- well, wait.

Did the trusteeship -- is the Executive Board disbanded?

MR. MCAVOYAMAYA: Completely.

THE COURT: The trustee is -- there's no Executive Board whatsoever?

MR. MCAVOYAMAYA: Completely disbanded the board.

THE COURT: Okay. So the trustee stands then in the shoes, I would presume, of the Executive Board or the president and once the initiative or referendum has been received by the

board or the president, the board -- I presume the trustee standing in his place -- shall automatically place the subject matter on the agenda of the next Executive Board meeting for reconsideration. And so, in a sense -- and then it gets referred to a vote of the membership. Why -- here's --

MR. MCAVOYAMAYA: Are you talking about the local Constitution?

THE COURT: Yeah. Article 20 of your -- of your local -- I don't know if it's the Constitution or the bylaws or the rules, but it's--

MR. MCAVOYAMAYA: The trustees -- the trustees -- like, the trustees considered in the local Constitution are not international trustees. It's the trustees that are created by the local Constitution. It's a completely different situation than a trusteeship in this -- in this sense. I mean, there is a -- there is definitions under -- of what trustees are, but they have to do with dealing with, you know, collective bargaining units here. There's trustee of the local union, not the international trustee.

THE COURT: All right. Let's turn to the issue of irreparable harm.

I get the argument that there is possible harm, but what evidence is there that replacement of the lead negotiator on behalf of the local is going to lead to irreparable harm?

MR. MCAVOYAMAYA: Because -- because of the fact that

it is -- it is the international making the -- choosing the collective bargaining representative.

Mr. Urban was fired from this union as collective bargaining representative because he charged $445,000 and took two years to negotiate the last contract. This is a -- a union that does not have a lot of money and because of -- and they fired him expressly because of that. So there's a demonstrated intent -- and they have not disputed that Mr. Urban was fired prior, I might add, and that -- that demonstrates the fact the members did not want him involved. And now, he is charging fees under the -- under the -- the local union's accounts to -- and -- and -- again, and that demonstrates irreparable harm. On top of that, they've also taken out credit cards, American Express credit cards on the accounts, which is going to leave the local union in debt. They're paying for their people to be here --

THE COURT: Okay. But, monetary damages do not constitute irreparable harm. The trustee has to post a bond. The local has a remedy of going after the international for monetary. So if the bill -- if Mr. Urban runs up a bill that's huge, based upon what he did as appointee of the SEIU, if the trustee spends money under your credit card, there's a bond to go after and you can sue the international. There's no evidence that the international's going to be bankrupt. So if there's a monetary remedy, there's no irreparable harm.

MR. MCAVOYAMAYA: Your Honor, there's also an issue with the fact that the due structure in this particular union was -- was deficient, you know, when they first entered into and because of that they have -- they have had to fire staff. They just don't have the money for this and -- and to -- like, if this occurs, yes, we may be able to sue the international to get that money back, but they're going to have to fire people, they're going to have to -- to -- to downsize until they can get some kind of remedy and that demonstrates --

THE COURT: That sounds like a structural problem on behalf of the local that predates this whole dispute.

MR. MCAVOYAMAYA: Does that eliminate the harm?

THE COURT: The question is whether it's irreparable harm caused -- caused by this action of the trustee.

MR. MCAVOYAMAYA: It's going to -- it's going to end up -- it's going to result in -- in them having to -- that -- to reduce their ability to represent the members the way they -- that they need to. And on top of that, they've also subjected this -- the local union to a number of wrongful termination suits as well. They've discharged people under -- under employment contract.

THE COURT: Okay. So --

MR. MCAVOYAMAYA: There's several employment con -- so, the local union can be sued right now because of this if --

THE COURT: And you may be absolutely right and that

may be a harm, but again, I'm having trouble seeing that as an irreparable harm because the local would have a remedy of then naming the SEIU as a third party defendant in such suits or going after the trustee's bond and saying you caused these problems, you caused us to fire people and therefore, if we're going to be liable, we're coming after you under your bond or we're going to sue you directly on a third party complaint or as a separate lawsuit. There's a monetary remedy for that and therefore I don't see irreparable harm in those kind of things.

MR. MCAVOYAMAYA: Well, I believe the case law clearly shows that -- that there -- the ability to -- to choose your collective bargaining representative, like, in that democratic process is a -- is demonstrative of irreparable harm, Your Honor.

THE COURT: Okay. All right. That's a little closer to the point. I'm with you there. The selection of the negotiator, because the deal he may cut may not be the best interest --

MR. MCAVOYAMAYA: What -- what -- yes. And what the members want. I mean, the members asked the trustee to allow Mr. Nguyen to be the representative and they told the members of the collective bargaining unit that you do not have a choice and that is irreparable harm, Your Honor, because it is their union. It is their choice and this man who -- who -- the current one -- the current representative, who they fired

prior, is now back making decisions for them.

THE COURT: I understand the distaste for Mr. Urban.

MR. MCAVOYAMAYA: And they're going to have to live with those contracts that are negotiated by the man that they don't want negotiating them.

THE COURT: Let's go back to a hypothetical role for a second. In the event -- let's presume there was no trusteeship put in place; this was just the board who decided, you know what, we don't like our current negotiator, we're coming down in a time crunch, Urban has history here, Urban negotiated the last deal, we, the board, are going to change our negotiator, we're going to hire Urban to come back in on an emergency basis and negotiate this and the members said, We don't like Urban. Can't the board say, Too bad, we're the board, we're authorized to do this, we're doing this? And the -- and the membership would have -- would be stuck at that point.

MR. MCAVOYAMAYA: I do not believe that that's true because the local union Constitution allows the independent collective bargaining units to choose their negotiator. I believe that that is under the Constitution. If I -- if I could look it up on my computer, I could get you the provision.

THE COURT: Who would that independent collective bargaining unit be?

MR. MCAVOYAMAYA: That's the Clark County collective

bargaining unit.

THE COURT: Okay.

MR. MCAVOYAMAYA: The one that is currently negotiating be -- that was negotiating with Mr. Nguyen for this current contract, then they fired him and told the collective bargaining unit that they no longer have a choice between to -- in anything. They're just there.

THE COURT: All right. All right.

MR. MCAVOYAMAYA: That's the irreparable harm, Your Honor.

THE COURT: Okay. All right. Thank you for that.

(Brief pause in proceedings.)

MR. COHEN: May I be heard, Your Honor?

THE COURT: Hang on one second. I'm reviewing my notes to see if I have all my questions answered before I turn to you.

(Brief pause in proceedings.)

THE COURT: You may have answered this already, Mr. Mcavoyamaya. Garcia was not a member of the Executive Board; correct?

MR. MCAVOYAMAYA: No, he was not.

THE COURT: So he can't argue that he relied upon any misrepresentations made by the international because the misrepresentations weren't made to him; correct?

MR. MCAVOYAMAYA: No, because -- yeah. The board

meeting was closed to the members. He was at the board meeting and -- when it was closed, though.

THE COURT: So --

MR. MCAVOYAMAYA: Yeah.

THE COURT: -- in order to maintain that misrepresentation, fraudulent or negligent misrepresentation claim, you've got to have a member of the board say that I was misrepresented to and I reasonably relied upon those?

MR. MCAVOYAMAYA: And we submitted a statement of one of them.

THE COURT: Okay.

MR. MCAVOYAMAYA: Yes.

THE COURT: All right. I saw it.

MR. MCAVOYAMAYA: So, yes. And she specifically stated that she felt coerced and that Mr. Ury was her attorney and -- and I think that -- that a California attorney coming down to Nevada to -- to give legal advice to a party with a clear conflict of interest and misrepresent the legal basis for -- for -- of the -- of the local union Constitution, I think that that is pretty demonstrative of fraudulent intent, Your Honor, and I think that -- that just based on the fact that they've never done -- they've never asked to impose this trusteeship, just shows that they knew, and they failed to apprise the board of their rights. They failed to tell them that the Affiliation Agreement existed, that the trusteeship

provisions were waived, that, you know, the local union Constitution provided for a vehicle to replace the officers, they failed to tell them anything. They just came in and said that we -- that you have to vote to allow us to place you in trusteeship.

THE COURT: Why did they have that obligation? Why didn't the local know that on its own? Again, why wouldn't the local know its own Constitution? Why wouldn't the local know its own rights and regulations? Why would it blindly rely on someone who is coming in and telling them that this is how it works?

MR. MCAVOYAMAYA: Because the primary two officers who would be responsible for knowing that, which is the president and vice president, were removed improperly by the international.

THE COURT: So the board doesn't know what its own powers and authorities -- there's only two people in this union that know what it's allowed to do?

MR. MCAVOYAMAYA: The two people that would be most likely to know were removed improperly by the SEIU, and we should address that -- that particular issue, too, because the Affiliation Agreement provides exclusive jurisdiction over members in the local union, which means -- that -- that waives the jurisdictional provisions utilized by the -- the international union's president to take over the hearing of

Ms. Mancini's and Kisling's hearing.

If you take a look at the union Constitution, the union Constitution clearly says that -- that any charges against the president or the vice president is the exclusive jurisdiction of the local union and upon request, they can ask the -- the board can ask the international to come in and bring a hearing officer. That did not happen, and the Affiliation Agreement voids the jurisdictional provisions that were utilized in this case to remove the two people that were most likely to know the legal rights surrounding the affiliation.

THE COURT: A hearing was held and a hearing officer made a determination recommending the removal; correct?

MR. MCAVOYAMAYA: At the -- at the international. But if you take a look at the local union Constitution --

THE COURT: I understand that.

MR. MCAVOYAMAYA: -- the only way that can happen is if they ask for it and they didn't ask for it in this case.

THE COURT: Was any legal action taken to either stop those hearings, to block those hearings, or to block the result of those hearings?

MR. MCAVOYAMAYA: There was local union members that went up to the hearing, yes.

THE COURT: Was a legal action -- did someone seek an injunction to stop those hearings saying those are ultravirus, it was beyond the rights, they can't do this? Was any

action -- legal action taken to try and stop those hearings?

MR. MCAVOYAMAYA: I don't believe that there was, you know, really enough time given -- in that situation to do that. Like I said, they held the hearing, they did the Report and Recommendation and the same day the Report and Recommendation came out they -- they were down here with their officers telling the board that they had to vote for trusteeship. So the same day that they removed the president and vice president from power, that same day is when they came down and told the board that they had to vote for trusteeship. So I just don't believe that there was enough time for them to do that. And I don't believe they should be penalized for -- for waiting until the decision to take legal action. Because, I believe, wouldn't it -- wouldn't it then be moot as well? Because there was no act -- there was no harm -- there would be no harm in that situation until the president and vice president are removed. So that action wouldn't be actionable until the international actually took action against the president and vice president and that same day that they removed those two officers from power they were down here making misrepresentations to the local board.

THE COURT: It appears from your moving papers, Docket No. 14 -- wait a second. In your ex parte application for TRO, which was nearly identical to the Preliminary Injunction, on Page 5 of Document 14 you say, at Line 19, that

on October 29th of 2016 the president of SEIU, Ms. Henry, improperly exercised jurisdiction over complaints submitted by Local 1107 members against several members of the Executive Board. She improperly ordered a hearing to determine the validity of the charges. That's October 29th.

On April 26th Ms. Nieters submitted a Report and Recommendation. I presume she conducted a hearing some time between October and April.

MR. MCAVOYAMAYA: That's correct, but what act -- like, without harm, without actually removing the president from power, what is the harm that you could -- that you could assert when you're bringing it? I believe it would be moot because you're saying that in the future, that possibly the president and vice president may be removed by the -- by the -- by the international through the hearing, which I think would essentially be a motion for -- you know, Motion to Dismiss for -- for --

THE COURT: Unripeness.

MR. MCAVOYAMAYA: Yeah, unripeness, exactly. And so, like, it became -- that claim became ripe on the day the Report and Recommendation was issued and the day that Ms. Henry removed the two officers from power. And that same day is when they sent people down here and -- and voted for the trusteeship, Your Honor.

THE COURT: And Ms. Mancini and Ms. Kisling have not

filed any actions to get reinstated or to undue the hearing against them; correct?

MR. MCAVOYAMAYA: They are going -- they have been going through the international's process.

THE COURT: The appeals process?

MR. MCAVOYAMAYA: Yeah, the appeals process. So yes, they have done that. We will be filing a -- you know, a legal action on behalf of them shortly, but the -- she wanted to, you know, exhaust the remedies just to be thorough.

THE COURT: All right. Okay. Thank you.

Mr. Rothner.

MR. ROTHNER: Mr. Cohen's going to do it.

THE COURT: Sorry. Mr. Cohen, go ahead.

MR. COHEN: Thank you, Your Honor. There was a lot of ground covered.

THE COURT: Yes, there was.

MR. COHEN: I want to start first with, really, I think, the most simple but important point in this case. The Affiliation Agreement is clear and it authorizes the board to vote for a trusteeship. There is no dispute about that. It happened in this case, as the Court understands, by a wide margin, and there's -- there's no real response to that from the plaintiff other than, well, other aspects of the union -- local union's Constitution and bylaws prevented that.

THE COURT: Tell me what provision of the Affiliation

Agreement authorizes that.

MR. COHEN: It is Document 111, Your Honor.

THE COURT: I've got the Affiliation Agreement.

MR. COHEN: It's Subsection 18. Paragraph 18, Your Honor.

THE COURT: "The provisions of Article VIII, Section 7(a-f) and Article XII, Section 3 of the SEIU Constitution regarding trusteeships are hereby waived except for the purpose of enforcing this agreement pursuant to Paragraph 21 below or with the approval of the PEA Board of Representatives."

MR. COHEN: And the PEA Board of Representatives is the same -- same board, Your Honor.

So, I think that would be -- you couldn't ask for clearer language. Clearly it authorizes a trusteeship.

And there's a second point here. Counsel has said that somehow even if the Affiliation Agreement authorized the local union to vote for a trusteeship, the SEIU's Constitution and bylaws didn't authorize SEIU to impose a trusteeship. Those provisions are only waived absent a vote of the Executive Board. They're not waived if the Executive Board voted to authorize it. So all trusteeship provisions of the international's Constitution are in full force and effect because the local union's board of -- Executive Board voted in favor. It's simple.

The -- the argument that counsel makes in response to

what I think really is the heart of the case, Affiliation Agreement authorized what the Executive Board did, is two-fold; first, like I said that there's other aspects of the Constitution, the local's Constitution and bylaws that prevented them from doing what the Affiliation Agreement that they're a party to authorized, that's somewhat nonsensical to think -- you would think that you would want to harmonize those two contracts, not hold one void because of what the other one says.

THE COURT: Um-hmm.

MR. COHEN: So let's assume the Affiliation Agreement authorized it. He -- counsel points to the provision of the local bylaws that talk about disestablishment. The local union has not been disestablished from anything. It remains party to all of its collective bargaining agreements. It remains the sole exclusive collective bargaining representative of all the bargaining units that it represented prior to the imposition of the trusteeship. There's no disestablishment.

With respect to the role of the trustee, we cited several cases, Your Honor. The trustee steps into the role of the local union's officers and has to discharge her duties in the best interests of the local union. There's literally nothing here that's resulted in the "disestablishment" and I think what disestablishment means is decertification, replacement of Local 1107 with a different organization as the

exclusive bargaining representative.

I want to make a larger point here, Your Honor. We've heard so many assertions here that -- for which there's no evidentiary record whatsoever. There's no evidence. We've heard accusation after accusation about fraud, about misrepresentations. What we have in the record to rely on are three unauthenticated e-mails. That's -- that's not admissible evidence, Your Honor.

THE COURT: Well, I can rule on an injunction request on an emergency basis without admissible evidence.

MR. COHEN: Okay. Well, let's assume -- let's assume it's -- let's assume you're on three e-mails, Your Honor, from the 29 Executive Board members that were present. One of the e-mails, who is, I will assume for the sake of argument, from an E-Board member, says that the Executive Board -- and I'm quoting -- or -- excuse me -- the international -- I'm quoting, she felt blindsided at the board meeting even though the representatives from the international did an adequate summation of the reasons and there was opportunity for the E-Board to ask questions.

That's the evidence of fraud? That the international did an adequate summation of the reasons?

I would submit that there's -- there's simply no basis for the accusation that the international committed fraud and that -- and as the Court, I think rightly pointed out,

there's a serious causation problem. At most, we have e-mails from three Executive Board members, one of whom admits that the international did an adequate submission of the reasons. Okay. So we have two, of the 17 who voted in favor. And by the way, one of those two abstained and admitted in his e-mail that he really didn't understand the trusteeship well enough or the Constitution and bylaws.

And the Court brought up another point which is adequately supported by Ninth Circuit precedent. The *Cecil Backhoe* case says that labor unions are presumed to understand the contracts to which they're a party and, in fact, the language we quote, and admittedly, that case has to do with alleged fraud between an employer and the union, but it says that labor unions are presumed to understand the contract to which they're a party and -- and I think that, of course, applies here. You would expect the Executive Board of the union to understand the agreements, particularly its Constitution and bylaws and as the Court pointed out, the president and the vice president of the union aren't the only two people who understand what the Constitution and bylaws means.

So, with -- the Affiliation Agreement clearly authorized the vote. Nothing in the union's Constitution and bylaws prevented it. Nothing in the international's Constitution and bylaws prevented it. There's no evidence of

fraud and misrepresentation except for, at best, one or two unauthenticated e-mails.

He -- he -- the -- counsel has said that there was a misrepresentation about there being no way to replace the president and vice president. Really what you have, though, is a situation in which there's no president, there's no vice president. Who's going to run the day-to-day affairs of that local union if there's no officer to do that? So, counsel suggests that, well, we can just hold another hearing at the next Executive Board meeting or maybe at the next Executive Board meeting. The union has to run its day-to-day affairs. Collective Bargaining Agreements to negotiate and enforce, grievances to handle, National Labor Relations Board proceedings. A myriad of things to do on a day-to-day level and the two principal officers of the union aren't there to do it. So, of course the trustee -- of course the international's concerned about that and you can imagine a situation where there's urgency and they need the Executive Board to act promptly to make sure that that local union is capable of running its day-to-day affairs.

THE COURT: But plaintiff is going to argue that's akin to saying I killed my parents, so have sympathy on me because I'm an orphan. If your union created the problem by firing the -- terminating the president and vice president, why should that inure to your benefit?

MR. COHEN: I appreciate that, Your Honor. I want to say one word about that.

There's -- counsel has said that somehow it was improper for the international to remove -- or to take jurisdiction over the charges. We cited in our brief, and it's quite clear, the international Constitution, Article 17, Section 2(f) -- and this is on Page 10 of our opposition brief -- states that the international president may assume original jurisdiction "if the international president, as a result of an investigation, believes that the charges filed against a member or officer involve a situation which may seriously jeopardize the interests of the local union or the international union."

There's no evidence that the international president didn't believe that there was cause for concern here. There's --

THE COURT: Is that -- let me stop you.

Is that provision still in effect or has it been superseded or wiped out by either the Affiliation Agreement or the local Constitution or something like that?

(Counsel conferring.)

MR. COHEN: Yeah. That was the international Constitution. No, Your Honor.

THE COURT: It's still in place and still enforceable?

MR. COHEN: Oh, yes, and this was -- the international took jurisdiction over these charges prior to the imposition of the trusteeship, Your Honor. This was, as the Court pointed out, back in October.

And there's a second point. Counsel said, well, what's the harm until the hearing officer recommends removal of both officers. Well, the harm, according to counsel, is the international wrongfully taking jurisdiction over charges against the local union officers. If that was wrongful, if that was unauthorized, that was the harm. And yet, the international assumed jurisdiction over those charges back in October and they did nothing.

THE COURT: Mr. Mcavoyamaya suggests that the whole purpose of the local Constitution and the Affiliation Agreement is to give the local control and therefore that provision you cite about the international being able to step in and take over is contradicted and is superseded or overruled by the local Constitution or the Affiliation Agreement.

MR. COHEN: I'm not aware of anything in either of those agreements that says that the article which I just quoted to the Court is not in effect. And with all due respect to counsel, there's no evidence that -- that -- I mean, first of all, he hasn't cited any specific provision of the local Constitution or bylaws, or the Affiliation Agreement, that specifically preclude the international president from taking

jurisdiction over charges, other than his overall view, his general argument that, well, the local Constitution, of course, places primary emphasis on local control. Well, of course it does, but it's an affiliate of a local union. I mean, excuse me --

THE COURT: It's international.

MR. COHEN: -- it's an affiliate of an international union. So of course it's going to be subject to the international's Constitution and bylaws, except to the extent that those provisions have been waived by agreement as they were in the Affiliation Agreement.

You know, if I could just turn -- I think that really disposes of our position with respect to likelihood of success on the merits and we think that there's really no likelihood of success obviously and --

THE COURT: Let me pause you because I don't know if I wrote down the right -- you were quoting from the SEIU Constitution about the authority of the president to take the actions?

MR. COHEN: Yes, Your Honor.

THE COURT: What section of that was the --

MR. COHEN: That is Article 17, Section 2(f), Subsection ii, and it's quoted at Page 10 of our opposition brief and it's at ECF Number 11-7 at Page 39.

THE COURT: Thank you.

Okay. I apologize for interrupting. I wanted to make sure I had that.

MR. COHEN: I want to address irreparable harm.

There's no irreparable harm, Your Honor.

First, with respect to financial malfeasance, I've heard counsel say numerous times, and in his papers, that somehow the trustee has expended funds without authorization. The sole evidence, and if we're -- if we're going to do away with evidence, the sole assertion here is a photograph of an envelope from American Express to the trustee.

MR. MCAVOYAMAYA: I have the envelope here, Your Honor, in you want to look at it.

THE COURT: Let me stop you. That, to me, sounds like there's a monetary remedy available and that would not constitute irreparable harm.

MR. COHEN: Okay, Your Honor.

THE COURT: Address his argument that the fact that you're displacing a negotiator --

MR. COHEN: Okay.

THE COURT: -- is irreparable harm.

MR. COHEN: Okay. I want to address that first.

Counsel's asserted numerous times that the members want Peter Nguyen to be their collective bargaining representative. I am not aware of any evidence he submitted proving that there was a vote, any evidence whatsoever other

than his naked assertion that the members wanted Peter Nguyen.

There's several responses. One, we submitted the declaration of Mike Urban. Now -- and he's shown, in concrete terms, the progress he's made in bargaining. There were eight collective bargaining sessions when Peter Nguyen was the chief negotiator and they had, I believe, four tentative -- or no -- excuse me -- zero tentative agreements -- between zero and four, I forget now. Since Mike Urban has taken over, I -- I think there's been 22 tentative agreements with respect to this successor agreement and there's only six left. So -- so he's made --

THE COURT: Which is a credit to Mr. Urban but it also, I understand, as the deadline approaches, rapidity -- speed takes over and --

MR. COHEN: Sure, Your Honor.

THE COURT: -- things happen.

MR. COHEN: That's right.

And there's a second point here, though, and I think it reflects something that -- it's a profoundly antidemocratic tendency of plaintiff's position. Although they're, you know, purporting to extol democracy, this whole thing is so antidemocratic. There are 22 elected members of the Clark County bargaining committee. Those -- they were elected, Your Honor, and that's Article 10, Section 4 of the local's Constitution and bylaws which authorizes bargaining units to

vote for their bargaining committee. They don't vote for -- no one voted for Peter Nguyen to be their chief negotiator; they voted for those 22 of their fellow employees to be the bargaining committee members. And -- and I think it is, again, it's . . . well, it's insulting to them to think that Peter Nguyen was the chief architect of everything that had to do with that collective bargaining. There's 22 employees, Your Honor, who work in Clark County who sit at those negotiations day in and day out. Presumably, Your Honor, they have some role in collective bargaining and devising strategy.

THE COURT: And those 22 who were elected are still in place --

MR. COHEN: Yes.

THE COURT: -- and still participating?

MR. COHEN: Yes, Your Honor. And that is in the declaration of Michael Urban submitted with our opposition.

THE COURT: Let me ask you this. In the event a -- an agreement is negotiated to completion and by the end of the month there's a deal, who votes to ratify that deal? What's the process?

MR. COHEN: Those members of the collective bargaining unit, and I could cite to you the local Constitution and bylaw provision requiring it. Article 16 of local Constitution and bylaws, Section 9, requires ratification of Collective Bargaining Agreements by the bargaining unit.

THE COURT: By the bargaining unit?

MR. COHEN: Yes. The employees.

THE COURT: Those 22 or --

MR. COHEN: No. No. The employees in the Clark County bargaining unit.

THE COURT: So the people that will be impacted by that contract that's negotiated get to vote "yes" or "no"?

MR. COHEN: Yes, Your Honor. The employees -- the bargaining unit are those employees that are subject to the terms of the Collective Bargaining Agreement.

THE COURT: So they get to vote?

MR. COHEN: Yes, Your Honor.

THE COURT: Thank you.

MR. COHEN: You know, there's a few other arguments about Peter Nguyen's role and we address it in our brief, but with respect to the Evergreen Clause, that -- that would apply no matter what.

And there's another point that they raise in their papers about somehow the expiration of the Collective Bargaining Agreement spelling certain doom for everybody. There's a extraordinarily well-established principle in labor law, Your Honor, that requires the terms and conditions of employment to remain in effect, the status quo has to remain in effect, unless and until the parties agree otherwise, or there's a bona fide impasse. So, that circumstance would exist

whether or not Peter Nguyen's the chief negotiator and again, what we have here is -- there's another point.

We're talking about irreparable harm, Your Honor, but the plaintiff is not even a member of that bargaining unit. Raymond Garcia is not even employed by Clark County. He's not going to be affected by that collective bargaining agreement. Where is the irreparable harm to plaintiff? There's none.

THE COURT: Address Mr. Mcavoyamaya's argument that because the union -- I'm sorry -- the international has not held that hearing within 30 days after imposition of the trustee, that the trusteeship should be dissolved.

MR. COHEN: Your Honor, the international's Constitution and bylaws is clear that the president can extend the time for holding a hearing.

THE COURT: And you don't know if she's done that or not?

MR. COHEN: I assume that she has, Your Honor, because it hasn't been held within 30 days and -- and the Constitution and bylaws gives her clear and plenary authority to extend the deadline. There's no requirement that it be done pursuant to notice to plaintiff. There's no specific requirement that he cites or is evident in any of the papers that suggests she can't do it by fiat. That's her role. That's her authority.

THE COURT: Isn't there an equally plausible

explanation that everybody just forgot about it or just decided --

MR. COHEN: No, Your Honor. I can assure the --

THE COURT: -- not to have it?

MR. ROTHNER: Could I be heard as long as we're not requiring strict adherence to the Rules of Evidence here?

I know, from my personal communications with the international union, that they have been diligently trying to settle on a date. It involves calendars of some people, including me, and locations and including the availability of a hearing officer. I know that they have a tentative date, which I hesitate to mention --

THE COURT: Understood.

MR. ROTHNER: -- because it's tentative, but I know they have a tentative date.

THE COURT: Okay. All right. Thank you for addressing that.

Mr. Cohen, didn't mean to cut you off.

MR. COHEN: Your Honor, I just want to make one more point about the public interest here.

We cited Ninth Circuit case law to the Court and that's really just the tip of the iceberg. The string cites go on for days about the well-established policy of avoiding unnecessary interference in the internal affairs of unions. And I'm quoting now from the *Motion Picture & Videotape Editors*

*Guild* case. "Disputes between an international and its local are best left for internal settlement. It's precisely for that reason that 'courts must be careful not to undermine union's self-government.'" That is the public policy at stake here and that is precisely what plaintiff seeks to do.

There's no dispute the Executive Board, in the representative democracy that the Court has likened this to, it's absolutely right, it's a representative democracy. The members voted for the Executive Board, the Executive Board voted for this, and on behalf of a single member of the union plaintiff asks the Court to undue the democratic will of the Executive Board.

Now, plaintiff may have good arguments for the wisdom of the Executive Board's decision and those arguments will be aired out at the trusteeship hearing, but that's the internal process here, not going to federal court and asking the federal court to intervene and undermine the will of the Executive Board at the behest of a single member. That is 180 degrees in opposition to the well-established federal policy of non-intervention, and that is the public interest at stake here, Your Honor.

THE COURT: Thank you, Mr. Cohen.

MR. COHEN: Thank you.

THE COURT: Let me see if I had any other questions left for you that you haven't answered.

(Brief pause in proceedings.)

THE COURT: Mr. Mcavoyamaya, address for me, first, Mr. Cohen's statement that -- in response to my question, that if a deal is negotiated to fruition, that deal has to be taken back to the members to be voted upon; correct?

MR. MCAVOYAMAYA: That's correct, Your Honor.

THE COURT: Okay.

MR. MCAVOYAMAYA: But currently right now they're not -- they're not making the decisions.

I actually have a letter, a signed letter from a member of the collective bargaining unit that works for Clark County. The printout is -- because it was, like -- it was a scanned image, so it's kind of -- it's readable; it's just a little, you know, messed up. I can show you it on the computer if you'd like to see it, but I'd like to read it.

It says, "My name is Syed Hyder."

COURT REPORTER: Spell that, please.

MR. MCAVOYAMAYA: S-y-e-d-H-y-d-e-r. He's one of the people that I -- I -- I brought the -- or I submitted his e-mail as well.

"I'm employed by Clark County with the Department of Air Quality. I am a shop steward and also serve as SEIU 11 -- on -- as a member of the SEIU 1107 bargaining team for Clark County.

"We started contract negotiations with Clark County

in January of this -- of this year with Peter Nguyen as our chief spokesperson. Since then we completed eight bargaining sessions. Mr. Nguyen, as our chief -- with Mr. Nguyen as our chief spokesperson. We were making progress towards control -- towards a contract, but they have been stalled.

"Mr. Nguyen was removed as our chief spokesperson. That, in my opinion, is detrimental to our negotiation process."

I can provide that to the Court --

THE COURT: Okay.

MR. MCAVOYAMAYA: -- as well.

So, the collective bargaining unit itself is -- is angered about the displacement of him as well as the concessions that Mr. Urban is making. They've made 20 --

THE COURT: Stop.

MR. MCAVOYAMAYA: -- the fact that --

THE COURT: Stop. Stop!

MR. MCAVOYAMAYA: Yes, Your Honor.

THE COURT: Stop for a minute.

You answered my question, which was, if a deal is negotiated and Mr. Urban and his team, this 22 unit group enter into an agreement, that has to be approved by the members; correct?

MR. MCAVOYAMAYA: Correct, and right now the members do not approve of what the -- the decisions that are being

made.

THE COURT: Perfect. Great. Stop.

MR. MCAVOYAMAYA: Yeah.

THE COURT: So, let's say they have that vote and the members say no, we don't like the deal you cut. There's no deal; right?

MR. MCAVOYAMAYA: I don't believe that that's true because of the trusteeship, Your Honor.

THE COURT: Well, wait a second. The members have to vote to approve a deal. If they don't like the deal Urban cuts, they vote against the deal, there's no deal. Where's the irreparable harm?

MR. MCAVOYAMAYA: That's if the trustee holds a vote, Your Honor. They didn't hold a vote -- they didn't hold a -- they didn't hold a vote with all the membership regarding the trusteeship. There's no -- there's -- that -- that is based on the assumption that this trustee is going to allow them to do that --

THE COURT: Wait. Wait. Wait.

MR. MCAVOYAMAYA: -- and I don't think that they will.

THE COURT: Wait.

So you think that the trustee could approve a contract negotiated by Urban without the vote of the members?

MR. MCAVOYAMAYA: They have taken over all control

and removed the board -- the board of the union from power.

THE COURT: They haven't taken over -- they haven't removed the members; right? And it's the members, not the board that votes; correct?

MR. MCAVOYAMAYA: No. It would be the collective bargaining unit.

THE COURT: Unit. Great.

They haven't been displaced?

MR. MCAVOYAMAYA: Their -- their -- the lead negotiator has and they're making decisions, like I -- like they said, 22 concessions since he became the -- since he became the representative. The fact that there were no concessions before that shows that he's making decisions that they don't want, and he has told them -- the trustee has told the bargaining unit that they have no choice. That is the fact here.

THE COURT: Okay. I -- I -- I'm going to presume that's correct for a second. You're still not addressing my point. Let's say he cuts the worst deal in the world and he says you know what, our members are going to take 5 cents an hour to work and we're not going to charge anything for overtime and we're not going to have any benefits. Terrible deal. And he takes it back -- and Urban brings it back. According to your Constitution, according to your local rules and bylaws, those affected members of the union have to vote on

that?

MR. MCAVOYAMAYA: That's according to the local union. Their position is that the local union doesn't -- the local union Constitution doesn't apply. They're using the international union Constitution to impose a trusteeship on the local and there are no provisions in the international Constitution that requires the trustee to hold that vote.

THE COURT: Is there any evidence before me that would show or demonstrate that the members of this affected unit would not get to vote on a deal Urban ultimately cuts?

You're saying the only evidence you have is the fact that there's a trustee in place who may or may not allow them to vote.

MR. MCAVOYAMAYA: I think that -- that -- that that is the case. Either -- there's no evidence either way. And because of the imposition of the trusteeship, according to the international, under the international's trusteeship provisions, there's nothing in there that says that they have to follow the local union Constitution, which means that they don't have to hold a vote.

THE COURT: Do you -- do you realistically think that Clark County would enter into a contract that has not been approved by the members but rather was dictated by a trustee?

MR. MCAVOYAMAYA: I don't think that they know, to be honest, Your Honor. They have -- they have -- they have Urban

negotiating all these -- all these provisions with the County. He's the representative, according to the trustee. I don't think that there's going to be any notice to -- to Clark County after they entered into the negotiation that oh, we're not holding a vote.

THE COURT: You don't think Clark County asked, Why is Nguyen not here and why is Urban here now? and somebody didn't explain that to them?

MR. MCAVOYAMAYA: I'm sure that they explained to them that it was -- that they placed the other side into trusteeship, not that they're not -- like, whether or not they will hold a vote. The trusteeship means that they are now in control, in sole control of the union. They don't have to hold that vote, because that's under the local Constitution.

THE COURT: If --

MR. MCAVOYAMAYA: On top -- and to that point, I would -- I would like to address the fact that they are trying to interpret the local union Constitution. The local union Constitution says expressly in it that the interpretation of the Constitution is governed by the local union, not by anyone else. So they have exclusive -- the board has exclusive jurisdiction for that. The local union has exclusive jurisdiction to interpret that and the Affiliation Agreement. The Affiliation Agreement expressly includes a jurisdictional provision, exclusive jurisdiction over all members and all

employees. There is no possible -- I mean, it's exclusive. Exclusive jurisdiction is exclusive jurisdiction over others.

THE COURT: Tell me what section of that Affiliation Agreement you're referring to.

MR. MCAVOYAMAYA: It should be -- I believe it is Paragraph -- or is Paragraph 5. Exclusive jurisdiction over all members. Let me -- let me find my -- let me find it in my --

THE COURT: Paragraph 6 says, "The exclusive jurisdiction of PEA shall extend to all employees of Clark County" --

MR. MCAVOYAMAYA: And all members. Exclusive.

THE COURT: Wait a minute. Hold on.

All right. But Mr. Cohen points out that under the international Constitution, they have the right to impose this trusteeship and there's nothing in the Affiliation Agreement that takes that away.

MR. MCAVOYAMAYA: If you take a look at the letter that -- that Ms. -- what is it -- the -- Ms. Henry --

THE COURT: Okay.

MR. MCAVOYAMAYA: -- the president of the international, sent to union members, said that she is exercising her general jurisdiction under the provision cited by opposing counsel --

THE COURT: Okay.

MR. MCAVOYAMAYA: -- to take over the hearing.

THE COURT: Okay.

MR. MCAVOYAMAYA: Well, the exclusive jurisdiction over members is vested in the local board, not the international. That provision itself says that the jurisdiction -- any jurisdictional provisions of the international Constitution over members of the local union are waived.

THE COURT: So -- so -- so you're saying that that paragraph, that sentence, in Paragraph 6, means that the international Constitution has absolutely no application and the international can't do anything to the local?

MR. MCAVOYAMAYA: I'm saying that it has the exclusive jurisdiction over employees and members and the local union Constitution reaffirms that because it says that they have exclusive jurisdiction over charges against officers or the board. They can ask for a hearing officer to come down from the international to be an impartial representative, but that did not happen here, Your Honor.

THE COURT: Okay. Hold on a second.

MR. MCAVOYAMAYA: And that's under trial -- the trials and hearings section of the local union Constitution.

THE COURT: Well, Paragraph 5, the one you were talking to, says that, "PEA shall retain its identity, including full autonomy in accordance with the provisions of

the international Constitution and bylaws of SEIU," which suggests to me, when it says "in accordance with the provisions of the international," that --

MR. MCAVOYAMAYA: It's full identity and full autonomy. The autonomy provided in the local Constitution. However, they expressly state in the next thing that the exclusive jurisdiction over the members is vested in the local union and the local union Constitution affirms that provision of the contract.

THE COURT: Well, that exclusive jurisdiction provision in Paragraph 6 seems to me to say that all employees of Clark County would fall under the jurisdiction of PEA and that the international will not allow any others -- any of its local unions to conduct any organizing efforts or to bring in -- you guys are the exclusive unit for Clark County.

MR. COHEN: Your Honor, if I --

MR. MCAVOYAMAYA: You could look at it that way, Your Honor, but if you look at the local union Constitution, the local union Constitution, with regards to trials and hearings, says that hearings over charges to a member are the jurisdiction of the local union board, not the international. They can request it. So, like -- like, you could -- you could look at that provision of the Affiliation Agreement and say maybe it's ambiguous, but with the local union Constitution affirming that that -- that that jurisdiction includes charges

against officers, I think that -- that -- that the two together -- they work together, Your Honor.

THE COURT: So you're saying that the local Constitution, in conjunction with this paragraph, can supersede the international Constitution that's not been expressly waived in here?

MR. MCAVOYAMAYA: Absolutely.

THE COURT: Okay.

MR. MCAVOYAMAYA: And also, like I said, they're trying to interpret the local union Constitution which is impermissible. Local union Constitution is interpreted by the local union, not by anybody else. Same thing with the Affiliation Agreement. Affiliation Agreement says the provisions of it are interpreted by the local union, not the international.

THE COURT: Well, not necessarily, because it also says that "any disputes concerning the meaning and application of this shall be, upon the request of either party, decided by arbitration." So there's a provision that an arbitrator can make that decision, not just the local, if one side selects that.

MR. MCAVOYAMAYA: But the interpretation -- it gives deference to the local union's interpretation of the Constitution.

THE COURT: All right.

MR. COHEN: Your Honor --

THE COURT: Hang on one second, Mr. Mcavoyamaya.

Mr. Cohen.

MR. COHEN: I just want to make a very brief point that just piggybacks on Mr. Mcavoyamaya's point.

The international -- the local union's authority to interpret its Constitution and bylaws, I would agree it has that authority. It did. It interpreted its Affiliation Agreement as authorizing it to vote in favor of the trusteeship.

THE COURT: I -- I --

MR. COHEN: I want to make just one other quick point about that Paragraph 6. That Paragraph 6 is a simple no rating provision, Your Honor. Just -- it prevents other unions from asserting jurisdiction over those --

THE COURT: That's how I interpreted it as well.

MR. MCAVOYAMAYA: That's a misrepresentation, Your Honor. They did not advise the board of the Affiliation Agreement. They did not advise the board when making this vote that the Affiliation Agreement existed. They just said that you have no choice but to do it.

THE COURT: Well, it gets back to the point, do I have to advise you that you have a driver's license? Do I have to advise you that you have a lawyer's license? I mean, how much does the international have to tell and couldn't one

presume that board members know there's an Affiliation Agreement and a local Constitution?

MR. MCAVOYAMAYA: They had an attorney do it, Your Honor, and the attorney had a clear conflict of interest.

THE COURT: Well, and there's nothing says that the local has to rely upon that attorney as opposed to getting its own attorney or making its own independent decision.

MR. MCAVOYAMAYA: And that -- well, that's what the local board -- but they were told they had to vote that day, in the closed meeting, they couldn't take time afterward.

THE COURT: 12 members of who disagreed.

MR. MCAVOYAMAYA: 12 members abstained because they didn't -- because they didn't believe they had enough information.

THE COURT: 5 abstained. 7 voted.

MR. MCAVOYAMAYA: 5 abstained. 12 -- or 7 voted "no."

THE COURT: Anything else?

MR. MCAVOYAMAYA: Yes.

Regards to the fraud, they're trying to say that there was no evidence of fraud. The fraud comes from failing to advise the board of the Affiliation Agreement and the conflict of interest and the fact that they closed the board meeting to members, which was customarily opened to all the members.

THE COURT: Okay.

MR. MCAVOYAMAYA: So that the members could not comment.

You know, as far as their day-to-day relations argument, they could have held a special election. That's what the local union Constitution provides for. It provides for a special election and they're failing to hold that and failing to abide by the local union's, you know, clear democratic bylaws to hold a special election to replace the vice president is clear. Like, I mean, that particular -- I mean, like, they're refusing to abide by the local union Constitution by refusing to hold a special election.

THE COURT: Couldn't the board make a determination --

MR. MCAVOYAMAYA: Now?

THE COURT: No. Before the board -- take it back to the day of the vote, where the board voted for the trustee. Couldn't the board have sat there and said, We have two warring factions here; we've got problems that started the whole thing and because of these warring factions we're concerned about having an election right now and we, as a board, think that maybe the best think to do to bring peace to the valley temporarily is to have an independent neutral third party trustee come in, temporarily, calm the waters, let's get through this process, let the water settle and then we're going

to have to vote once everybody kind of gets their act together? Why couldn't the board do that?

MR. MCAVOYAMAYA: Well, number one, that did not happen and number two, one of the e-mails that was included was one of the members who voted "yes."

THE COURT: Okay.

MR. MCAVOYAMAYA: And she voted for the trusteeship and felt that she was coerced to do so. She wasn't given enough information. I think that alone shows that not all the people who voted "yes" knew what they were doing. They -- she -- they -- she felt pressured by the international's officers and attorney that they sent down here, that she couldn't leave without voting for the trusteeship and she voted for it and has changed her mind. That -- the fact that there's a board member's statement in this case that says that -- that says that she wished she could take back her vote because she did not believe that it was procured properly, I think, is evident of the fact that there's a likelihood that if this vote is held again, it will fail.

THE COURT: There's a lot of people in this country that woke up in early November and thought, boy, I'd like to change my vote. There's a lot of people in England after the Brexit vote that woke up the next day and think, gee, I'd like to change my vote. Doesn't mean it gets to happen.

MR. MCAVOYAMAYA: As far as -- as far as this

particular --

THE COURT: Be careful what you say. I'm being facetious. Don't go there.

MR. MCAVOYAMAYA: Yeah. No. I mean, as far as this situation goes, it's because they -- it was procured through, you know --

THE COURT: Understood. There's a big difference in what you're saying.

All right. Anything else?

MR. ROTHNER: One real technical point, Your Honor, if I could. This is on the ratification question. It's a question of irreparable harm and I just want to say that there's been a lot of speculation about what the trusteeship would do. ECF No. 1-1, Page 190, contains the international union Constitution's member Bill of Rights and the fourth item is the right to participate in the union's bargaining efforts and to approve union contracts.

THE COURT: Okay. Thank you.

Anything else, Mr. Mcavoyamaya?

MR. MCAVOYAMAYA: Well, as far as their -- their refusal to hold the hearing pursuant to the trusteeship provisions of their own Constitution, I just want to highlight to the Court that opposing counsel said that he assumed that she did that, which I don't think the Court should consider because it's an assumption.

And the fact that the unit is currently not governing itself, the trustee is governing it. The unit is not governing itself right now. So to say that democratic governance is occurring right now is, I think, a misrepresentation. It's not occurring right now and I believe it's because it was -- this trusteeship was procured through fraud.

A lot of the members didn't even -- like, they didn't know that they were going -- that their positions on the board were going to be vacated by the trustee. I mean, that -- that particular -- I mean, the board members -- it's pretty clear that the board members did not know that when the trustee came in, all their positions would be eliminated, and that's what the trustee did. When they come back to vote, it's not going to be for trusteeship, Your Honor, and I think that the facts show that clearly. I think that the letter from the representative on the board who voted "yes" shows that they didn't know and I think that -- that closing the board meeting, failing to apprise them of the Affiliation Agreement, misrepresenting the provisions of the local Constitution, through an attorney, that represented to them that he was representing them, I think that, like, when you look at the facts of this case all together, it shows that -- that -- that this was not procured through the proper procedures and if -- and it should go back to the local union board to make an informed decision.

THE COURT: All right. Thank you.

MR. MCAVOYAMAYA: Thank you, Your Honor.

THE COURT: All right. Let me first deal with the Motion to Remand because I have to determine jurisdiction.

I'm going to deny the Motion to Remand. I do think there's jurisdiction.

A Section 301 claim, if it's legitimate, does fall within this Court's jurisdiction and would make the claim removable. The question is whether the contract that was allegedly breached is between two labor organizations, which in this case the Affiliation Agreement is.

Both of the unions, the international -- the international and the local have private and public sector employees. The statutory definition of labor organization states that it applies to an organization that employees participate in that exists for the purpose, in whole or in part, to bargain with employers. That clearly is the case here.

The plaintiff relies upon the public employee exemption. I think that the cases cited by the plaintiff are distinguishable. They allege -- the alleged breach of the Affiliation Agreement in this case would impact public and private sector employees alike. If bargaining were not currently proceeding with Clark County, the same dispute would still arise, as I think both sides concede because the dispute

is over how the local was managed and operated, not over the negotiations with a particular employee -- employer.

I do think the cases cited by the defense are more applicable. They support a holding here that the unions are labor organizations in the context of a breach of two unions' Affiliation Agreement that has no specific relation to public employees, a public employer, or a public Collective Bargaining Agreement.

So in sum, I do find that there is jurisdiction and so there is a federal claim supporting jurisdiction and the other claims can come in under supplemental jurisdiction.

Turning to the motion for injunction, I'm going to deny that at this point. I don't think there's a demonstrated likelihood of success on the merits.

I start with the well-established federal policy of avoiding unnecessary interference in the internal affairs of unions. That comes from the *Motion Picture & Videotape Editors Guild* case, 800 F.2d 973, at 975, it's a Ninth Circuit, 1986 case. So the plaintiff has a significant hurdle to overcome in the initial stage.

I don't find there to be a likelihood of success at this stage based on a board vote to disestablish the local. The local has not been disestablished. The local has not been dissolved. It's been placed in a trusteeship. At some point that trusteeship will end and the powers will revert back to

the board, which shows that it hasn't been disestablished.

The next argument is that there's a breach of the contract based on a failure to hold elections. The president and vice president vacancies alone aren't what prompted this dispute or prompted the vote -- board to vote as it did. I have to consider this in light of the circumstances that existed, and that is some warring factions, some inability to get along and problems with the local resulting in a deep division and union business apparently not getting done. The board could have reasonably concluded that holding elections and backfilling those positions at that time was not the best way to go and that, rather, it may be better to bring in a neutral third party trustee to smooth the waters temporarily.

There's an argument that the Affiliation Agreement or covenant of good faith implied therein was breached. There are allegations to support that, but I don't find sufficient proof offered at this stage to allow me to conclude that Garcia is likely to prevail on those claims. There's some arguments there. There's some smoke here about what happened, but at this stage I don't find there's enough in front of me to support a finding of likelihood of success on the merits of the claims of the breach of the Affiliation Agreement, breach of the covenant of good faith and fair dealing, misrepresentation, legal malpractice, or breach of fiduciary duty.

In addition, Garcia is not a board member, so it's a

little unclear in my mind as to how he could have -- how he could have relied upon alleged representations or how the attorney-client privilege could have applied to him. I understand that Mr. Garcia is trying to assert this on behalf of the union itself, but there's some potential standing issues there that need to be fleshed out.

Turning next to the other -- to the next factor under the injunction standard, that is irreparable harm. I don't find a likelihood of irreparable harm. There's a demonstrated possibility, but most of the harms that are referenced have monetary remedies. If the credit cards are run up or if the international spends the local's money, there's a lawsuit that can be made against them. The local can collect upon the trustee's bond that would be put up. So there is a financial remedy available to remedy those.

With regard to the argument, which is a little more to the point, of irreparable harm, because a new negotiator may cut a deal that the members don't like, there's a remedy for that irreparable harm and that is, the members can vote against the deal that the negotiator cuts and therefore, he can negotiator all he wants, but ultimately he has to go back and get the members to vote "yes" and if the members vote "no," they're not harmed at that stage, at least from what I can see. So therefore, I don't see a likelihood of irreparable harm.

The alternative test for injunctions is, under

*Wild Alliance* I think it's called, is that if there are serious questions raised and the balance of hardship tips sharply in the favor of the movant, then I can grant that. I don't find that the balance of hardships in this situation tips sharply in favor of the plaintiff at this stage so I can't enter an injunction under that standard.

And finally, I do think that the public interest does not support an injunction because that would violate the well-established federal policy of avoiding unnecessary interference in internal affairs of the union. Nor does the public interest support me interfering with the local's self-governance by overruling a vote of its board.

Now -- so the motion for injunction is denied.

This is an interim decision because it's an emergency relief. The case lives and goes forward. In the event -- well, I -- I don't find at this stage that having an Evidentiary Hearing on the motion for an injunction would change my mind or do any good so I'm not going to order an Evidentiary Hearing at this stage, but, as this case goes forward and as -- as plaintiff and defendants do discovery, if there are affidavits and declarations and deposition testimony that's obtained that supports stronger a -- a fraudulent misrepresentation, the number, a vast -- a large number, a majority of the board says it was misrepresented, lied to, or it would have changed its votes or something that would have

altered that -- altered my analysis, or if there's a better demonstration of irreparable harm, that is, that the members aren't being allowed to vote on a contract that's being negotiated, then I would reconsider and determine at that point whether to have an Evidentiary Hearing. But at this stage there's not enough evidence in front of me to warrant -- not enough argument and evidence in front of me at this stage to justify an Evidentiary Hearing on these allegations. So I'm denying it without prejudice so that if the plaintiff can go and develop that evidence and information, you can take another shot at it. But, obviously you've heard my concerns. And so, I wouldn't run back here tomorrow seeking another injunction. Take into account these are my concerns and I'd need these addressed before I would consider entering some kind of injunctive relief.

All right. There is a pending Motion to Dismiss. It's not fully briefed, so I'm not going to rule upon that motion at this point. Obviously plaintiff gets an opportunity to address that.

The discovery timelines and the like are ticking, so under our rules you need to get your discovery plan and scheduling order in place and the case will go forward.

Anything else I can address for the parties?

MR. MCAVOYAMAYA: I have one question, Your Honor.

THE COURT: Sure.

MR. MCAVOYAMAYA: So your jurisdictional issue in denying the Motion to Remand was that there's no county employee attached to the suit; is that correct?

THE COURT: No. No. As I stated, I don't find that the cases you cite to are as persuasive as you believe them to be. I think that there's no -- the dispute here is between the local and the international. The local and the international both have public and private employees that are represented by the union. The dispute here doesn't arise out of public versus private employees. It doesn't arise out of a particular Collective Bargaining Agreement with a public employer, or negotiations with a public employer. And so, therefore, I don't think the cases you're citing to move me in that regard.

Now, that's my decision right now on the Motion to Remand. Obviously, subject matter jurisdiction can be addressed at any time and I can do it sua sponte. I'm going to go back and look at the cases you cited again and obviously I got your reply brief late yesterday afternoon. We went through it, but I'm going to go back and take a look at *Bell* and I'm going to look at the district court case, the district court's decision also in relation to the magistrate judge's decision. So I can, at some point, decide no, I don't have subject matter jurisdiction, but at least at the stage right now I'm not going to grant the Motion to Remand, not just because the plaintiff is a private employee, because I know you could go out and get

another one and leave to amend and try to bring him in and cure any potential defect like that. It's bigger than just that issue.

MR. MCAVOYAMAYA: Okay. So -- so -- so -- okay. So you're going to go back and look at the case law and is -- is -- is the position then if this was brought by a county employee, you would look at it from that particular perspective and if that would remove jurisdiction, you'd find no subject matter jurisdiction? I'm just confused about that.

THE COURT: I'm going to go back and take a look at the cases you cited in your reply. I'm going to listen -- take a look at the cases that Mr. Rothner mentions again and if I change my mind on jurisdiction, I'll let you know. As of now, I find --

MR. MCAVOYAMAYA: Thank you, Your Honor.

THE COURT: That's all right. As of now, I find there's jurisdiction. If that changes, you folks will be the second to know after my clerks.

Mr. Rothner? Or Mr. Cohen, one of the two of you?

MR. ROTHNER: I just wanted to say thank you.

THE COURT: Oh, sure.

Anything else?

MR. COHEN: Thank you, Your Honor.

THE COURT: All right. Thank you.

We're in recess on this matter.

(Proceedings adjourned at 11:16 a.m.)

--oOo--

COURT REPORTER'S CERTIFICATE

I, Heather K. Newman, Official Court Reporter, United States District Court, District of Nevada, Las Vegas, Nevada, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true, complete, and correct transcript of the proceedings had in connection with the above-entitled matter.

DATED: 6-21-2017 /s/ Heather K. Newman
Heather K. Newman, CCR #774
OFFICIAL FEDERAL REPORTER