# EXHIBIT A –
## Trusteeship Hearing Transcript

SEIU LOCAL 1107

EMERGENCY TRUSTEESHIP IMPOSED

HEARING

BEFORE HEARING OFFICER APRIL VERRETT

THURSDAY, JULY 13, 2017

NEW YORK-NEW YORK LAS VEGAS HOTEL & CASINO

3790 LAS VEGAS BOULEVARD SOUTH

LAS VEGAS, NEVADA

CARLA N. BYWATERS
CCR 866

PAGES 1 - 151

LAS VEGAS, NEVADA; THURSDAY, JULY 13, 2017

4:00 P.M.

THE HEARING OFFICER: Good afternoon, Sisters and Brothers. I want to call this hearing to order. So my name is April Verrett, and I am an International Executive Board member of SEIU. I am also an officer with SEIU Local 2015, which is the Long Term Care Workers Union in California.

I have been appointed by the SEIU International Executive Board to serve as the Hearing Officer to consider whether the International President's emergency trusteeship over SEIU Local 1107 was improper -- was properly, excuse me, imposed and should continue.

I am assisted today by my counsel, Alma Henderson. She is SEIU Associate General Counsel. She will be advising me on legal issues that may arise during the hearing. In addition, SEIU Legal Operations Manager, Lorna Abraham, who was at the table where you-all checked in is assisting with hearing logistics today.

There are also Sergeant-at-Arms inside and outside of the hearing room who I will call on to help me maintain order in this room should it be necessary.

Will the Sergeant-at-Arms team members please raise your hands to identify yourselves.

I want to communicate to everyone that it is my commitment to ensure that today's proceedings are both orderly and respectful but, most importantly, offer an opportunity to the members of 1107 that their voices will be heard to every extent that you-all want your voices heard today. We will stay here as long as necessary so that every member has an opportunity that wants to participate in these proceedings under the Rules will have an opportunity to do so.

On April 28th, 2017, pursuant to the express authority granted the International President under Article VIII, Section 7 of the SEIU Constitution and Bylaws, President Mary Kay Henry placed Local 1107 into an emergency trusteeship and appointed Luisa Blue as Trustee of Local 1107 and Martin Manteca as Deputy Trustee of Local 1107 with all of the powers and duties that they are entitled to under the SEIU Constitution and the Labor-Management Reporting and Disclosure Act.

President Henry determined that the emergency trusteeship was necessary to prevent the disruption of contracts, assure that the Local Union perform its duties as a collective bargaining representative, restore democratic procedures, protect the interests of

Local 1107 and its membership, and otherwise carry out the legitimate objects of the International Union.

In addition, President Henry determined that an emergency existed in Local 1107 that required immediate action and justified the pre-hearing appointment of a Trustee and Deputy Trustee at the Local.

On May 25th, 2017, under her express authority under Article VIII, Section 7(f) of the SEIU Constitution, President Henry determined that good cause existed to hold today's hearing more than 30 days after the trusteeship was imposed, in light of Local 1107's pending commitment and the schedules of the individuals whose attendance at this hearing was necessary.

She also determined that good cause existed for the International Executive Board's decision on the trusteeship to be made more than 60 days after the imposition of the trusteeship. A copy of the Order of Emergency Trusteeship as well as the Notice of Hearing, Notice of Appointment of Hearing Officer, and Rules of Procedures for today's hearing are all available at the table where you signed in.

At this point, I want to clarify for the record that because of a drafting error, the Notice of

Hearing misidentified Ms. Sharon Kisling as Local 1107's former Secretary-Treasurer. In fact, she is the former Executive Vice-President of the Local.

Let me now briefly summarize the rules and procedures for today's hearing. This is an informal union hearing that is not intended to be a formal legal proceeding. There will being no formal rules of evidence.

Unless otherwise approved by me, only the following individuals may attend the hearing: Regular Local 1107 members in a bargaining unit represented by the Local, Local 1107's Trustee and Deputy Trustee, assigned International Union staff, my counsel, counsel to and spokespersons of the International President, who is the only official party in this proceeding, and, of course, our court reporter.

Individuals other than those who I have named may not attend the hearing or speak on the record except that they may be called as a witness to testify on a specific issue.

Before Local 1107 was placed into trusteeship, International President Henry removed former Local 1107 President Cherie Mancini and former Executive Vice-President Sharon Kisling from their positions as Local Union officers and suspended them as SEIU members

for six months after a hearing last October on internal union charges that had been filed against Ms. Mancini and Ms. Kisling as well as other Local members, which resulted in the Hearing Officer concluding that both Ms. Mancini and Ms. Kisling had violated provisions of Local 1107 and SEIU's Consitutions.

Ms. Mancini has appealed to the International Executive Board for Ms. Henry's decision removing her from office and suspending her membership in SEIU, and that matter remains pending with the International Union.

I want to be very, very clear to everyone here. I am not here to review last fall's internal charges, that decision or the appeal filed by Ms. Mancini of the decision to remove her from office and suspend her membership. Ms. Mancini's appeal will be reviewed by the International Executive Board at a later date.

Instead, it is my job today solely to gather information and evidence that I need to make a Report and Recommendation to the International Executive Board on the one question of whether or not the 1107 trusteeship was imposed properly and should be continued.

However, because of the special circumstances

surrounding the Local 1107 trusteeship and the loss of their status as SEIU members, I am exercising my discretion to allow a special exception to the hearing attendance rules that I described earlier, and I will permit Ms. Mancini and Ms. Kisling to attend this hearing should they choose to do so and to make statements concerning the trusteeship on the record even though they are not currently SEIU members.

By allowing Ms. Mancini and Ms. Kisling to make statements in this hearing, I am granting them an opportunity that non-SEIU members generally do not have. And I want to reiterate I am doing so only because of the facts and circumstances surrounding the trusteeship and the loss of their SEIU membership status.

Although Ms. Mancini and Ms. Kisling are being allowed to participate in this hearing, neither of them will be an official party in these proceedings and neither of them will be allowed to present or cross-examine witnesses. Their participation will strictly be limited to making verbal or written statements concerning the Local 1107 trusteeship when I call on them after the International President's witnesses and evidence have been presented.

To be clear, they can come and make

statements. I will also allow them, should they want to, provide a written statement after these proceedings for the record. Everyone in the hearing room must sign in at the sign-in sheet at the table where you checked in.

A court reporter will take down a complete record of what is said in this hearing for my use in making a Report and Recommendation to the International Executive Board. The court reporter's transcript will be the official record of the hearing.

If any official party wants a copy of the transcript, it must make arrangements with the court reporter directly to pay for a copy. No other audio recording, video recording, photography or other recording of this hearing is allowed.

If the International President spokesperson wants to submit written materials for the record at this hearing, copies must be provided to me, to my counsel, as well as the court reporter.

In order to have a complete and full record on which to base my Report and Recommendations to the International Executive Board, I want to hear from every Local 1107 member who wants to speak today, as I said before. Therefore, I am asking that we respect each other's views and opinions and the right to

express them without being interrupted.

I will be calling on Local 1107 members who wish to speak about the trusteeship toward the end of today's hearing. At this time, I'll pause for a few seconds to allow those of you who have cell phones and other electronic devices to shut them off and/or silence them so the hearing will not be disturbed. I'm going to do that myself.

To the order of business, we will proceed with this hearing as follows: First, the International President spokesperson will present witnesses and evidence addressing why the trusteeship of Local 1107 was properly imposed and should be continued. The International President spokesperson may make an opening and closing statement, present witnesses, and submit documentary evidence for the record.

Witnesses will be sworn in by the court reporter. Only witnesses called by the International President spokesperson may testify during this portion of the hearing, and I or my counsel may question any of the International President's witnesses.

I want to note for the record, as outlined in the Notice of Hearing Local 1107's former Executive Board was given an opportunity to designate by majority vote a spokesperson to present its position regarding

the trusteeship at today's hearing, but I understand that the former Local Executive Board has not voted to designate such spokesperson to represent that Board today.

Therefore, it is the International President that is the only official party to these proceedings. However, I encourage members of the formal Local Executive Board to stay for the member comment portion of this hearing so that they can state their views of the trusteeship on the record.

As I explained earlier, in light of the special circumstances surrounding this trusteeship and the membership status of Ms. Mancini and Ms. Kisling, they were offered opportunities to make extended statements regarding the Local 1107 trusteeship. I do see Ms. Mancini is here today. I have not seen Ms. Kisling come into the hearing room.

Therefore, after the President's witnesses and evidence have been presented, I will recognize Ms. Mancini for 30 minutes to make a statement concerning the trusteeship. Should Ms. Kisling join us, she will be extended the opportunity after Ms. Mancini. They will not be sworn in before making their statements.

I will then hear from Local 1107 members,

including former Local officers and Executive Board members who want to speak about the trusteeship. I will ask the members to identify themselves for the record at the beginning of their presentations, and they will not be sworn in prior to making their statements. Excuse me. Only I or my counsel may question these members.

Any Local member who wishes to speak about the trusteeship should indicate that they wish to do so on the sign-in sheet where you-all checked in. If a member has a time constraint and needs to speak out of order, she or he should make his or her situation known to me, and I will do my very best to accommodate them. After I have heard from the members, the International President spokesperson will have an opportunity to make a closing statement. We will run this hearing as late into the evening as necessary -- God bless us all -- so that we finish today.

I will leave the record open until Friday, July 28th, 2017, for the receipt of written post hearing submissions from the International President and from the members. I am not requesting any such submissions; however, the International President and the members may choose to submit them.

Any such submissions should be sent to me in

care of my counsel, Alma Henderson, and the SEIU Legal Department by mail at 1800 Massachusetts Avenue, NW, Washington, D.C. 20036, by fax to (202)429-5565 or by e-mail to alma.henderson@SEIU.org.

Of course, that information will be made available to you later in the hearing should you need it. Sheets with the deadline for proposed hearing submissions with the Legal Department address, fax number, and e-mail address are available at the sign-in table.

When the record is complete on the trusteeship, I will make a Report and Recommendations to the International Executive Board orally and/or in writing, which will make the final determination on whether the Local 1107 trusteeship was imposed properly and should be continued pursuant to the authority under Article VIII, Section 7(f) of the SEIU Constitution. I may make a single report or several partial reports.

Are there any questions about the rules and procedures for the hearing that I have just outlined?

MS. MANCINI: Can I ask a quick question?

THE HEARING OFFICER: Of course.

MS. MANCINI: Are we sure that everyone was noticed? Because I don't believe membership was noticed. I have not spoken to one person who said that

they received notice of this hearing.

THE HEARING OFFICER: It's my understanding that the requirements for notice of this hearing pursuant to the SEIU Constitution and Bylaws were followed. If there is any reason to believe that that didn't happen, I will hear evidence to such.

MS. MANCINI: Okay. Thank you.

THE HEARING OFFICER: First, I will enter five exhibits into the record. Hearing Officer Exhibit No. 1 is the SEIU Constitution and Bylaws. Hearing Officer Exhibit No. 2 is the long form of the Order of Emergency Trusteeship issued by President Henry on April 28th, 2017. Hearing Officer Exhibit 3 is the short form of the emergency Trusteeship Order issued by President Henry on April 28th, 2017.

Hearing Officer Exhibit 4 is the May 25th, 2017, Memorandum from President Henry to Local 1107 Trustee Luisa Blue and Deputy Trustee Martin Manteca extending the Constitutional deadlines for holding this trusteeship hearing and for the International Executive Board's issuance of its decision on the trusteeship.

Hearing Officer Exhibit No. 5 is the Notice of Hearing Notice of Appointment of Hearing Officer, and Rules of Procedure for this hearing issued by International Secretary-Treasurer Gerald Hudson on July

3rd, 2017.

(Hearing Officer Exhibits 1 through 5 were admitted into evidence.)

THE HEARING OFFICER: At this time, I'll ask who is going to serve as the primary spokesperson for the International President at today's hearing?

MR. ROTHNER: My name is Glenn Rothner, and I'm counsel to the International President and the Trustee and Deputy Trustee that she appointed.

THE HEARING OFFICER: Thank you. Mr. Rothner, do you have an opening statement to present at this time?

MR. ROTHNER: I do.

THE HEARING OFFICER: Please, Mr. Rothner, if you can state and spell your name once more for the record and proceed with your statement.

MR. ROTHNER: Glenn, with two "n"s, Rothner, R-o-t-h-n-e-r.

OPENING STATEMENT BY MR. ROTHNER

MR. ROTHNER: The SEIU International Union Constitution at Article VIII, Section 7(a) describes the circumstances under which the International President may impose a trusteeship.

MS. HENDERSON: Excuse me, Glenn, can you speak into the microphone a little more closely?

MR. ROTHNER: Do you want me to start over?

And those are for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures or otherwise carrying out the legitimate objects of this International Union.

The evidence that we will present today addresses all of these grounds, but most importantly, it addresses a serious breakdown in internal union governance within Local 1107. That breakdown involved warring factions on the Executive Board, persistent conflict leading to disorderly and chaotic meetings, bitter confrontations, name calling, and shouting matches.

That inability to maintain order and resolve conflict prevented the Local Union and its leaders from carrying out their duties and serving the members of the union. That evidence that we will present today will come primarily from one of the Executive Board members pre-trusteeship. Brenda Marzan will be our first witness.

In addition, we will present evidence concerning the effect that that conflict internally had on the ability of the Local to carry out its collective

bargaining responsibilities, and one of the prime examples of that was the efforts to obtain and ratify a Collective Bargaining Agreement involving the Local 1107 members at UMC, University Medical Center.

We will not present evidence through witnesses on that subject today because that subject has been addressed already in a hearing, the hearing on internal needs and discipline, and we will be presenting the Internal Needs Report of the Hearing Officer as well as the entire transcript of the two-day proceedings. And when I begin the presentation, I will identify those documents and mark them for identification.

The events involving the UMC Collective Bargaining Agreement involve a disruption at the time that the members were preparing to ratify their Collective Bargaining Agreement last year, and interference from the then-president of Local 1107 who unilaterally canceled the ratification vote and posting the cancellation vote notice on the website at the Local union.

In addition, she announced that there would be an investigation into charges that the bargaining team had breached their fiduciary duty and failed to represent their union members -- unit members properly. In addition to undermining the bargaining team's

authority, the former President's conduct signaled to employers the Local lack of unity, weakening the union's stature and damaging its ability effectively for and to represent its members.

Although the former President eventually relented under pressure from UMC members and leaders, and the contract was ratified, the delay in ratification meant delaying the longevity pay and raises for Local 1107 members. Another ground for trusteeship is the Local's failure to communicate adequately with its membership and interfering with its collective bargaining responsibilities.

Members and stewards have complained about difficulty in getting information and assistance from the Local, information and assistance that they need to represent themselves and their colleagues and that the local pre-trusteeship impeded their ability to perform their representational duties properly. Again, our principal witness on this will be Brenda Marzan, and she will identify a number of documentary exhibits that bear on this topic.

That breakdown in communication also impeded staff oversight leaving Local staff themselves without clear direction on the work they were required to perform, to whom they should report, and from whom they

would receive feedback. This not only impeded the proper and efficient functioning of the Local but detracted from the staff's ability to direct their resources and energy toward serving the membership.

Local 1107's former Executive Vice-President usurped the former President's constitutional authority to hire and fire Local staff by attempting to terminate a staff member while the former president was on vacation undermining democratic governance in the Local. That problem is, in part, a function of something that we will describe in testimony and in exhibits.

And that is not only conflicting provisions within the Local Union Constitution, but a vacuum, a void, of policies or procedures that fill in the flesh on the bones of the Constitution. This Local functioned, in essence, without any policies or written procedures whatsoever, and it didn't function well as a result.

Another gap that was related to the breakdown in governance was that there are written documents that can be referred to in order to restore civility or at least calm to an Executive Board meeting.

Those were either not utilized or ignored such that when Robert's Rules of Order was invoked or

training was given on Robert's Rules of Order, when shouting matches began, the shouters shouted down anyone who sought to invoke parliamentary procedure; and, again, Brenda Marzan will be our primary witness on that topic.

As a result of these dysfunctions, the Local Union's Executive Board itself voted by a margin of 17 to 7 to request that the International President implement a trusteeship over this Local in the hope that, by doing so, there would be an opportunity to fix these problems and restore the Local Union to a place where it could again govern itself. Its inability to do so then is what caused this trusteeship.

THE HEARING OFFICER: Great. Thank you, Mr. Rothner. At this time, you may call your first witness.

MR. ROTHNER: Brenda Marzan. While she's taking the witness chair, I do want to identify some exhibits. We have a binder, a black binder, that has the bulk of our exhibits in it along with an index. I referred earlier to the Needs Report, and that is Exhibit 1 in that binder, so we offer that at this time.

Not in the binder are some bulky documents, which don't yet have numbers on them, but I'm going to

assign some numbers. We have some gaps in the index, and I'm going to use the gaps for this purpose. The Local Union Constitution and Bylaws, the current version will be Exhibit 13, and I've distributed copies of that.

And then the transcripts that I referred to just a while ago of the combined Internal Needs Hearing and Disciplinary Hearing will be marked respectively as Volume I will be Exhibit 15.

THE HEARING OFFICER: I'm sorry, Hearing Day 1?

MR. ROTHNER: Day 1, yes, and Day 2 will be Exhibit 16. And I've submitted those to the court reporter as well.

THE HEARING OFFICER: Thank you.

BY MR. ROTHNER:

Q Ms. Marzan, when did you join Local 1107?

THE HEARING OFFICER: Sorry.

MS. HENDERSON: She needs to be sworn first.

THE HEARING OFFICER: Please. Ms. Court Reporter, please, swear in the witness.

(Witness sworn.)

THE HEARING OFFICER: Please proceed with your questions.

BRENDA MARZAN,

having been first duly sworn, was
examined and testified as follows:

EXAMINATION

BY MR. ROTHNER:

Q Ms. Marzan, when did you first join Local 1107?

A That's me, sorry. Time to punch out, sorry. I thought I turned off the ringer.

THE HEARING OFFICER: Take your time. Take your time.

THE WITNESS: Sorry, so sorry. Try that again.

THE HEARING OFFICER: Brenda, I'm sorry. Can you spell you name, please, for the record.

THE WITNESS: M-a-r-z-a-n.

BY MR. ROTHNER:

Q When did you first join Local 1107?

A 1988.

Q And was that your first day of employment in a bargaining unit represented by Local 1107?

A Yes.

Q Where were you working?

A Clark County.

Q What did you do there?

A I worked for IT. I was a computer programmer.

Q And have you continued to be employed by Clark County since then?
A Yes.
Q In that same group?
A I became a business analyst about 14 years ago but in the same department, IT, yes.
Q And have you been a member of Local 1107 continuously since then?
A Yes.
Q Prior to the imposition of the trusteeship, did you hold an office in Local 1107.
A Yes, I did.
Q What was that office?
A The Vice-President of the Non-Supervisory Unit.
Q At Clark County?
A Sorry, at Clark County.
Q And had you been elected to that office more than once?
A Yes.
Q When were you first elected to that office?
A The term before that, which would have been four years ago, so 2013.
Q And when you say the Vice-President of the Non-Supervisory Unit, that means that you were a member

of the Executive Board by virtue of being the Vice-President of the Non-Supervisory Unit?

A Yes. Our Constitution and Bylaws, all of the elected officials are actually members of the Executive Board, so all Vice-Presidents, Chief Stewards, and then you have the At-Large Officers.

Q So --

THE HEARING OFFICER: I'm sorry, Mr. Rothner, one clarifying question.

Brenda, the first time you were elected was in 2013?

THE WITNESS: Correct.

THE HEARING OFFICER: And that was as the Vice-President?

THE WITNESS: Correct.

THE HEARING OFFICER: Thank you.

BY MR. ROTHNER:

Q Was there a President of the Non-Supervisory Unit?

A No.

Q So the chief elected officer from your unit is the Vice-President?

A Correct.

Q That makes you a Vice-President of Local 1107?

A It makes me an Executive Board member.

Q Good. I understand. Had you held any other positions in Local 1107 before you became the Vice-President of the Non-Supervisory Unit?

A I never held a Board position. I was on a lot of different committees within the Local --

Q And what --

A -- throughout my career.

Q -- were some of these committees?

A Election Committee, Communication Committee, PAC Committee, I think I was on just about every one of them throughout the years.

Q Finance Committee?

A Finance Committee, lastly.

Q All right. In 19 -- I'm sorry. In 2016 and 2017, would you describe the functioning of the Executive Board at its meetings?

A Disruptive, unprofessional, it lacked any kind of -- I don't even know what to say -- structure. There was no structure to it. Even though there was agendas posted, and people understood what should have been talked about, we never seemed to be able to get through a Board meeting. Half the time we couldn't even get through the agenda to approve the agenda to move forward.

Q What do you mean approve the agenda? Isn't

the agenda prepared in advance?
A In our Constitution and Bylaws, one of the items is the agenda goes out, and then when you come to the meeting, you have to approve the agenda before you move forward. So everybody's aware of what's on it, but then once you get there, it is discussed and approved.
Q And whose responsibility is it under the Constitution and Bylaws to prepare the agenda in advance?
A The Secretary.
Q Did the Secretary do that?
A Yes.
Q So you said you couldn't even agree on the agenda. What do you mean?
A There were times where somebody would ask for one of the items to be moved up, maybe if there was a special guest that was there, to move an agenda item up. It seemed that there was a lot of discussion. There would be people complaining about it or disagreeing. If Robert's Rules of Order were invoked, people would start yelling across the tables at each other. It was disruptive.
Q All right. Well, I'm going to ask you to give me a specific example of this. And I'm going to ask

you to turn to Exhibit 30 in the binder in front of you. And the particular set of Minutes, it's a collection of Select Minutes -- or from the Meetings. The one that I'm looking at is February 22, 2017, which is towards the middle -- no, it is the third set. Do you see that?

A Yes.

Q So.

THE HEARING OFFICER: One second. Thank you.

BY MR. ROTHNER:

Q I'm just going to read something to you.

A Okay.

Q It says -- this is on the second page -- "These meetings are becoming hostile, profane language, people talking over each other, no respect. Why can't we all get along with each other, we need to start conducting better meetings in order to get the business done." Now, what preceded those comments? You were there. Don't just read what was on the page, but tell us what happened.

A This is one of those times where there was an item on the agenda that had asked to be moved up from where it was, and I believe it was -- based on this, it was actually probably the voting for the PAC because most of the time we wouldn't get through a meeting. So

half of the items that should have been voted on to do the business of the Local, we would never get to because everybody would leave before the meeting was done.

Q What do you mean? Why would they leave before the meeting was done?

A Because nothing was happening, people would be screaming and yelling at each other, so people would start hanging up on the phone and they'd start walking out the door.

Q Okay. I need to take a little detour here.

A Okay.

Q What do you mean by hanging up on the phone?

A So we allow the Executive Board to call in. It's actually a different direction, though, so they can put their name on a list, and there's a secured line. And they're contacted on the phone number that they give them, and then they can attend the Executive Board through the phone line.

Q Is that for people who are in remote areas?

A For remote areas, and you know, a lot of the people are in healthcare. So if they're on duty that night and stuff, they'll be able to take some time to be able to do the meeting, but they wouldn't be able to travel all the way to the Local and come to the

meeting.

Q Okay. So you were saying that there was this PAC issue. What was the issue with the PAC? And is that the acronym for political action?

A Yes. So the Political Action Committee, I believe this is one where they were actually asking for us to approve some of the people that the committee had recommended for us to back for elections. So, you know, it has to come to the Board in order for us to agree to back that person and to also back the money, if we're going to give them money.

Q And on that occasion in the face of the hostility, the profane language, people talking over each other, and so on, was action taken on whether to endorse those candidates or not?

A In this particular case, we did do that, but it wasn't taken out of order.

Q I see.

THE HEARING OFFICER: I have a question.

MR. ROTHNER: Yes.

THE HEARING OFFICER: Ms. Marzan, you said a few times that people were screaming and yelling at each other. Can you remember, maybe in this instant regarding the PAC, who was screaming and yelling at each other specifically or was it so chaotic you

couldn't say who was or who wasn't?

THE WITNESS: There was never -- there was never really specific people. It would start off with one person saying something and another Board member would take offense or would, you know, call out during the meeting, and then the next thing you know, there's several people doing this. So it could be everybody, actually. It just depended on how -- what the topic was or how heated the motions were in the room, just --

THE HEARING OFFICER: Thank you.

BY MR. ROTHNER:

Q So let's generalize a little bit. Were there occasions where, because of the screaming, shouting, and the insults, you would not only not get through the whole agenda but you might even lose a quorum?

A Correct.

Q How often would that happen?

A Probably the majority of the time.

Q And why would you lose the quorum?

A Because some of the people that were there trying to do the business of the Local would get fed up and would walk out the door. So they -- you know, you also had people on the phone. If there was people at home with their kids, you know, and they're on speakerphone, that the foul language that was going on,

they're going to hang up because they're not going to allow their children to hear profanity that was going on within those Board meetings, the name calming, the -- it was -- it was very unprofessional.

Q Well, let me ask you to turn to another example, if you would, Exhibit 2 in the binder. I'm looking at the last page of that exhibit, and the last topic is PAC, and the name Debbie Springer is associated with that. But then it says, "Meeting Adjourned due to situations."

A Yes.

Q Did you get through the agenda item on the PAC recommendations for endorsements in that meeting?

A I do not believe that we did. I think after everybody started walking out the door, it was determined that several of us would go to the PAC meeting, the next PAC meeting, the following week to discuss the individual that we had concerns about that they wanted us to back.

Q Well, I'm going to take this up with another witness, but can you tell us -- it's quite vague here. It says at the bottom there, "Refer to Recording for Further Discussion," and then, "Meeting Adjourned due to situations." Can you remember what was actually happening? Because those two lines don't really tell

us what was happening.

A So, again, the individual that we were trying to back or that the PAC meeting recommended that we back was a Board of County Commissioner that has not sided with us. They are not union friendly. They are not labor friendly, and several of us had major issues with that, so there was a lot of discussion. Again, it got out of hand. People were screaming and yelling and pounding on tables, and people started walking out the door.

Q Did you lose a quorum?

A I believe we probably did. You know, most of the time, we were barely over a quorum as it was.

Q Well, let me ask you this: To the best of your recollection, was that the last item on the agenda for that meeting?

A That, I don't remember.

Q But you weren't able to --

A I can't tell.

Q Were you able to take a vote on that particular --

A No, we did not. Oh, actually, I think we may have voted in everybody but him. I think we pulled him off of the list so that we could have discussion. So, yes, we did. We did end up voting the rest of the

people in.

Q Aside from yelling and profanity, was there any sort of physical manifestation that happened at that meeting and others?

A There were several meetings where there was some people that would stand up and go towards each other or walk across the room at each other to the point where several times it was brought up that maybe somebody should be calling Metro, those officers, to come to the Local.

Q Metro is Las Vegas Police Department?

A Metro Police Department.

Q All right. I'm going to ask you to go back to Exhibit 30 for just a moment to take a look at another example, and this would be the Minutes for January 25, 2017, which is the fourth set of Minutes there, next to last.

Was this meeting disrupted? You could take a minute and review the Minutes, too, to refresh your recollection. I could probably help you. If you look at the last page twice, there is the phrase that we've seen before, "Refer to Recording for Full Discussion" -- actually three times. Do you see that?

A Yes.

Q And do you remember that meeting and what that

was about?

A Yes.

Q Why don't you tell us?

A Okay. So, that meeting, there was Mark -- the first set of the information, Mark Travis from Sunrise Hospital asked if there was any way to have his bargaining team paid for, because they were going to end up with a lot of time with the bargaining, and he didn't know if there was a way to have them reimbursed for the time that they would be putting in, and there was a whole lot of discussion about that.

Q Okay. Was that a civil discussion?

A Yeah, that was pretty civil.

Q What about the next item under "New Business," where it ends up saying, "Refer to Recording for Full Discussion"?

A So that one was, there was charges brought against UMC that had been posted in the RJ, so I had asked --

Q I'm sorry. You have to tell us what the RJ is.

A Oh, I'm sorry. The Review-Journal, the newspaper here in Clark County or in Las Vegas.

Q Okay.

A So I had asked to find out what charges had

been filed, and I wanted to -- I asked President Mancini if she could tell me what she had actually said to the newspaper, and Trustee Thomas asked me to give a report based on that information at the next E-Board meeting.

So this was when I was supposed to give -- I was on the agenda to give that report, but I had no information to give to the Board because the information had not been given to me.

Q Okay. Was this the two items here about the New Business, Mark Travis begins about a policy, I don't know what the policy is, and then the charges, UMC charges. Were those civil discussions?

A The UMC charges ended up heated because I hadn't been given the information, and people were asking me questions that I couldn't answer. And when they started asking me why I wasn't able to give the information, I explained that President Mancini had not given me what I had asked for, so I had nothing that I could talk about.

So there was a whole lot of disruption on that, asking why I hadn't been given the information, and you know. It wasn't -- it didn't get completely out of line, but there was a lot of talking over each other and trying to figure out why I hadn't been given

the information.

Q So was there a discussion at this meeting of some assistance that the Executive Vice-President of the Local had given to one of the stewards or key stewards at one of the hospitals, someone named Krystal Shen?

A I don't think that was this meeting.

Q Okay. Well, we'll get to that. Did that come up at a meeting?

A Yes.

Q And do you remember which meeting that was?

A That would have been the meeting prior to the trusteeship, so March.

Q Okay.

A No -- yeah, March.

Q So let's turn to that one, which is the second set of Minutes, March 29th.

MS. MANCINI: Excuse me. I'm sorry. Why -- I thought we were talking about why the emergency trusteeship was --

THE HEARING OFFICER: Ms. Mancini.

MS. MANCINI: I'm sorry. I'm out of order, right?

THE HEARING OFFICER: You are out of order.

MS. MANCINI: I appreciate that.

THE HEARING OFFICER: I'm sorry. Tell me that date again.

MR. ROTHNER: March 29, 2017.

THE HEARING OFFICER: Thank you.

BY MR. ROTHNER:

Q Have you found that, Ms. Marzan?

A Yes.

Q Once you determine that, let me know.

A It doesn't look like this is the right one, either.

Q All right. Well, maybe we'll come back to that. Do you want to take a minute and try to find that?

A Sure.

Q It isn't absolutely necessary that we have the Minutes, but if you remember the event, that's fine, too.

A Yes. The Executive Vice-President had gone to Krystal Shen, who I believe is the Chief Steward of San Martín Hospital, Ancillary, if I recall correctly. And she had asked for some help from the Executive Vice-President, so the Executive Vice-President attended a grievance hearing with her. She did not do any of the speaking or anything, but she attended the hearing.

So it was brought up in the meeting that there was some questions as to why she was attending those hearings, and there was a lot of discussion about what the job was of the Executive Vice-President, and there was a whole lot of discussion. That was another one of those where it got very heated, a lot of name calling, people didn't like that a public sector person was helping a private sector person. It just -- it got very, very ugly.

THE HEARING OFFICER: Might this be from the Minutes of the February 22nd, 2017?

MR. ROTHNER: Why don't we take a look at that.

THE HEARING OFFICER: Is that them?

THE WITNESS: That would be it. Thank you.

BY MR. ROTHNER:

Q Okay. And, I'm sorry, let me get to that.

All right. Would you just take a look at that and see if that refreshes your recollection so that you can give any further testimony on that?

A Yes. So that's pretty much what I said before, there was a lot of heated discussion about -- and I actually think it says it in here that a non -- well, a private sector officer went and helped -- I'm sorry, the other way -- a public sector officer went

and helped a private sector officer.

Q So is there something wrong with the Executive Vice-President under your Constitution and Bylaws going to help a steward at one of the bargaining units?

A No. The Executive Vice-President is an at-large officer; therefore, the At-Large Officers are accountable to all members of the Local not just their sector.

Q And I would just refer the Hearing Officer to Exhibit 13, which is the Local Union's Bylaws page 11, it's Article XVII, Section 7(a), which describes the duties of the Executive Vice-President and begins by saying under (a) Accountability, the Executive Vice-President shall be accountable to all the member of the Local Union and to the Executive Board and shall report to the President of the Local Board.

Was this the only experience you had, in recent years, of disagreement about the Executive Vice-President helping stewards and other representatives in bargaining units?

A I had never seen that before. As a matter of fact, under the prior President, President Mancini was actually the Executive Vice-President, and she and Martin Bassick, the President at the time, were going to all of the different employers and meeting with

employees.

They had a special organizing plan that they were doing, and they were going out together to all these different places. So, in that case, the Executive Vice-President was going to all of the employees, not just that sector that she came from.

Q So, just to be clear, do you know whether Krystal Shen asked for assistance?

A Yes, she did.

Q Do you know whether she had had trouble getting assistance before she asked?

A Yes, she had.

Q And what do you know about that?

A I know that through multiple e-mails that she included me on that she was having problems getting the Local, the hall, to actually file grievances for her, to show up at grievances, to let her know if meetings had been set up. She would call down there, and people would not answer the phone or she left e-mails, and they wouldn't return the e-mails or phone calls.

So during an Executive Board meeting where she brought up some of these concerns, Executive Vice-President Sharon Kisling pulled her to the side after the meeting and offered to help her.

Q All right. Let's move on to something else.

Would you look at the September 28th, 2016, Minutes, which are the last Minutes in Exhibit 30. And on the second page under "Motion to Approve Minutes," that's the Minutes of the prior meeting, there's a comment, again, "Refer to Recording for Full Discussion is when all the yelling started." Do you remember that event?

A So this is, again, where there was items that -- in 2016, at the tail end of 2016, we were going through a move to a new building, so there was a lot of things that we needed to get accomplished, including budget for furniture, for the move itself. We needed to make sure that the committees had time to give their proposals and the Board to be able to vote in which proposal they wanted or which bid they wanted to take, et cetera.

So because of the fact that there was such disarray at the E-Board meetings, it was asked to move all those voting items up to the top so we could get the business of the Local done at the beginning of the meeting instead of waiting until there was no time to do it and there was no members left.

Q And is that what the yelling was about?

A Yes.

Q If you read down the page a little bit, under "Finance/Treasurer Report," there's another entry that

says, "Refer to Recording for Full Discussion." Do you remember that event?

A Yes. So this was about a magazine that had been created, and there was some concern that the amount of the magazine was high to several of the officers, and there was some discussion about if it should have come to the Board for approval.

Q I'm sorry. Actually, I think you read down a little too far. I was referring to the item --

A Oh.

Q -- having to do with the Finance/Treasurer Report. There's also an entry there, "Refer to Recording for Further Discussion."

A Okay. So this was -- so right after the election, the new Treasurer, Shiela Grain, started -- well, they had their first finance meeting. In that finance meeting, a couple of the people that normally would attend those meetings did not show up, but at that meeting, Shiela Grain was put in as Chair of the Finance Committee.

I think they met twice, and then the third meeting, which would have been this meeting or the week before this meeting, we showed up to the Finance Committee meeting and Deb Springer asked to put Alfredo Serrano in as the Chair of the Finance Committee

meeting -- or Finance Committee, even though there was already a Chair.

So there was a lot of discussion at the Finance Committee meeting because at that finance meeting there was a lot of work that needs to get done. That was tabled, and it was put on the agenda for the following week, and this was to ask to have Sheila reinstated and eventually, after a lot of discussion, Alfredo stepped down, and Sheila went back in as the Chair.

Q Okay. Was that discussion that preceded Alfredo stepping down civil?

A No.

Q Describe it.

A Again, there was a lot of yelling and screaming. People didn't understand why it was at the Board. It was -- I believe Sheila tried to explain what had happened in the finance meeting the week before and the very first meeting. There was -- it was just -- it was very hostile. It was just hostile.

Q So, I'm sorry, I interrupted you. You were talking about a magazine --

A Sorry.

Q -- the item at the bottom?

A Yeah, the next one. So the magazine, it was

never brought to the Executive Board for a vote. So there was a lot of discussion on, if an item like that needed to be brought to the Board for a vote, because there's a line -- because in the budget, there's organizing budget and there's always been some disconcern about what can and cannot be done based on a budget.

And we keep -- we, meaning several of us that have done finances including Sheila as the Treasurer and who also is a CPA -- believe that all of those big budget line items needed to come to the Board for approval even though there was a big budget for that type of item. And this was, again, one of the things where there was a lot of cursing, screaming, yelling, et cetera.

Q Right. I want to move on to something else now. Was there a time when, as far as you were concerned as a member of Local 1107, the atmosphere at the Local Union's offices was welcoming in the sense that you, as a member, felt like it was your office?

A Yes, absolutely.

Q And when was that?

A Prior to -- actually, probably prior to even Martin Bassick being President. So the last time I ever felt welcomed in there was probably right after Al

went in, which would have been -- you know, he would have been three Presidents ago.

Q Okay. And, I'm sorry, Al's last name was?

A Martinez.

Q Martinez. And Martin's last name was Bassick?

A Bassick.

Q And the order of Presidents was Al --

A Al Martinez, Martin Bassick, Cherie Mancini.

Q Okay. Describe what the atmosphere was at the Local's office in the last couple of years?

A Very unprofessional. There was, if you walked in the door, you would hear cursing, screaming down the hallways. At one point, because the tension was so thick, I felt multiple times when I walked in there, the staff would take off running into their offices, closing the doors. You just didn't feel like you were welcome there. You didn't feel like you had a voice in your hall.

The only time I would go down there -- I used to literally live down at the hall; I would spend so much time down there. I worked four 10's, and I was there on every Monday that I had off doing stuff with the organizers, trying to come up with ideas, going over plans, whatever I was needed to do. It got to the point where I didn't even want to go down there even

for meetings.

Q Was there a point recently at which the Executive Vice-President was herself barred from the hall?

A Yes.

Q Tell us how that happened.

A There was an incident where, during the vacation of Ms. Mancini, Sharon Kisling was down at the hall, and I'm not sure exactly why, but she was doing something. And there ended up a discussion with the Organizing Director, Peter Nguyen, on one of the part-time employees that we had working down there on if she was allowed to continue to work. And I guess that would be -- it got very heated so much to the point that there was some screaming and yelling going on, and Metro, the police department, was called, and eventually she fired Mr. Nguyen.

Q And who was Mr. Nguyen?

A The Organizing Director.

Q And how did she then get barred from the hall, the Executive Vice-President?

A Mr. Nguyen filed a restraining order against Executive Vice-President Sharon Kisling.

Q I would just like the Hearing Officer to take notice of Exhibit 11, which is the Temporary Order for

Protection that was issued by the Justice Court in Clark County on September 28, 2016. And specifically, that, on the second page, ordered her -- toward the bottom, the second box that's checked -- to stay away from the hall.

So this was a staff member --

A Yes.

Q -- of the Union?

A Yes.

Q Who went to court to get a Temporary Protective Order to keep the elected Executive Vice-President away from the hall?

A Correct.

Q What was the effect on the Local at that point?

A It caused a lot more division. There was a lot of staff, you know, siding with staff and officers siding with officers. So, again, it was uncomfortable for a lot of us to go down to that hall. We couldn't get business done because nobody would talk to you. Nobody would answer the phones. If you sent e-mails, they weren't even responding to e-mails. There was a lot of animosity.

Q So you did say that the Executive Vice-President Sharon Kisling tried to fire the staff

member?
A Yes.
Q The Organizing Director.
A Yes.
Q Who had hired the Organizing Director?
A President Mancini.
Q And would you just take a look at Exhibit 6, please. Were you copied on that e-mail?
A Yes.
Q And is this Sharon Kisling's response to the fact that there was a restraining order -- or protective order issued against her?
A Yes. I actually think the intent of her -- of this e-mail did not come across the way it was supposed to. In the third paragraph, she's talking about herself being a 20-year employee working for the Department of Family Services.
That department highly frowned upon anybody having any kind of court -- you know, court items. So a restraining order could have caused her to lose her job if they had found any validity to the information.
Q Okay. Were the police called to the Local in connection with these events?
A Yes. At the tail end of that day, Metro was called to the scene, did their investigation, if you

will, and they actually -- in the report, they say there was no incident. So they didn't even -- they didn't even write up a report because they didn't see anything that was going on that led them to write up a report.

Q And the day that you're talking about is the day that she fired Mr. Nguyen?

A Yes.

Q You talked about members being afraid to go down to the Local. Is that a problem that you think the Local can solve on its own?

A No.

Q And if they were afraid to go down to the Local for assistance, in connection with matters that they needed support on, how did they get it, if not by going down to the hall?

A They would search out the leaders, so they would find -- you know, most of the time, I think they would go to the website and find somebody that was in their sector and reach out to one of those leaders.

Q Now, I think you talked earlier about the Executive Vice-President meeting with people in different units after her election. And did she get a response from the people she met with? Were they asking for help from her concerning issues of concern

to them?

A Yeah. There was actually some very positive comments going on during that time that they felt that they were being heard again when she was showing up. I think she would go down there and actually just sit in the break rooms and stuff to talk to people.

Q And did somebody complain about what the Executive Vice-President was doing in that regard?

A No.

Q Was there some sort of an internal investigation conducted around that time by outside counsel to the Local Union?

A So not long after that -- well, during that time, some of the things that had come to the Executive Vice-President Kisling, there was some concerns that came to her attention that caused her to bring it up to the Executive Board.

And at that Executive Board meeting, Mary Grillo from SEIU International was present at that Board meeting, and after that Board meeting, she asked for those concerns to be given to our counsel, Michael Urban, to go through and take a look at that information, do an investigation, and determine if there was anything that need to be looked at further or if there was any charges that needed to be filed, et

cetera.

Q And do you remember what some of the concerns were that were supposed to be investigated?

A I know one of them was that the office up in Reno was not being utilized. There was some concerns that there was a lot of stuff that wasn't being taken care of up there. There was a ton of mail that had been found that --

Q So -- excuse me -- I didn't mean to interrupt you.

A No, that's okay.

Q The Local Union has a second office?

A Yes. Well, not anymore, but yes.

Q At that time, it had an office in Reno?

A Yes.

Q And is there some significant bargaining unit or units up in Reno?

A There's Renown Hospital up there, and I think not far from there is -- I think it's Washoe County I'm not for sure, so there's two offices that that person would take care of.

Q And nobody was going to the office to open mail?

A That was the concern is they weren't sure because there was a lot of unopened mail in the office,

so they didn't know if that Local had been being taken care of -- or that office had been being taken care of.

Q So it causes me to ask a question.

A Okay.

Q Were there policies and procedures regarding things like taking care of mail?

A As far as I know --

Q Whose responsibility it was and how often it should be collected?

A Yeah. As far as I know, there is no policies or procedures at the Local.

Q On any subject?

A Not that I'm aware of. I know there were at one point, but you can't find any down there.

Q Would you take a look at Exhibit 5, please?

THE HEARING OFFICER: Mr. Rothner, can I just ask a question. Do you have an estimate for how much longer you're going to question this witness --

MR. ROTHNER: Yeah, this is taking longer than I thought. I'm going to say it's about 20 minutes, 25 minutes.

THE HEARING OFFICER: I'm going to ask that we take a quick break. I'll be as quick as I possibly can.

(Recess taken.)

THE HEARING OFFICER: So Mr. Rothner, I want to take care of one -- as Hearing Officer, I want to use my discretion to go out of the order of business for just one second, if you would allow me.

MR. GUSTAFSON: My name is Fred Gustafson. I'm a Union Steward. Just curious as to if we can find out how and when the notification of this meeting went out and to who so that we can look it up. I hear it was an e-mail maybe, but I have --

THE HEARING OFFICER: Just so I can clarify, thank you Mr. Gus -- I don't want to mispronounce your name.

MR. GUSTAFSON: Fred.

THE HEARING OFFICER: Thank you, Fred. Just for the record, I'm going out of order to address the concern that the member has brought up. It's the second time I've heard this concern, and just for clarity for the record, I want to talk about the Notice of Hearing and the procedure that was followed pursuant SEIU Constitution and Bylaws.

Fred did not ask to make a statement for the record or to give any testimony. He just wants his question answered. He has to leave to get to work, so I just want to answer his question while he's still in the room.

On July 3rd, 2017, the International Union mailed the Notice of Hearing to the members of the former Executive Board for whom it had available e-mail addresses, and it sent a copy of the notice by overnight to Ms. Nancy King. So it is our position that that was the procedure that was necessary as provided by the SEIU Constitution and Bylaws, and it was followed.

MR. GUSTAFSON: Just to the Executive Board?

THE HEARING OFFICER: To the Executive Board.

MS. MANCINI: You can always just say no.

THE HEARING OFFICER: And so, Ms. Mancini, I realize this may be something that you want to address what you make your statement, and that is allowable.

MS. MANCINI: Okay.

THE HEARING OFFICER: Mr. Rothner -- oh, Steve. Oh, you're moving the mic, okay.

Please, Mr. Rothner, go on with your witness.

MR. ROTHNER: Yeah. So before we go back to the witness, I do want to mention that Exhibit 3 we're not going to have testimony about. It's another Executive Board member's response to the Temporary Protective Order, and we're just offering that without any testimony to elaborate on it.

And Exhibit 8 is another sort of set of -- a

chain, let's call it an e-mail chain, having to do with the same issue and the reaction of members.

BY MR. ROTHNER:

Q All right. So we were going to talk about Exhibit 5. Tell us what Exhibit 5 is.

A This is the website showing the officers on 8/17/2016.

Q Okay. So it shows the officers, but if you look, starting particularly at page 3 of 5, there are lots of vacancies and even more when you get to pages 4 and 5.

A Correct.

Q Do you know how long these vacancies had existed as of August 17, 2016?

A I believe all of the vacancies that are showing on here were all vacant since the election took place in June, so they would have gone into effect July, so they would have been vacant since the election.

Q Oh, so people didn't even run in the election in June --

A Correct.

Q -- for these positions that are identified as vacant?

A That would be my guess.

Q Do you have an opinion based upon your experience about why there were so many seats left unfilled?

A No. And especially because the majority of them, while I'm looking at this, were mostly in the private sector, so I'm not quite sure why there would be so many.

Q Is it a problem as far as you're concerned?

A Absolutely.

Q Why is it a problem?

A If you don't have anybody taking care of the members at those locations, your membership -- your membership is your No. 1 goal, right? It's to make sure that the membership is protected, and if there's not officers at those hospitals, they wouldn't be -- they wouldn't be protected.

Q Would you turn now to Exhibit 7, and this is an e-mail message from Sharon Kisling, the Executive Vice-President. Were you copied on this e-mail? I'm sorry. I've got the wrong one. This is from you, Exhibit 7. I was on Exhibit 7.

A Okay. I was like (inaudible).

Q Why were you asking for a meeting to be facilitated by Mary Grillo?

A So, at the time, we had an e-mail account

called Clark County Communications, and the officers would go to that e-mail account to get reports that were sent over from the County. Sometimes, if we had information that we wanted to share amongst the rest of the officers, we would send it to that account so then it was available to everybody without having to worry about it.

Q Okay. So I want to be clear. This is a Union e-mail account?

A A Union e-mail account.

Q Restricted to Union leaders?

A Yes. Specifically Clark County Union leaders.

Q Okay. And what happened to it?

A I believe it was Sharon Kisling was actually trying to get in that e-mail account to take a look at something, one of the reports that is sent over from the County to that e-mail account, and she couldn't get in. So there was some discussion about, "Why can't I get into the e-mail?" And I believe it had actually been taken offline, and so there was a whole bunch of discussion trying to figure out what took place. And in this chain, it was getting, again, heated, so I kind of stepped in and asked Mary Grillo to facilitate a meeting with the Local and us so that we could get past this problem of communication.

Q And was that an important source of information among leaders in the County?
A Yes.
Q And so did a meeting happen?
A Yes, sort of.
Q Describe what happened.
A So the meeting was set up. We took off time to come down there and meet. Cherie was there. She brought in a couple of people with her. I believe it was Tanisha, and it may have been Alfredo Serrano. And so we were there, and Mary Grillo was facilitating. We started coming up with our ground rules. We had started, you know, charting some information, and as we were sitting there, the meeting was abruptly stopped because Sharon Kisling was filed -- was served the TRO during that meeting.
Q And who arranged for her to be served during that meeting?
A Peter Nguyen.
Q Who was the Organizing Director?
A Yes.
Q Was that the end of the meeting?
A Yes. We couldn't go any farther because there was a lot of disruption. Sharon obviously, was very upset. At that point, we knew she couldn't be there.

So we asked to have Peter sent home, so that we could try to get this meeting out of the way, so that we could try to move our Union forward between the hall and Clark County leadership, and it just -- it didn't go. We all ended up having to leave.

Q Would you turn to Exhibit 10, please. This is an e-mail chain. Can you just summarize what it was about? Did it have to do in any way with Pat?

A Yes. So several of us that sat on the PAC committee were at one of the meetings, and there was a lot of -- a lot of conversation and determining where money was going to go and for who. And so, as we were sitting there, it was determined "x" person gets $500, another person gets $1,000, et cetera, and --

Q You're talking about candidates?

A Right. Sorry. Yes, the elected officials. So when we were going through those, we got concerned because there was so many candidates that we were backing we were worried that we didn't have enough money in the COPE fund, so this is the conversation asking to review the budget in that COPE fund.

Q And were you given the opportunity to do that?

A I don't know that the information that -- we were provided the financials, but we were told that there was enough money to handle what we had done

during COPE, so we were okay.
Q So was this a civil interaction that went on?
A This actually doesn't look too bad. There's a lot of --
Q Well, were you getting the response you wanted in terms of the information from the President of the Local?
A No. Because, again, you know, the officers have the right to know what the budgets are, what money is available in those funds, and we weren't getting the information. It was all over the place, and then eventually, finally, it was just stated that the finances would be at the Finance Committee, but it was stated that there was money in that fund, so --
Q Okay.
A I think it even ended up that Sheila Grain had to say the Treasurer is asking for the information, and then it finally became a priority.
Q So I want to move to another topic, Union bank time. Tell us what Union bank time is?
A Union bank time is a negotiated item in the Clark County contract, and Union bank time can be used for anything we deem is Union-related, so it can be used for going up to legislation. It can be used to help other organizations do some walks or, you know, if

they have an action, we can use that to help with those actions. Instead of having to take our own personal time, we can take bank time to do those actions.

Q And who administers the bank time that is negotiation. This is for Clark County?

A Yes.

Q Who administers the bank time?

A The Vice-Presidents.

Q Ah. So is there a Vice-President for Supervisory?

A Yes, that would be Mark Matthews today?

Q So that would be you and Mark Matthews?

A Correct.

Q Okay. Did you ever have a problem with abuse of bank time?

A There was some concern that certain individuals were using more than they should be using, and we were trying to have conversations about that with the individual.

Q Okay. And did this question of use of bank time get reported to the County?

A Yes.

Q By whom?

A President Mancini.

Q Was that a surprise to you?

A Yes.
Q Why?
A Because when you're dealing with other officers of the Local, I believe you should handle those items internally and not take it to the employer until it's deemed that there is a problem, and then you make that decision together on if it should go back to the employer.
Q Well, before President Mancini took the issue to the County, the employer, had she communicated with you or Mr. Matthews about there being a problem?
A There was some discussions, but there was never any indication that she was going to go and ask for audits and stuff to be done for that individual, no.
Q And did Sharon Kisling have any part in this issue of the Union bank time?
A Yes, she did.
Q What was her part in it?
A She was the individual being accused of the abuse.
Q So the President of the Local Union went to the employer to report alleged abuse of bank time by the Executive Vice-President?
A Correct.

Q Would you take a look at -- by the way, until this time, had the County ever paid any attention to your use of bank time?
A Never.
Q And did this report by the President to the County against the Executive Vice-President cause any concerns within your units?
A Yes. Now, we're questioned on a lot of things. If there's somebody brand new that's using even a couple of hours, we get phone calls.
Q From whom?
A From the HR Department. They're the ones that oversee those reports. We also, if there's people that are misusing it now, you know, if they're using -- unfortunately the form is very confusing to the stewards. We're trying to correct that.
The current leadership of the County is trying to correct that form. So people are doing the form incorrectly and Mark and I were notified that if people continued to misuse the form, which is an accident, actually, that they could start progressive discipline on some of these individuals.
Q And did this cause any turmoil among the leaders within the County units?
A Actually, I think it made us stronger.

Q Okay. Let's turn to Exhibit 17. Before I ask any questions about that, I just want to say that I am not going to ask any further questions about Exhibit 14, but it does have to do with the Temporary Protective Order, and there's already been some testimony. This sort of adds to the background there.?

Exhibit 17, if you look at the second page, it's, I guess, a memo -- is it? -- to Executive Board members from the President --

A Correct.

Q -- about an audit of Union paid leave time?

A Correct.

Q How did that come up?

A This actually came up because there was a memo sent to UMC from President Mancini asking for the report on the Union bank time there.

Q Okay. And were dues involved in that?

A So the way the Union bank works in our contracts is it's negotiated. So we've actually, in the past, given something away to actually receive that bank time, so there are no dues associated at all. This is negotiated bank time with the employers, and I believe most of the private sector has bank hours in their contracts.

Q I'm not sure you call it bank, but --

A Public sector, not private sector.
Q Union leave?
A Yes.
Q So, in your opinion, who should have been the one to look into whether there was a problem?
A The officers, specifically the Vice-Presidents.
Q From those units?
A I'm going to go actually take that back. I think in UMC their contract, I believe, actually talks about the Chief Stewards handling their bank time. Theirs is a lot smaller than ours.
Q Now, going back to the first page of this Exhibit 17, you're communicating with the President?
A Yes.
Q And in the second paragraph, you begin, "Also, if you want to start a war, you just did." What did you mean by that?
A So, right prior to this, there was some information again in an RJ article regarding the leadership.
Q The Las Vegas Review-Journal?
A Yes.
Q Okay.
A I keep doing that, sorry. About the

leadership of UMC, there was some charges that were filed against them, and then the next thing you know she's trying to audit those bank hours.

THE HEARING OFFICER: Brenda, can I just ask you, the "charges were filed," can you talk about what type of charges these were and who filed them?

THE WITNESS: I believe these were EMRB charges filed against the --

THE HEARING OFFICER: Help me out, EMRB?

THE WITNESS: Employee Management Relation Board.

THE HEARING OFFICER: Okay.

THE WITNESS: Which oversees the Union.

THE HEARING OFFICER: Sure. It's the government entity that oversees the collective bargaining relationship between the County and its employees.

THE WITNESS: Correct.

THE HEARING OFFICER: I just want to make sure I understand. So these were charges that Union employees filed against the County?

THE WITNESS: No, that President Mancini filed against UMC leadership.

THE HEARING OFFICER: Got it. Thank you.

THE WITNESS: This might also be when -- I'm

trying to see -- I don't remember specifically what the charges were for. It doesn't really indicate on here.

BY MR. ROTHNER:

Q Well, would you take a look at Exhibit 20 and tell me if that's connected with these issues?

A Yes. So we had a lot --

Q Tell us the connection.

A Basically, this -- our concern was if we're attacking our own leadership, it's breaking down the Union. So when you watch leadership being charged or being taken off committees that they've been on --

Q Did that happen?

A Oh, yes, that happened.

Q About the committees, tell me briefly about that.

A So the committees, we have contractual committees, again, in our contracts to include -- I mean, there's several in all the different contracts -- but specifically in this one was in regards to UMC's labor-management.

In the UMC labor-management, there has been a long history, probably since the birth of labor-management at that contract, that the Chief Stewards, and I think the VPs, sit on that labor-management committee, and that's the way it's

been since the day of inception, and President Mancini removed them from that committee.

Q Okay.

A Yes. Now that I'm thinking about it, that's what the charges were is that UMC -- actually, UMC management refused to come to the meeting because they didn't feel that the appropriate people that would be addressing the needs of the members would be at that meeting. So they said that they felt that they needed to be at that meeting, so they actually invited the leaders back to the meeting.

Q And, I'm sorry, why weren't the leaders already being --

A Because --

Q -- invited?

A -- Cherie Mancini removed them from that committee.

Q Did she explain why?

A Not that I'm aware of.

Q So would you look at Exhibit 18. Did you write this letter to Mary Kay Henry?

A Yes, I did.

Q And it doesn't indicate who are the other signers. Was there a list of signers?

A Yes. So this was all of the Clark County

officers, excluding Jim Cowan, because I could not reach him at the time.

Q What caused you to want to send this letter to Mary Kay Henry on December 5, 2016?

A So, actually, I'm going to take that back. I also believe this was -- I believe UMC officers were also signers on this e-mail. This is about the RJ article, the Las Vegas Review-Journal.

THE HEARING OFFICER: Review-Journal.

THE WITNESS: I'm getting there.

BY MR. ROTHNER:

Q Which is the next couple of pages in the exhibit, right?

A Yes.

Q Okay.

A And there was some concern that there was information in here that that was -- it felt to us that the leadership of our units were being bullied, that this information was not true, that more attention was being paid to items that should not have been communicated to the public at all, and it just gave us great concern that we're airing our dirty laundry, and especially the fact that there's badmouthing throughout this about leadership.

Q Would you look at Exhibit 19, are these other

articles in the Las Vegas Review-Journal?
A Yes.
Q Identifying problems within Local 1107?
A Yes.
Q And how far back do they go?
A The problems with the SEIU Local 1107?
Q The publicity concerning problems with the Local 1107.
A Well, the specific information that's throughout most of this stuff would be since the timeframe that Michael Scott Davidson started with the Las Vegas Review-Journal, and he took an interest in SEIU Local 1107 and --
Q Specifically, the first article talks about a "toxic environment." Do you see the headline?
A Yes.
Q And that's written at the time of Martin Bassick's --
A Yes.
Q -- resignation?
A Yes. There was also some prior to this where it actually talks about the issues with President Bassick and Clark County management that's -- so there's been stuff even prior to this.
Q So let's look at Exhibit 24 now, and this is

dated March 21, 2017. We talked earlier in regard to Exhibit 5 about a number of vacancies that existed on the Executive Board.

A Yes.

Q Were there elections held to fill those vacancies?

A No.

Q No elections?

A No.

Q Were there nominations posted so that the Local members in those units could nominate members to stand for election to fill those vacancies?

A Not that I'm aware of, and it was never brought up at the Executive Board meetings.

Q Okay. So in the absence of elections --

THE HEARING OFFICER: Go ahead and finish your question.

BY MR. ROTHNER:

Q -- were people actually sworn in to office on the Executive Board to fill the vacant positions?

A Yes. There were actually, I believe, nine total people that were appointed to positions.

Q Okay. I want to ask you to take a look at Exhibit 1 -- I'm sorry -- Exhibit 13, Local Union Constitution, Article XIII, Section 8(f).

THE HEARING OFFICER: Can I have the page?
MR. ROTHNER: I'll get up to that in just a second.
THE HEARING OFFICER: I beat you, 17.
THE WITNESS: 17?
THE HEARING OFFICER: 17.
MR. ROTHNER: No, I'm sorry. I got the wrong -- oh, it's Section 8(f)(4) -- actually, I take that back. It is Section 4. It's not 8(f). It's Section 4. It's on the next page.
BY MR. ROTHNER:
Q Under this provision of the Local Union's Constitution --
A Yes.
Q -- can vacancies be filled in the offices that were filled --
A No.
Q -- without an election?
A No.
Q Did you raise this as a concern?
A Yes.
Q And what response did you get?
A There -- I didn't get any response. I actually asked if there was a current election committee to make sure I had not missed something and

never got a response on that, so I sent charges up to Mary Kay.

Q And those charges have not been adjudicated?

A Actually, Sister Alma Henderson asked me to provide some discovery on those charges, and I believe during her investigation, the hearing -- the hearing decisions back from the October hearings came down, so these were never dealt with past getting information to Sister Alma Henderson.

Q Well, then the trusteeship was imposed and --

A Correct.

Q -- all offices were vacated by virtue of the trusteeship?

A Correct.

Q All right. Would you take a look at Exhibit 23, please. I'm sorry. Before you do that, was it Exhibit 21 the cover that you used regarding the filling of these vacancies without an election?

A Yes. And I guess it actually isn't -- I said it was charges, but it was actually an appeal because dealing with elections, you do an appeal, so I did.

Q So I've asked you about Exhibit 23. Are you familiar with this letter from the Organizing Director to Mark Travis?

A Yes, I am.

Q And Mark Travis was your counterpart; in other words, he was the Vice-President for the Supervisory in Clark County?

A No. This Mark is actually -- he works for Sunrise Hospital.

Q Oh, okay.

A I believe he was the Chief Steward at Sunrise Hospital.

Q I'm sorry. And do you have any idea why the Director of Organizing for the Local Union sent the Chief Steward a letter threatening litigation for defamation?

A There was another individual at Sunrise that was sending out e-mails and other propaganda, if you will, to the Sunrise employees talking about how he felt he was unfairly handled on a termination that took place on him, and this letter was sent to Mark versus the -- and I cannot remember the other individual.

Oh, actually on the next page -- Robert Dean was actually the person that was sending the information, but I'm not sure why. Based on this letter, he's saying that there were personal attacks being done on him, and I do not believe Mark ever personally attacked.

THE HEARING OFFICER: Brenda, who is Robert

Dean?

THE WITNESS: Robert Dean was actually a prior -- I believe he was an Executive Board member years ago and a very active Union officer and Union Steward within the Local several years ago. I don't know all the details, but I believe something happened that he ended up out of work, and then later he ended up terminated.

And based on the letters that I saw that he was sending out, he felt that the Local did not provide what he needed to be able to get his job back.

BY MR. ROTHNER:

Q Well, getting back to Mark Travis, did he continue in his position after he got this letter --

A No.

Q -- sorry -- from Mr. Nguyen?

A No, he resigned at the next E-Board meeting.

Q Did you talk to him about that?

A Yes, I did.

Q What did he say?

A He was just fed up. He -- I had a lot of conversations with Mark. He felt that he didn't get any help down at the hall. He -- at Sunrise, at that point that he resigned, I think there was four or five NLRB charges -- that's the National Labor Relations

Board -- against his hos -- or against -- from the members there against the Local, because he wasn't getting the help that he needed to be able to help those members.

Q All right. I'm going to ask that you turn to Exhibit 25 now, and this is a simple one-page document. It's just a notification of impasse at the Clark County negotiations. It's dated April 7, 2017. I know you have a lot to say about this.

It's getting a little late. I'd like to you summarize briefly what assistance or interference you got from the Local in connection with your negotiations affecting Clark County, and let's start with which are the largest bargaining units represented by Local 1107?

A Clark County is the largest as far as employees and as far as membership.

Q Okay.

A And then I believe UMC is second.

Q All right. So tell me about whether you got assistance or not in connection with those negotiations?

A Okay. So kind of a little bit of history: The prior legislation, we had some really bad legislation that went into place that caused about 14- to 1500 employees to be injured, as I call it,

financially.

Now, they eventually, through legal, we were able to get them paid and stuff, but that legislation caused a problem with all of our contract negotiations because we have a hard deadline now that if our contracts aren't settled, they do not have to retro pay anybody that has financial impact during that timeframe.

So anybody from -- in our case, our contract ends June 30th, so July 1st until the contract's settled, anybody that would have merit increases, if they had -- in our contract, once you hit a certain threshold of number of years, you get increase and accruals to stick in vacation, longevity increases.

So anything that would have impacted during that timeframe, based on that legislation, they would not have to make those employees whole, so we needed to make sure that we had our contract complete by June 30th. So the officers -- actually, a lot of the officers prior and the officers current had been asking to get the contract starting --

Q You mean the Clark County officers?

A Clark County officers because we knew that we had this problem. So we had started asking to get our committee together and stuff, probably started those

conversations back last May, and nothing took place even though we constantly had conversations, e-mails, heated discussions.

Nothing took place until November when a whole bunch of the leadership happened to be there for another meeting where we asked President Mancini to come in and asked her if she had sent the Letter of Intent to bargain with Clark County, and at that point the answer was no. So we kind of pressured the issue and --

Q Let me interrupt you for just a second.

A Yes.

Q Why so early? Did it have anything to do with impasse procedures?

A Right. So, per NRS again, Nevada Revised Statutes, in order to -- once you call impasse -- well, first of all, you have to have six sessions, so you have to go through six bargaining sessions before you can call impasse. Once you call impasse, it has to be agreed to go to binding arbitration.

If one of side or the other refuses to go to binding arbitration, you actually have to go through arbitration twice if you don't like the result to be able to get a binding arbitration. So you're talking, you know, a good six-month process in order to be able

to get a final binding decision on an arbitration.
Q And that's why you were concerned about it not being done by November or --
A Correct.
Q -- earlier?
A Yes. Because --
Q So what did --
A -- of the --
Q -- President Mancini do when you wanted a letter to go out in November?
A She went and talked to Mr. Nguyen, who is the Organizing Director, and he said, per Nevada Revised Statute, it didn't need to be sent until February 1st. So we explained again that that wasn't acceptable because there wasn't enough time that, if we actually had to call impasse, that it should be done on February 1st.
So Julie Ouellette happened to be at the Local at that point and kind of kicked in and asked why didn't she just send it, it was just a letter, and eventually, later that day, the letter was sent.
Q Okay. So bargaining commenced?
A Bargaining commenced.
Q And did you choose your team?
A Yes. So because of the turmoil between the

hall and the County leadership, Mary and -- Mary Grillo and Julie Ouellette sat down with both sides and came up with a game plan on how to choose the bargaining team even though the Constitution and Bylaws allows the officers to choose their own bargaining team.

Q The Union officers?

A Yes. So we tried we came together and decided to do what they had come up with so that we could try to prevent some of this hostility that was going on.

Q Okay. And as far as you were concerned, once you set up your team, were you making adequate progress in your negotiations?

A No.

Q Why not?

A Several reasons. First of all, again, because of the timeframe, there was a lot of new people, and I loved having the new people because they bring a fresh set of eyes and stuff, but there was a lot of training that had to take place, obviously, because they had never gone through that.

So when you're on a big timeline, and you're rehashing information over and over, it takes up a lot of time during your prep of your bargaining.

Q And were you concerned at some point that you weren't going to get the bargaining done in time?

A Yes. When we had over half of the articles open on a seasoned contract, it brought great concern to me and others on the bargaining team.

Q What do you mean by that when you have over half of the articles open?

A We have 43 articles, I believe, in our contract, and I believe we had 24 articles open.

Q Why so many articles open if this is a --

THE HEARING OFFICER: Just to clarify, "open," meaning proposals on the table to --

THE WITNESS: Exactly.

THE HEARING OFFICER: -- make changes?

THE WITNESS: We were going to crossover language.

BY MR. ROTHNER:

Q So why so many proposals in a contractual relationship of long duration?

A I'm not sure.

Q Who decided that there would be that many proposals on that many articles?

A So, basically, the bargaining team brought up different articles, so there were specific problems that we were aware of because we had lost arbitrations or grievances, et cetera, that we knew needed to be looked at.

We also had modified some language in certain articles and realized that there was some pieces missing on some of that changed language from the prior contract. So we knew specifically on certain ones that needed to be corrected.

There was other people that brought up articles that they wanted to see modified or language changed; and during that process, those of us that had been working this contract for many years tried to explain why that language was important bringing up grievances or arbitrations that had been won, and a lot of times that information was just dismissed.

Q Why?

A I'm really not 100 percent sure.

Q Okay.

A I have my opinion, but --

Q Okay. Well, did you --

THE HEARING OFFICER: May I, Mr. Rothner?

MR. ROTHNER: Go ahead.

THE HEARING OFFICER: So, essentially, what you're saying is that it was the bargaining committee that had a process by which it decided what proposals the committee would make during bargaining?

THE WITNESS: Yes.

THE HEARING OFFICER: And who was leading the

bargaining committee or leading the negotiations?

THE WITNESS: Peter Nguyen, the Organizing Director.

THE HEARING OFFICER: Thank you.

BY MR. ROTHNER:

Q All right. So were you concerned enough at some point to communicate with President Mary Kay Henry?

A Yes.

Q And would you look at Exhibit 26. Is that your communication?

A This is actually about -- I, actually, spoke to the Las Vegas Review-Journal. This is an e-mail about that.

Q Okay. But it is an e-mail to Mary Kay Henry?

A Yes, it is. So --

Q And why did you speak to the Las Vegas Review-Journal?

A At this point, we had a lot of concerns. We had called impasse at this point. We still had -- we only had two -- no, I don't even think we had any articles at this point closed. There was nothing signed off at this point, so basically the entire contract was still up in the air.

So the officers of Clark County, excluding Jim

Cowan because I couldn't find him, sent a letter together up to Mary Kay Henry and let her know that we had a lot of concerns about what was going on.

Q Okay.

A At that point, somehow, and I still don't know how, the Las Vegas Review-Journal contacted me. Basically, it was about the impasse, asked me a couple of questions being a member of the Executive Board and a member of the bargaining team, and I answered those questions.

And then he asked me if I would go on the record, and I said that I wasn't comfortable with doing that. And he talked to me some more, and after a while, I said, "Look, I really need to ask -- let me go back to the leaders and ask some questions, and I'll get back to you."

So I went back to our Clark County team and asked them what they wanted to do, and the County officers said, "Yes, we need to go to the RJ." So I took a laundry list of items from the team and went to the RJ and answered his questions the way the leaders of Clark County wanted me to do.

Q A laundry list of items that were at issue in the negotiations?

A Yes.

Q Okay.
A Or in general, I mean, just the whole thing, mostly about bargaining, about not being heard, you know, we didn't have a voice in our Union. There was a long laundry list.
Q And did you get a response from the Union?
A This -- yes. So we were at the table with Clark County in negotiations at lunch, President Mancini came in with the article and asked that the -- asked the bargaining team what they thought about the article, and asked them what they wanted to do about me going to the RJ, Review-Journal.
So the bargaining team basically said that that wasn't the place for it, if they had an issue, that they would take it up with me on their own. President Mancini kept saying that the article, there was a bunch of lies in the article. The members of the bargaining team were asking what lies were in the article, and at that point President Mancini left the room.
Q Okay. Were you at the meeting of April 26th, 2016, where the Executive Board of the Local voted to request a trusteeship?
A Yes, I was.
Q And had you been on the agenda for that

meeting?
A Yes, I was.
Q Why did you get yourself on the agenda?
A Actually, because of everything that was going on, I actually wanted to ask the Executive Board to self-trustee the Local.
Q And did you have to do that?
A No. Because the results came down the night prior and International was at the Executive Board to ask us to consider trusteeship.
Q The results of the disciplinary charges?
A Yes, the October hearing charges.
Q And what was the vote at the Executive Board meeting on requesting a trusteeship?
A I believe it was 17 to 7 and 5 abstentions.
Q I may have said 2016. I meant 2017.
A I'm sorry. Understood.
Q Yeah. I'm sorry, did you give the vote?
A 17 to 7, and I believe it was 5 abstentions.
Q And was there a quorum?
A Yes.
Q Why did you vote for a trusteeship?
A Personally, to me, I didn't want to go into trusteeship. I -- it was the last thing I ever wanted to do, but because the Local was in such disarray.

There was so much hostility at the Executive Board meetings.

We weren't doing any business of the Local and for the membership, and now things were going into the management side where the employers knew that we had no power. We had no control over our own Local, so how were we going to have any power within the employers?

So it was -- I don't think we have a choice. I don't think we had a choice. Plus the fact that the two highest-ranking officers were no longer in positions and our Constitution and Bylaws doesn't tell you what to do once that happens, so there would have been nobody in leadership at that Local.

Q And are there things you'd like to fix during the course of the trusteeship?

A Absolutely.

Q What would you like to fix?

A Constitution and Bylaws, No. 1; policies and procedures, No. 2; and an organizing plan to get the membership up, and I don't think any of those have been done.

Q Have you been active in the Local since the trusteeship?

A Yes.

Q And how do you find the Local so far under

trusteeship?

A Well, today, if you walk in there, it's a completely different feeling. It's very professional. You're welcomed. People talk to you. They smile at you. If you make phone calls, you get a phone call back. If you send e-mails, you're getting e-mails back. It's just completely different.

Q Is there still a long way to go?

A Absolutely.

MR. ROTHNER: I have no further questions.

THE HEARING OFFICER: Thank you, Mr. Rothner. I have a few.

EXAMINATION

BY THE HEARING OFFICER:

Q Brenda, if we can go back to Exhibit 19, which is one of the Review-Journal articles, this one from April of 2017.

A Yes.

Q And this is the article that is describing President Bassick's resignation?

A Yes.

Q So would you say, based on this article, that some of the issues about the disarray and the local preceded President Mancini and Executive Vice-President Kisling?

A Absolutely.
Q Would you characterize the atmosphere, the disarray in the Local, under Bassick's tenure, like how did it compare to what became the disarray that followed? Was is it the same? Was it different?
A I think under President Bassick's reign is where a lot of the public versus private issues started coming to fruition, and because I was public and he was public, it wasn't as obvious to me at the time that there was that turmoil between the two sectors going on. So it became more apparent to me once President Mancini was in because I'm not private.
Q Can you talk a little bit more about the public versus private dynamic and why you think this existed?
A I personally don't -- I didn't believe it really existed, and I still don't think there is a problem with private versus public. I think others do, and I think they use that -- I think they use that. I think it's a right versus wrong.
I think, if you take a look at the sectors, we have a lot of the same issues. Yes. There are definitely some big differences between the two, but it's the same issues, a bad boss is a bad boss. So I think others have used that, but I personally don't

believe that that exists.

Q Turning your attention to Exhibit No. 23, this is the letter dated March 20 of 2017 to Mark Travis from Peter Nguyen.

A Yes.

Q Do you know if there were other communications like this that Peter Nguyen sent to other members? Are you aware of any.

A Not that I'm aware of. This one was actually brought to the Executive Board, so that's why I'm aware of it.

Q And it was brought to the Executive Board by whom?

A By Mark Travis --

Q By Mark Travis?

A -- because he had concerns about it.

Q And did the Executive Board discuss it?

A To great length. As a matter of fact, several of the Clark County officers, including myself had grave concern because it's talking about personal stuff in here, and you're on SEIU Nevada letterhead. You're using SEIU Nevada monies to send the letters.

And you know, we took a look at from the standpoint, if this was us in our organization, we would have been, at a minimum, disciplined, probably

not had a job at this point because we're misrepresenting the County.

Q And so was there any conclusions or actions taken by the board after that discussion?

A Not that I'm aware of.

THE HEARING OFFICER: Thank you.

MR. ROTHNER: Just following up on that, if you just don't mind.

THE HEARING OFFICER: Please.

EXAMINATION

BY MR. ROTHNER:

Q The first cc is Cherie Mancini?

A Correct.

Q Do you know whether, following that Board meeting, Cherie Mancini took any action against Mr. Nguyen in regard to the use of the Union's letterhead and a personal threat of litigation against an officer of the Local Union?

A I do not know if that happened at all. I'm going to assume that there was a conversation since the letter on the next page was sent out.

Q Right. But that -- did Mr. Nguyen remain employed --

A Yes.

Q -- by the Local Union through the imposition

of the trusteeship?

A Yes.

EXAMINATION

BY THE HEARING OFFICER:

Q And one last question, Brenda, and thank you for hanging in here.

A No worries.

Q You talked a lot about screaming and yelling at Board meetings, dysfunctional Board meeting, I think your words were that the Board meetings were dysfunctional, unstructured, and unprofessional?

A Correct.

Q You talked about unopened mail or what appeared to be, and my conclusion, a lack of business happening or a lack of representation happening in Reno. You talked about vacancies on the Board, the temporary restraining order that Mr. Nguyen got from the Courts against Ms. Kisling, and removal of leaders from committees?

A Correct.

Q Can you just summarize how you think those things contributed to -- I just want to get the wording right -- the interest of the Local and the membership. Why does -- I believe you are suggesting that these things created an emergency --

A Correct.
Q -- a crisis that made it necessary for the trusteeship to be imposed. Can you just say in your own words, just again, summarizing why.
A So for many months, it's probably very well known that I was sending a lot of correspondence to President Mary Kay Henry and the Executive Board with the concerns that were going on at SEIU Local 1107. And it seemed that every week there was something new that was happening that I personally was being questioned on by members.
Concerns -- we were hearing all over the place about members were ready to drop, and we watched two hospitals actually do de-cert, you know, right at the tail end of this. And it had concerns for me personally because I was watching my Union fall apart at my feet, and there was nothing I was able to do about it. And I couldn't allow that to happen, so I did what I could to make sure my membership was protected.
Q Sorry. I do have one more question. And to your knowledge, did Ms. Mancini or Ms. Kisling or any other leader of the Union, whether it was during Board meetings or in between them, to try to get some order? Do you know if there was anything done to try to turn

things around?

A President Mancini during the meetings tried to get order, but when people are out of control, you cannot do it. You know, when you start having people puffing up their chests and crossing the room at each other, and you know, putting fists up, you're not going to get the order. You just aren't. But, yes, she definitely tried to do that, absolutely, just to no avail.

THE HEARING OFFICER: Thank you. No more questions. Do you have any --

MR. ROTHNER: I do not.

THE HEARING OFFICER: -- further questions, Mr. Rothner?

Thank you so much, Brenda, and thank you for your leadership and continued activism in our Union.

(The witness was excused and left the stand.)

MR. ROTHNER: I would appreciate a short recess at this point.

THE HEARING OFFICER: How long would you like?

(Recess taken.)

THE HEARING OFFICER: So, thanks, everybody. We can come back to order. Again, I want to go out of order for just a second, Mr. Rothner. It has been

brought to my attention that there are members who need to leave, and so as I stated in the beginning, I have committed to making sure members who want to have their voice heard in this process have that opportunity, and I do understand that folks have other commitments.

So if there are members who need to leave by a certain time, I will allow us to go out of the order of business for them to address the hearing at this time, and there is always the option of submitting a written statement before the record closes.

There is, again, instructions that I see from my relief within her hand of how someone can submit a written statement for the record, if they so choose. So if there's any member that wants to come and provide a statement at this point, I will allow that; and if not, Mr. Rothner, please call your next witness.

MR. ROTHNER: Patricia Armstrong.

THE HEARING OFFICER: Mrs. Armstrong, as you are taking your seat -- go ahead -- if you can state your name and spell it for the record.

THE WITNESS: Patricia Armstrong, P-a-t-r-i-c-i-a, A-r-m-s-t-r-o-n-g.

(Witness sworn.)

THE HEARING OFFICER: She's all yours, Mr. Rothner.

MR. ROTHNER: Thank you.

PATRICIA ARMSTRONG,

having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. ROTHNER:

Q When did you first become a member of Local 1107?

A 2006.

Q Where were you employed at the time?

A Clark County Fire Department.

Q What did you do there?

A Planning intake. It was title office specialist, but (inaudible).

Q Have you continued to work for the County?

A Yes.

Q In the Fire Department?

A Yes. We've actually merged with the Building and Fire Department, but I still do for the County -- I mean, for the fire side.

Q And you've been a member of Local 1107 continuously since 2006?

A Yes.

Q What is your title now?

A Building Department Specialist.

Q When did you first hold office in Local 1107?
A I believe it was around 2013.
Q And what was that office?
A Secretary.
Q And were you reelected?
A Yes.
Q So did you continue to serve as Secretary until the trusteeship was imposed?
A Yes.
Q As the Secretary, are you the person who takes Minutes at the Executive Board meeting?
A Yes.
Q So I know you've done this before, because I asked you to do it before, but I want you to take a look at Exhibit 2. Are those true and correct copies -- is that a true and correct copy of your Minutes from August 31, 2016?
A Yes.
Q And would you take a look at Exhibit 30. Are those true and correct copies of your Minutes for the meeting dates indicated on those exhibits?
A Yes.
Q There in Exhibit 2, I've gone over this with Ms. Marzan and I just wanted to ask you briefly because you're the Secretary, at the end of the Minutes, it

says "Meeting adjourned due to situations."

A Yes.

Q What did you mean by that?

A That was when probably an outburst or there was a disruption because a near altercation took place, and it disrupted the meeting.

Q And that was the end of the meeting on that occasion?

A Yes.

Q And on other occasions, you enter a notation, "Refer to Recording for Full Discussion." Why do you do that?

A Because there was language that was used during the meeting that I didn't think was appropriate to put in the writing in the Minutes, so I just put in there, "Refer to Recording," so if people actually wanted to hear what was said, then they would have to listen to the recording.

Q Would it only have been foul language or might there be other circumstances where you just didn't take the time to take down anything else?

A Most of it was foul language. A lot of it might have been conversations about a member of staff or something like that, but most of them, yeah, was inappropriate or foul language.

Q Would some of it, on occasion, have been yelling and screaming.

A A lot of it was, yes.

Q Did it come to more than words on occasion? Were there confrontations?

A There was a couple of meetings, yes, where there was near confrontations where members had to be separated or, one, some held back; but, yes, there were occasions on that.

Q And what effect would these instances of confrontations, yelling and screaming, foul language have on the Board's ability to get its business done?

A Well, it would cause the Board not to be able to conduct business. There was items on the agenda that might need to be voted on, and we were not able to have quorums or the members would leave during the meetings or they might hang up on the phone during the meeting, so it would have a big effect on the business of the Local being taken up.

Q So when there were things that needed to get accomplished that you couldn't do it because of the lack of civility in the meeting, did you try e-mail votes?

A Yes. There was a few times that we tried e-mail votes because we couldn't get issues voted on

during the E-Board meeting.

Q And was that successful?

A In my opinion yes and no, because a lot of the people or members wouldn't respond to the e-mails, so we were not able to really get an accurate quorum or vote on the item, so yes.

Q So you didn't get enough of a response to be able to say you had a quorum?

A Exactly, yes.

Q What do you think needs to be done to fix this Local so it can govern itself?

A Working on our Constitution and Bylaws, policies and procedures, offer us training, maybe some humble training. I mean, we need to realize that when we are elected to these seats or offices, we're elected to represent the membership, so that's what we should be doing, representing the membership.

It shouldn't be a personal agenda of anyone on the E-Board. It shouldn't be private versus public. It should be the concerns of the membership and taking care of the membership. That's what you were elected to do.

MR. ROTHNER: I have no further questions.

THE HEARING OFFICER: I have no questions for this witness. Thank you so much. Thank you for your

leadership and continued activism in our Union.

THE WITNESS: Thank you.

(The witness was excused and left the stand.)

MR. ROTHNER: And our next witness is Bob Hauptman.

THE HEARING OFFICER: Please, for the record, state your name and spell it and get sworn in by the court reporter.

THE WITNESS: Robert Hauptman, H-a-u-p-t-m-a-n.

(Witness sworn.)

ROBERT HAUPTMAN,

having been first duly sworn, was

examined and testified as follows:

EXAMINATION

BY MR. ROTHNER:

Q Mr. Hauptman, have you had some professional involvement with the affairs of Local 1107 recently?

A Yes, since about May 15th.

Q Okay. And what has your involvement been?

A I am a consultant to the International and have been helping to review the records and the review system and some other aspects.

Q Do you have any educational background in

business and finance?

A I have an MBA from Stanford.

Q Okay. And in connection with your examination of the books and records of the Local Union, did you find anything that concerns you about the Local's Political Action Committee reporting?

A Yes. It was brought to my attention that there hadn't been a report filed since January of 2015, and I went through the activities to see if reports were needed and there were, so there was some potential serious consequences.

Q So, in Nevada, how often do reports have to be filed?

A There's a schedule of about five periodic reports every year, and they need to be filed, if there's activity, and there's an annual registration form that must be filed to keep your committee in existence.

Q And when was the last time the annual report was filed?

A 2014.

Q And approximately how many of the periodic reports were missing based upon political activity?

A Based upon activity through the bank account, I believe there were six reports that needed to be

filed that weren't in addition to the registrations.

Q And what are the possible consequences for failing to file these reports?

A Well, failing to file the registration can have the committee deactivated, which means you're not allowed to do anything while you're inactive. You need to be registered before you take any contributions -- accept or make contributions. And there's penalties, which make -- for those number of reports, it's probably going to be in the $45,000 range, initially. We may be able to negotiate those down, but the exposure for the Local is between $40- and $50,000.

Q Is there another area of possible financial exposure for the Local that you found concerning settlements?

A Yes. It was raised by the CPA firm that there were settlements made to several staff grievances in May of 2016 that were set up in a way that taxes be paid by the Local, and those taxes were never paid, and the amounts weren't even included in people's W-2s which exposes the Local to significant potential penalties and interest.

Q And just take a quick look, are those the settlement agreements found at Tab 31?

A Yes.

Q And what do you believe is the range of the exposure in regard to the failure to pay withholding on those tax settlements?

A Well, in addition to actually paying those taxes now when they're finally done and submitted late, there will probably be between $20- and $25,000 of penalties and interest assessed by the IRS, which may be reducible, but that's the potential.

Q Is there also a concern about whether pension contributions should have been made?

A The auditors raised that point, and it needs to be finalized with the pension administrators, but probably there will be additional amounts required that haven't been budgeted yet, but -- there may not be penalties for the pension, but there will be additional funds that haven't been recognized.

Q Would you take a look at Tab 32, please. In the course of taking a look at various books and records of the Local Union, did you come upon a Department of Labor subpoena that was issued to the Local Union in September of 2015?

A Yes, that's what this exhibit starts with.

Q And did you find out when the Local Union responded to that subpoena?

A Well, there are following e-mails from local

counsel talking about it not being responded to in October 6th, a year later, they were still getting correspondence from the Department of Labor investigator asking for things that were in this subpoena.

Q So I just want to be clear that the subpoena itself on page 1 indicates that the response deadline is September 16, 2015?

A Yes. So this is a year -- correspondence a year later asking for some of the same stuff.

Q All right. What, in your experience, has SEIU done about responding to requests from the Department of Labor?

A They always try to respond promptly. Sometimes there will be arguments about the content or format or how to respond, but they never try to keep them hanging.

Q And what is to be gained by having a good, cooperative relationship with the Department of Labor?

A Well, the Department of Labor has a lot of power, but it's also kind of a negotiation process of, "Oh, do you want -- are you going to take our originals? Will you give us an extra week because somebody's on vacation?" There's a lot of back and forth possible, and they can either be very strict or

very commonsense.

Q Is that true about whether they find technical reporting violations and whether there will be penalties or not?

A I believe so. I mean, when the investigator gets angry at you, they tend to look for a lot more and take it a lot more seriously or they try to do a lot more, but generally it's just by human nature, so --

Q And did you come across anything in your examination of books and records that indicates to you why the Local took approximately a year to respond -- over a year?

A Not specifically. I mean, generally, the Finance Department does not have great recordkeeping, and it may have been very difficult to get these, but even when difficult, you have conversations to explain to the investigator what the problem is, what you're doing, and try to keep the conversation going.

You don't let them hang for months saying, "Why haven't you sent them," which appears from this correspondence to be what was happening.

Q So is the keeping of membership lists part of the Finance Department?

A Not precisely. I mean, there's an interaction with the Dues Department because you have to account

for the amount of money that was deposited, but the Dues Department is fairly separate.

Q Well, in the course of your examination of the books and records of the Local, did you find problems with the membership lists?

A Substantially, yes.

Q What were they?

A Essentially, the system and the way it was being used don't produce one.

Q Why is that?

A In the immediate case, there were two people in the Dues Department, one of which was let go in late March, and the auditors had been saying that the Dues Department was having trouble keeping up and doing some of the things you really want them to do like audit the employers.

Are they sending in the right amounts for the right people, and they had lost the capacity to do things like that, and they were falling behind in some of the routine work when there were two of them and then one was let go, and it turns out that he had his own methods of doing things that weren't what the vendor sold in the program and weren't documented anywhere.

So it's like taking a password, there's parts

of the process that couldn't be done after he had left, and no one had figured that out before he went.

Q And did that create a particular problem in terms of the representation of the members?

A Well, for everything, it makes it -- the dues staff -- the person who is left couldn't do some of the processing that needed to be done to get a good list for an organizer of new employees.

Q What about for ratification?

A For the ratification of the County and because of the deadline that everyone knew we were facing, we were very worried about having a list ready in time for ratification. We couldn't fix the computer process fast enough.

We wound up creating a membership list by hand with PCs but a totally manual process to use the best information from the employer to create the list that was accurate, but it took a lot of work and would not have been done under the normal staffing.

Q Would you turn to Exhibit 33. Would you tell us what this is?

A That is a receipt from Walmart on April 26th, late night, for a 4 -- I'm sorry -- $1,146 charge on the Union Amex card.

Q And do you know what it's for?

A It took quite a bit of effort by several people talking to American Express and Walmart to finally find out that it was for two laptops purchased.
Q And by whom were they purchased?
A By Sharon.
Q Sharon Kisling?
A Yes.
Q And has the Local been reimbursed for that purchase?
A The Local protested the charge with Amex, and they reversed the charge, but the Local was never -- so the Local never paid it, basically.
Q I see.
A But they never got the laptops.
Q So you have an MBA, would you have appreciated seeing some policies and procedures regarding the use of credit cards?
A That would be very helpful.
Q Did you see any --
A No.
Q -- in your examination of the books and records?
A No, I did not.
Q Did you see any policies and procedures regarding the maintenance of membership lists?

A No.

Q Did you see any policies and procedures regarding maintaining dues records accurately?

A No.

MR. ROTHNER: I have no further questions.

THE HEARING OFFICER: I do.

EXAMINATION

BY THE HEARING OFFICER:

Q Mr. Hauptman, going back to the DOL subpoena, which is Exhibit No. 32, I just have to ask, do you know what were the circumstances that surrounded this subpoena?

A No, I don't. I'm not sure why they wanted them. It's a fairly extensive list. I don't know anything about the investigation, just timing that they weren't getting information they had asked for.

Q And should I assume that it's still an ongoing investigation or to your knowledge is it closed?

A I have not dealt with them at all. I don't know.

Q And with respect to the Walmart purchase, was there any -- I get that there were no policies and procedures that would have governed how credit card use and credit card expenses were to be dealt with in a Local, but was there any documentation about the charge

or what it was for other than knowing it was two computers?

A Well, the only way we know it was two computers was because somebody spent several hours and days going back and forth with Walmart and American Express to get the raw material. This was the night of the Board meeting asking for the trusteeship. This was after the Board meeting. So Sharon never responded to any requests for an explanation of these charges.

MR. ROTHNER: And she had been removed from office.

THE HEARING OFFICER: Okay. Thank you. I don't have any more questions, Mr. Rothner.

MR. ROTHNER: Nothing further.

THE HEARING OFFICER: Thank you, Mr. Hauptman.

THE WITNESS: You're welcome.

(The witness was excused and left the stand.)

MR. ROTHNER: And our last witness is Martin Manteca.

I should say, however, that the last two exhibits, 34 and 35, are simply records from litigation brought by some members against the Local Union concerning the trusteeship, and they are declarations by Mr. Nguyen and one of the Local's outside counsel

concerning the Clark County negotiations and progress or lack of progress, and that's just to fill out the background on them.

THE HEARING OFFICER: Great. Thank you. Witness, if you can, for the record, state your name, spell it, and get sworn in by the court reporter.

THE WITNESS: Martin Manteca, M-a-r-t-i-n, first name; M-a-n-t-e-c-a, last name.

(Witness sworn.)

MARTIN MANTECA,

having been first duly sworn, was

examined and testified as follows:

EXAMINATION

BY MR. ROTHNER:

Q Mr. Manteca, when did you first start working for SEIU?

A May 1st, 2004.

Q And where was that?

A That was in Chicago.

Q What did you do there?

A I was an Immigration Organizing Coordinator for the Midwest.

Q And for how long did you remain in that position, and where did you go next?

A About a year and a half, and then I went to

Arizona.

Q For the International or for the Local?

A For the Local, Local 5.

Q How long did you stay there?

A For about three years, close to three years.

Q And did you then take another job in SEIU?

A I was hired by Local 1021 in San Francisco, in Northern California.

Q And what was your job at 1021?

A Organizing Coordinator.

Q Did you go back to Arizona after that?

A Yes, I went back about two years after that. I, again, worked for Local 5.

Q Did you then come back to California?

A Yes. Then I was asked to assist Local 721, Southern California with a major de-cert that was taking place.

Q And after that, did you become their Organizing Director?

A I became Organizing Director shortly after that.

Q And did you continue in that position until you became Deputy Trustee here at Local 1107?

A Correct.

Q When you became the Deputy Trustee, what were

your first priorities?
A So my first priority was to stabilize the Local, obviously, but to try to learn as much as I could about the current bargaining that was taking place, staffing, leadership structure, just mostly structure about financing and different employers.
Q And different units?
A Different units.
Q And, roughly, how many employers does the Local deal with?
A We have 14 employers.
Q And when you became Deputy Trustee, how many contracts were open?
A There were six open contracts and two -- one wage reopener and one impact bargaining.
THE HEARING OFFICER: I'm sorry, two wage reopeners or one?
THE WITNESS: One wage reopener and one impact bargaining.
BY MR. ROTHNER:
Q And of the contract negotiations, how many have been closed since the trusteeship?
A One.
Q Is that Clark County?
A That's Clark County.

Q What are the other open contracts right now? Can you name them by employers?

A Yeah. We've got Addus, which is home care. We have Sunrise Hospital, Southern Hills, Mountain View, Renown. Then we have wage openers in Southern Nevada Health District, impact bargaining in Las Vegas Convention and Visitors Authority.

Q So are you making progress in those contract negotiations, wage reopener, and impact bargaining?

A Well, we are, but very slowly.

Q Okay. Have you since you became the Deputy Trustee, have you tried to familiarize yourself with Local Union policies?

A I did try. I have -- I have been trying to.

Q What did you find?

A As other witnesses stated before, there's lack of policies and procedures in the Local, non-existent.

Q And is that true over policies that give direction to staff?

A That goes both to give directions to staff, to members, yes.

Q Operational policies, are there any operational policies?

A There's no operational policies. There's only HR policies. That's the only policy that I found.

Q In your examination of the state of the Local when you became Deputy Trustee, did you find anything of concern about the organizational structure of the staff?

A Yes. There was an Organizing Director, which seemed to be the top person within the staff, but then you had also elected officials, and there was confusion who had the last decision-making process as well as who people should not only report to, but who they were accountable to.

Q And based upon your investigation, did you find that the Organizing Director was functioning in some ways as a chief of staff?

A That was what it appeared.

Q Did you become concerned at all about instances where there was not support for a bargaining team that was seeking ratification?

A Can you repeat that?

Q Yeah. Did you find anything odd about the abilities of the bargaining teams to seek ratification to promote ratification of something that they had agreed on?

A Yes, yes.

Q What did you find?

A I learned of the University Medical Center

ratification process whereas a decision was made to go against the particular agreement that the bargaining team had reached.

Q And, once again, I hate to keep beating this question into the ground, but did you find any policies concerning that question of, you know, whose authority it is if the bargaining team wants a contract ratified, you know, what can stand in the way of it, can the staff or the highest-elected officers reject that? Any policies on any of those topics?

A The Bylaws seem to have very small reference to it, but no policies in the Local.

Q Is one of your priorities helping the Local develop policies?

A Yeah. That would be one of my priorities as soon as we get all the bargaining done.

Q So has there been sufficient time to help develop policies yet?

A Not yet.

Q Is one of your priorities going forward to work on creating a true staff structure and hierarchy?

A Yes. That would be necessary for the Local to function properly.

Q And have you had the time to do that yet?

A Not yet.

Q In your opinion, would a constitutional revision process be useful in this Local?
A Very useful.
Q And I think we've heard that from some of the other witnesses already. Have you had any experience before with locals where there was the kind of conflict and war going on that was described by the witnesses in this proceeding?
A I have dealt with that, but more at the Union level, not at the Board level.
Q And at the Board level, do you have an opinion about whether, where you have those kinds of conflicts in governance, it's useful to revise the Constitution and Bylaws?
A Yes, yes, definitely.
Q And will there be a member committee created in this Local to help with the process of revising the Local Constitution and Bylaws?
A Yes, and I'm looking at the members right now.
Q And will any proposed revised Constitution and Bylaws be put to a vote of the membership?
A Yes.
MR. ROTHNER: I have no further questions.
THE HEARING OFFICER: I just have a couple, Mr. Manteca.

EXAMINATION

BY THE HEARING OFFICER:

Q You talk about the lack of policies and the -- I would characterize -- insufficiency of the Constitution and Bylaws to really govern the Union and give direction to the staff. What type of liability would you say that created for the organization or creates for the organization?

A Well, I think if you look at -- well, you know, we have this investigation by the Labor Department. We have VFRs; I think it's eight so far. We have missed deadlines, so we're misaligned there, so we are in a constant mode of, you know, high alert because we don't know when the next thing will come up because of the lack of policies. So, you know, I think it's going to take a while.

Q And, similarly, I just want to be clear, the lack of policies also extend to lack of financial controls?

A Yes. As you heard from Mr. Hauptman, there's some substantial monetary penalties or monies owed to both the IRS and, potentially, the State because there was no procedures.

Q And in your role as Deputy Trustee, Mr. Manteca, have you had an opportunity to be privy to

the state of the financial stability of the Local?
A Yes.
Q And would you say the Local is financially stable or not?
A I would say that it is financially stable, but we have not seen uncovered all of the potential liabilities that we may have.
THE HEARING OFFICER: Thank you.
MR. ROTHNER: Nothing further.
(The witness was excused and left the stand.)
MR. ROTHNER: So that concludes our presentation but for a brief. I would say that, because we would like to write a brief, I don't think it's necessary for me to make a closing statement tonight.
I do want to say that I understood the deadline that was announced. I'm leaving on a two and a half week vacation on July 20th, so I don't know whether you want me to do this now or later in correspondence, but I'm going to have to request an extension of the deadline.
THE HEARING OFFICER: I would appreciate you to do that in writing.
MR. ROTHNER: Okay.

THE HEARING OFFICER: Thank you.

MR. ROTHNER: And I do want to say I think I've identified all of the exhibits in testimony or explained why I wasn't covering them by testimony. I think there probably are a couple, perhaps Exhibits No. 14, 28, and 29, that I may not have identified, but they are simply background and some of the events that have been described in testimony, and so I'd like to make sure I'm on the record as offering all of the exhibits.

THE HEARING OFFICER: Duly noted. Mr. Rothner, Tab 4 is empty, and I don't believe you noted any bulky items that belonged in 4.

MR. ROTHNER: I'm sorry?

THE HEARING OFFICER: Tab 4.

MR. ROTHNER: If it's empty, it's intentional.

THE HEARING OFFICER: It's intentional?

MR. ROTHNER: Yes.

THE HEARING OFFICER: Got it.

(International Exhibits 1 through 21, 23-26, and 28 through 35 were admitted into evidence.)

THE HEARING OFFICER: All right.

As I stated before we began, now I will give an opportunity for Ms. Mancini to come and give a

statement and say what you have to say that you think is relevant to these proceedings --

MS. MANCINI: Sure.

THE HEARING OFFICER: -- so please join us. And, again, I want to remind you that we're going to limit --

MS. MANCINI: It's not --

THE HEARING OFFICER: -- your time to 30 minutes. Okay. I'm just going to set a timer just in case.

MS. MANCINI: Certainly. First and foremost, I'm Cherie Mancini. I am employed at St. Rose Dominican Hospital.

THE HEARING OFFICER: For the record, Ms.Mancini.

MS. MANCINI: I'm sorry. Are we on the record? I thought it was just a comment. Is it already on the record?

THE HEARING OFFICER: The court reporter is --

MS. MANCINI: Okay. I apologize.

THE HEARING OFFICER: -- making it for the record. Can you just please spell your name.

MS. MANCINI: Cherie, C-h-e-r-i-e, Mancini, M-a-n-c-i-n-i.

THE HEARING OFFICER: But we are not requiring

you to go under oath.

MS. MANCINI: That's fine. I came in -- I've been a Union member since 2002 -- 2004, sorry -- 2004. I helped to organize St. Rose Dominican Hospital in 2004 to bring the Union into the hospital. I've been a Steward. I've been a Chief Steward. I've been an Executive Vice-President. I've been a President.

All of these things today -- first and foremost, I want to say that I'm well aware of what the Affiliation Agreement is with Clark County Public Employees Association and that there had to be a vote in order for a trusteeship to be imposed.

So the emergency imposing, I'm confused today as to why we're talking about this because all of these things were uncovered after this was imposed. It wasn't done because of these items, so that's why I'm confused on what was going on earlier.

The Board -- the International created an emergency by the removal of myself and Sharon Kisling, a removal that took over six months to happen, but it was so drastic that I had to be removed and so did Sharon. Sharon had testimony given against her today about the things that she did in the Local, and you know what, she can atone for her actions, and that's all I'm going to say about Sharon.

She's responsible for the things that she does and says. I take responsibility for what I have done and said. The things that were said today, this is a one-sided argument over things that were brought up after the trusteeship was imposed not -- these things were not the basis for the imposing of the trusteeship. The vote of the Board was what imposed the trusteeship.

Now, some of these things, I came into office of November of 2015. Things like the DOL, I worked very hard and very long with the DOL to help get this situation fixed or to give them whatever they needed. I had them down to the Local. I had correspondence with them.

It was in regards to issues with our previous President, one of the previous Presidents, Al Martinez, and his credit card use and all of these other things that he had associated. It had nothing to do with me. I was forthcoming and gave them all the information that I knew about and that they needed. Okay?

I left an $80,000 a year job that I was not guaranteed. These people are guaranteed their jobs. I did this because I believe in membership. I believe in unionism and I believe that every member has a right to be heard, and some of these people sitting here, they only care about their own selves. They only care about

their power in their shop and what they can get out of it.

I've dedicated hours and hours of life to this Union, and I believed in everything. I believed -- I took it hook, line, and sinker. Okay? I come from a Union family. My grandfather and great-grandfather worked at the mills in Lawrence, Massachusetts. Okay?

I believe everyone has a right to a voice, and that's why that my shop -- my shop, St. Rose Dominican Hospital -- is the highest membership shop in any right-to-work state in all of this SEIU. Ask them their membership.

Ask them their membership, and ask them what they've done to promote membership when they sit and they say, "I'll have the organizers do it. We don't need to bring in cards," because they're too busy. Okay?

And the audit on bank time was because of the fact that people were not where they should have been, and I never went to management. Why would I do that to myself? Why would I come in and risk my job, my livelihood, 15 years at St. Rose, and I have no guarantee of a job? But I came in and I -- you know what, I upset the apple cart, because not everything was as it was.

You know, there's a lot of great people in this Union. I'm not going to say it's everybody. We brought in new people. We had the lowest drop month ever recorded in the history of this Local in a presidential year, less than five people dropped in the public sector.

And you know why? Because I went out, and I talked to them. I went to as many shops as I could and talked to people and gave them what they wanted, which was face time with their Union. So you know what, I understand this Local is screwed up, and it's been screwed up for a long, long time, way before I ever showed up.

Because if y'all were here when Jay McAuliffe was here, you know the history of this Local. I got no help. Al got help. Martin got help, people come in to help them. How would I know about COPE funds? I frickin' -- I work in surgery. How would I know that? I have to depend on the people who are there working with me.

I have an audit every year, which was what was required of this Local, and I followed -- and they never came back and said one word about it; otherwise, it would have been addressed. I had an audit every year. I followed the rules.

But the people who were out -- when I have membership coming to me and telling me they don't know what they're voting in their contract, could I have done it a better way? I probably could have, but you know what, I don't have signatures that I have submitted in my appeal of nurses from UMC who felt they were excluded from the bargaining process and did not know what they were voting for in their contract.

And when I have the Chief Steward walking in the first day and handing over the rights of access for our Union to that facility -- that's what they did just to keep me out of there, to keep me from talking to people, and they're still doing it to this day. You know what, I'm not coming back to SEIU. I may come back; you never know. This isn't the first time. I went through the wars of CNA. Okay?

I held off CNA from my hospital two different times. I'm a fighter. I don't give up, but you know what, it's really, really hard for me to sit here and not think about what this whole big picture looks like, because I do believe in unionism. I do believe in SEIU, but this history of public and private, it's been going on for a long time.

Brenda knows it's been going on for a long time. It's been going on since Jay McAuliffe, and she

knows it, because she's been here and she's seen it. With Vicky Hedderman and Jay McAuliffe, they had to be -- they both got ousted, because it was healthcare and public sector. It's been going on for a long time, and there's a lot of people who are getting really tired of it in the healthcare sector.

We don't get bank time. We don't get time to go and help our members. We do it when we can on our free time. So when I know people who are supposed to be on their bank time, and they're at some other shop conspiring, putting out flyers, putting anti-SEIU 1107 propaganda out or creating websites that they knew about, Clark County Public Employee Association, decertify today. Okay?

It was admitted in the trial, people admitted at the trial that they knew that that was going on, and they never reported it; and, yeah, that's Brenda Marzan, right there. You could read the testimony in the hearing. Okay?

So this is not all one-sided. It's not all big, bad Cherie. Okay? Big, bad Cherie was doing the best she could with the garbage that she was dumped into. Okay? And people got pissed because what ended up happening was, was people weren't being represented, and they came down to the hall, and guess what, we got

them representation, and they decided, "Hey, I want to run for an office."

So guess what? They ran out some of the people who were in the office before, and those people got mad. But I'm sorry, I don't care who it makes mad. You know what, I don't care. I don't care anymore, because you know what, I'm still out helping people.

You know what, I lost 14 percent of my pay to finally get a job to go back, and I was fortunate to go back to my job because I would have had zero. So does that make it sound like I just came in there to ruin everything? Was that my point? Apparently, my point was to ruin myself.

So all of these things that are said, like I said, this was imposed, the Affiliation Agreement says that the International cannot impose trusteeship without a vote of that Board, and that emergency was created by the removal of Sharon Kisling and myself so that the Constitution could be presented on that day, shoved into those people's faces to say, "Here, you have no leadership. You need to vote on trusteeship right now."

And, as you know, there is a lawsuit that has been filed in regards to it with testimony from members who were in that meeting, officers that were in that

meeting who felt that they were coerced and pressured into voting for this trusteeship.

So if I have to rebut all of these things that were brought up against me, I have absolutely no problem with it. Okay? And I can sit here, and I'll tell them again to their faces that I will take a lie detector test that I have never, ever gone to the newspaper. Why would I ruin myself?

Ultimately, I'm the President. Everything falls on me. I'm responsible, and I take that responsibility. And that's why I was there when I missed my kids, all of my kids' events, because you know what, I was working and they knew, and I told them why I was doing it. And they said, "That's right, Mom. You need to do what's right for people and stand up for them." That's all I have to say.

THE HEARING OFFICER: Thank you, Ms. Mancini, and I do want to offer my sincere appreciation for your commitment and your leadership and activism in our Union. It takes all of us to make this Union work.

So, at this time, I will invite any members of 1107 who would like to make a statement for the record. Oh, and we have a list. I've got them in order. The first is going to be Debbie Springer.

MS. SPRINGER: May I sit down? Because you

know I'm old.

THE HEARING OFFICER: So I just want to say there's quite a few people who want to be heard. The hour is growing late, and so if we can really try to limit your statements to two minutes. I'm going to set the timer. I'm not going to be unfair, but let's all try to be respectful of one another.

MS. SPRINGER: Would that be an NBA two minutes or an NFL two minutes?

THE HEARING OFFICER: I am not the person you want to go there with, because I will go there. How about just a 120-second two minutes? Please, go ahead, Debbie.

(Discussion held off the record.)

THE HEARING OFFICER: Debbie, if you can spell your name.

MS. SPRINGER: Debbie Springer, S-p-r-i-n-g-e-r. A couple things first, the first E-Board meeting I ever was at, I asked if we should start plans and procedures and got a look like, "Who the hell are you?" And I've tried ever since I've been on the E-Board to get committees up and running, and Lord knows I've tried.

And, you know, if people were willing to step up and do this, I think we'd be better because it would

make our Union stronger. Anyway, I have some questions, but I only have two minutes, and I would like to submit these questions for you to take a look at and, hopefully, answer?

THE HEARING OFFICER: If I can, I will.

MS. SPRINGER: I mean, as part of the report. How many copies of it do you want?

THE HEARING OFFICER: I am being advised by counsel that there's probably no way in these proceedings that it's appropriate for me to answer questions, but I will definitely take them and review them.

MS. SPRINGER: Well, wait a minute. I mean, this is democracy, right? And this is what we're being charged with is being undemocratic. You know, I think we deserve some answers in a democracy, right?

THE HEARING OFFICER: So, Debbie, I just want to address the concern that you raised. Yes, this is a democracy, but the purpose of this hearing and my role is very limited and it is defined. I am here to hear evidence and to make a recommendation to the International Executive Board on whether or not the imposition of an emergency trusteeship was justified and whether or not it should continue.

As a leader in the organization, I take that

role seriously, and I want to make sure I do what I'm supposed to do. But I will also say, as a leader in this organization, I believe it's my responsibility to provide leadership for all members irregardless of what Local they come from.

So not as the Hearing Officer can I look at your questions and answer them, but as a member of the IEB, I will look at your questions and try to answer them. Does that make sense?

MS. SPRINGER: Well, okay, but you know, realize that a lot of people have these questions. I don't know what rules, under what rules, we're supposed to live under in this trusteeship.

THE HEARING OFFICER: Sure.

MS. SPRINGER: You have never explained that to me.

THE HEARING OFFICER: Sure. And I will direct you. I think the most appropriate person for you to address your questions to is going to be the Trustee, Luisa Blue, who is sitting over there.

MS. SPRINGER: Okay.

THE HEARING OFFICER: Thank you. Sheila Grain.

MS. GRAIN: Am I supposed to here or there?

THE HEARING OFFICER: Wherever you want to be,

Ms. Sheila.

MS. GRAIN: Good evening. My name is Sheila Grain.

THE HEARING OFFICER: Again, Sheila, if you can spell your name for the record.

MS. GRAIN: My first name is S-h-e-i-l-a; last name is Grain, G-r-a-i-n. Excuse me. I'm a Union member in good standing. I'm a Shop Steward at Clark County Department of Aviation. I'm a member of the bargaining team.

I've served on the elections committee, the Constitution and Bylaws committee, the PAC team. I was elected Treasurer on June 30th, 2016, and served as Treasurer until SEIU Local 1107 was trusteed on April 28th, 2017. I'm also a licensed Certified Public Accountant in good standing.

I voted yes for the resolution to trustee the Local at the April 26th E-Board meeting. I hereby affirm my yes vote for the emergency trusteeship of SEIU Local 1107 on that date. The list of needs I submitted to SEIU International at the October hearing and needs assessment continued and worsened through April 26th, 2017.

I request that SEIU International continue the emergency trusteeship of SEIU Local 1107 until such

time as a complete reorganization of the Local has been completed. I further request that SEIU International include a plan to reorganize SEIU Local 1107 into two sectors, public sector and private sector.

It is my belief that separating the assets, staff resources, and governance of each sector is the only solution to the acrimony and dysfunction, which have plagued SEIU Local 1107 over the past several years and deprived members of services and hindered successful governance of the Local.

I will personally make myself available to assist the Trustees in any way deemed appropriate to successfully separate the assets of each sector of SEIU Local 1107 and set up financial accounting and reporting systems and organizational charts, et cetera, as needed to facilitate a complete reorganization.

THE HEARING OFFICER: Thank you, Sheila.

MS. GRAIN: Thank you very much for your time.

THE HEARING OFFICER: Thank you. Mario Ochoa.

MR. MANTECA: He left.

THE HEARING OFFICER: Brenda Marzan.

UNIDENTIFIED SPEAKER: We're switching people.

THE HEARING OFFICER: I'm going to go in order.

MS. GRAIN: May I ask a question? I have my

remarks in writing.

MR. ROTHNER: It's part of the transcript.

MS. GRAIN: You got it all? I talk really fast.

UNIDENTIFIED SPEAKER: She got it. She's really good.

THE HEARING OFFICER: She's pretty good.

Victoria Harding.

MS. HARDING: Thank you. Victoria Harding, H-a-r-d-i-n-g. I'm Chief Steward of the Southern Nevada Health District here, part of SEIU. We're a small shop. You hear a lot about private sector, public sector.

Now, we have large sector, we have small sector, and the whole point of a union is that all of us come together for the greater good of everybody, and that got lost. It got lost a long time ago. It got lost before Cherie. I struggled and struggled and struggled.

I have shed so many tears in this Union hall. You have no idea. I couldn't get anything done for my membership. When it was October, and we were having the hearing, I stood up there, and I asked to not do a trusteeship because I really believed and felt that we could fix our own Union.

In that time since October to the point of the trusteeship, I was on board, and I was sending off my own letters to Mary Kay asking for help for this Local, because it literally crumbled around our feet. It became so prostrate it couldn't move.

When I was denied an attorney for my members, literally flat-out denied an attorney, to send something to the EMRB, Mary Grillo actually sat me down and said, "Victoria, you're already sending in your own intent to arbitrate. You're already doing everything yourself. Why don't you go down to the NLRB and have them show you how to fill out your own EMRBs?" I was denied so much for my members and --

THE HEARING OFFICER: You have about 30 seconds.

MS. HARDING: -- so I voted yes for the trusteeship.

Now, when I have things, and I bring them to Martin, he actually will ask me questions about what it is that I need, why I need it. He looks at the fiscal responsibility of that, because it's all of our members' money, and we have some financial issues. He's not asking me about a side. It's not about politics, and it's about my members, and my members are being served.

THE HEARING OFFICER: Thank you. Patricia Greaux.

MS. GREAUX: Hi, my name is Trisha Greaux, G-r-e-a-u-x, and I am Chief Steward of Ancillary at UMC. I've been a member ever since the Union came in at UMC, and I'm a proud member. Yes, I voted for it to be trusteed. Like you've heard from everybody else, we were lost.

We could not govern ourselves no matter how we got there, it was fair, and for us to be in denial to say that we did not need it, yes, we did. I can attest I had to step in twice between two people when they were there physically fighting. I stepped in between so they couldn't fight.

Yes, fighting went on. Profanity went on. Yes, we all acted unprofessional. I'm not going to say none of us did. Yes, all of us did. We all had a part in this because we were Executive Board members. Yes, we all acted unprofessional, and this is what we needed, a wake-up call because, if not, we would have destroyed our Union, and we forgot that we were here for our members.

And I'd like for it to continue to be trusteed because I do agree with Victoria, anytime we call down to that hall, they are there for us. There was a time

that they wouldn't -- we couldn't even call down there because we'd get questioned, "Why are we there? Who are we talking to?" But now, just walking in there, the whole air is just totally different and, yes, I'm happy, thrilled to death that we are trusteed.

THE HEARING OFFICER: Thank you, Ms. Greaux. Marea Salinas.

MS. SALINAS: My name is Marea Salinas. Do you want me to spell it?

THE HEARING OFFICER: Please.

MS. SALINAS: Okay, then. It's M-a-r-e-a, S-a-l-i-n-a-s. You know, I'm here today to say how upset I was with every E-Board meeting that we have, because you know, the members always been fighting and fighting every time that we have the E-Board meetings; and, unfortunately, we never accomplished anything.

So, you know, I hope we can accomplish all good for the members today, I mean, from now on, because at least we want the best and the better things for the members at this point. That's all I want to say. Thank you.

THE HEARING OFFICER: Thank you, Marea. Richard Hodg --

MR. HODGSON: Hodgson.

THE HEARING OFFICER: Yeah.

MR. HODGSON: Hello. I'll be very brief and to the point. Richard Hodgson, H-o-d-g-s-o-n. I am the former Chief Steward Department of Aviation, Clark County. Having been involved -- a long story -- working graveyard.

When we talk about giving time and energy, I know so much about it, because there was times where I went over 24 hours without sleeping, doing a full-time job, doing full-time Chief Steward duties, fulfilling my duties as an Executive Board member, so I just wanted to mention something that I think for the people that's been around for a while.

I was on the Executive Board when we changed from an Executive Director model to a Presidential model. I want to bring -- let's bring it home.

UNIDENTIFIED SPEAKER: Two minutes.

MR. HODGSON: If I need more, because this is very important, just 30 seconds or so.

THE HEARING OFFICER: 60 seconds, Richard.

MR. HODGSON: She interrupted me, so my time should stop.

I supported that move, but that was during President Al Martinez. Many of you remember. After Al lost all of this, President Bassick that was the first president after that initial presidential model and

then followed by Cherie Mancini, and one of the things that I looked at during that period was that we look at an organizing model as opposed to a servicing model.

Al Martinez, the President, had a service model. Martin Bassick tried very diligently to bring in an organizing model. Cherie Mancini came back and took us back to a servicing model. This Local has no identity.

We have to determine are we going to be a service model or organizing model? My opinion and what I've always fought for is that we need to be an organizing model and move this movement forward, because it's a movement. We have been --

THE HEARING OFFICER: Thank you, Richard.

MR. HODGSON: One thing. Some of our elected officials, because I was very involved in many legislations, many of you know, I've had elected officials, "What is going on with 1107?" We used to have respect from our elected officials, our legislators, our Commissioners.

They look at us now like, "What the hell is going on?" We need the International, some stability, institute or organizing model, and let's move this Local forward.

THE HEARING OFFICER: Thank you very much.

John Worthen.

UNIDENTIFIED SPEAKER: He had to go to work.

THE HEARING OFFICER: Michael Collins.

MR. COLLINS: Good evening. My name is Michael Collins. Collins, C-o-l-l-i-n-s. I'm a registered nurse at University Medical Center, a Steward at the University Medical Center. I'm a past Trustee, two terms with the 1107 Executive Board, and I'm a member of the SEIU Nurse Alliance. Thank you for coming, and thank you for the process.

I think the trusteeship was something that was inevitable, and I am glad that it is here and I'm glad that it's going to continue, and I think it needs to continue. But I also want to -- listening to the testimony today, I felt that the former President Mancini was being scurrilously attacked, and I felt it was very personal to her.

The dysfunction -- I first joined Local 1107 in 1989. The dysfunction of Local 1107 has been an ongoing process for the entire time I've been a member. If you are a member of the International Executive Board, at some point, you're going to visit Las Vegas to try to help us with some of the turmoil that we create for ourselves.

So I just want to say that I feel that all the

people here today are members that have a passion for what we need in our Union, but what we need in our Union more than anything right now is structure, and I believe that this trustee process should be used to develop a structure that will allow us to be a more functional organization going forward. Thank you.

THE HEARING OFFICER: Thank you, Mr. Collins. Regina Ellis.

MS. ELLIS: Hi, I'm Regina Ellis, E-l-l-i-s. I'm a registered nurse at Southern Nevada Health District, and I voted no for the trusteeship. And the reason I voted no was because I felt that the situation we were put in was really not the time to be voting for a trusteeship.

I thought that the day that the officers were removed from the building and the Executive Board walked in, and we were told that we had no officers and no language in our Bylaws, and we had to make a choice right then and there, I felt that it was really, really not appropriate for that time.

So what I would say to you: Is the Local dysfunctional? Yes. It was being imploded from inside out. And I can't tell you all the reasons why. You've been hearing them all night long. But I will say to you that since some of the people that have come here

from the International, we have had -- I feel like we've had a lot of response from them. We call them if we need something. They're there.

However, the things that I really want to focus on are organizing and the fact that we in our shops need organizers available to us. They are currently working on so many different things that we really don't know who, what, and where.

Also representation, there's really no people. The people that we talked to before, contract reps or labor reps, are now doing other things, and they're really not accessible to us. So I'm not saying to you that I'm not satisfied or anything like that.

I feel that the people that have come in are very conscientious and dedicated, and they're really trying to restructure this Union. So I would like to -- you know, I want to see that continue, but that was the reason for my no vote. I stand by my no vote. Thank you.

THE HEARING OFFICER: Thank you, Ms. Ellis. That is the last card that I have. Is there anyone else? One at a time.

MS. MAESE: Hi.

UNIDENTIFIED SPEAKER: Two minutes.

MS. MAESE: Ten minutes?

UNIDENTIFIED SPEAKER: Sure.

MS. MAESE: I'm Michelle Maese, M-a-e-s-e, like my essay paper. That's how you say my last name. I voted no. I was actually in a meeting with Sharon the day the e-mail came through, and I watched her, her whole body unfold. We went to the hall.

I watched Cherie come in -- I don't know if Cherie's still here -- I watched Cherie come in after she got the e-mail. It was horrific. It was horrible. The scene there was just -- it was crazy. It was like the E-Board meeting with four people. It was really bad.

I did vote no because I felt -- and I agree with Cherie -- I thought the emergency was created to say, "You have nothing, we are your life raft, grab on, because we're going to save you." Looking back on it, I still feel the same way. I felt like the emergency was created for us to vote that day. I don't feel like it was a time for voting.

I feel like everybody was emotionally charged, but since then I do feel like it was the best thing for our Local. Martin has been amazing. Any time we needed answers or questions, they respond to e-mails. We're not used to that, ever. We're not used to people picking up the phone and saying, "Hello?" I'm like,

"Wait. What? Hello. Okay." We're not used to that, either, and they do. They respond.

What I would like to see is training because when you become a President -- Cherie got no training, even though she moved from Vice-President to President -- whoop, mic drop. Okay. So Sharon got no training.

I was part of the bargaining team. I bargained three times. I'm the Chief Steward of the Supervisory Unit for Clark County, by the way, and I work for child fatality and sex abuse unit for four and under for Department of Family Services for 10 years.

Training is essential because what happens is when we begin to build that hierarchy of system, Cherie had no training. She didn't know how to handle the room, and the room was like that before she got there. So for her to kind of get the chaos under order, she didn't know how to do that, and neither did Sharon.

So I would like to see training and policies and procedures and our Bylaws redone, but, essentially, training because then we train the next person.

THE HEARING OFFICER: Thank you.

MS. MAESE: You're welcome.

MS. STEVENS: Hello. My name is Gwen Stevens. I work at UMC. I've been there for 25 years. I was a

Trustee, and I was a Vice-President two terms. I've been always active in the Union ever since I started there. Don't get me wrong, like Michael Collins said -- I agree with him 100 percent, even though we're not talking because all of this and everything else that happened.

But I agree with him, you know, for the simple fact we all are trying to make our Union better, and we do. And I'm not even try -- I think that Cherie did the best she could, but it just wasn't enough. We have to be stronger. We got to do what we got to do for the members. That's why we all are here right now to make sure we keep growing for working families.

Look how good -- SEIU, to me, is one of the best things that ever happened out here in Las Vegas. I mean, that purple -- people really used to respect that purple, but that purple ain't so purple no more. We got to get purple again.

Thank you guys for coming out here and for listening to all of our problems. I know that SEIU Nevada, we've been problem children for a while, but that's what happens when you come to the Wild Wild West.

THE HEARING OFFICER: Thank you.

MS. THOMAS: Hello, and thank you, SEIU

International, for showing up. My name is Claire Thomas, T-h-o-m-a-s. And I voted yes, because as a -- I was actually a Trustee, and when I first sat down at one of our E-Board meetings, I listened. I watched, and I noticed how we were divided in that room. We would have private on one side, public on the other side.

And just watching, you know, when anything happened or anybody said anything, then you would have the crowd on the other side just lambasting the other person, and I was like, "Wow." And I asked after the meeting, "Does this normally -- is this normal?" And I was told, "Yeah, it's normal."

So the second meeting, the same thing happened, and that's when I personally sent the presidency along with the E-Board meetings Robert's Rules, and it's on YouTube. I wanted everybody to see how you organize a meeting and how you conduct it.

So, you know, they can't say that I didn't do that. I did that. As a Trustee, I felt that we were not holding a meeting that we should have been holding and -- or how we should have held it.

Anyway, when towards -- I don't know -- maybe the sixth meeting that we had, noticed that any time you would --

THE HEARING OFFICER: You have about 10 seconds.

MS. THOMAS: Thank you. Any time that you would disagree with anything, then a fight would happen. You could not verbalize that, you know, your own self. But I want to say that I am truly happy that International is here to guide us and help us. Thank you.

THE HEARING OFFICER: Thank you. Is there anyone else? I see one person over there that has not spoken. Oh, there's two. I'm sorry.

MS. CARUTHERS: My name is Keishe Caruthers, K-e-i-s-h-e; last name is C-a-r-u-t-h-e-r-s. I was not for trusteeship, but since Martin and Luisa Blue had came into our lives, it's been, to me, a breath of fresh air. I'm actually now -- because at the time before we was trusteed, I wanted to stop.

I wanted to send in my resignation as Chief Steward because I felt that it was a fight that we never would win. So I expressed to all of the leaders within Clark County, and I'm like, "This is not worth it. SEIU can have this," is what I said. And I'm so happy that they're here now, because if they never came, membership was leaving.

UNIDENTIFIED SPEAKER: Yeah, we wouldn't have

a contract.

MS. CARUTHERS: Yeah, we wouldn't have a contract.

THE HEARING OFFICER: Thank you, Ms. Caruthers. Okay. Now, there is one more person.

UNIDENTIFIED SPEAKER: Are you sure?

UNIDENTIFIED SPEAKER: Who is that?

UNIDENTIFIED SPEAKER: Oh, she's not speaking.

THE HEARING OFFICER: Okay.

(Side discussion inaudible.)

THE HEARING OFFICER: Okay. And Mr. Rothner has already said that you don't want to make a closing statement at this time?

MR. ROTHNER: Correct.

THE HEARING OFFICER: So we are done, folks. I want to thank all of you all for your time and attention. It goes without saying, and you've heard me say various times throughout these proceedings, I really do want to, on behalf of our International Executive Board, I want to thank you all for your commitment, for your leadership, for your activism in this Union.

The fact that you all are still here is a testimony to what actually makes SEIU strong. Right? It is the fact that our members pour every single day

their time, their talent, their attention, your heart and your soul into making this organization for working people what it is, and we do not stand a chance in this country without our members wanting to stand up and stick to it each and every day.

So I really do want to appreciate and thank you all for sticking with it and for hanging in here, right, through these proceedings. I will make my Report and Recommendations to the International Executive Board as quickly as I can and that the body, the International Executive Board, will make a final decision on the trusteeship.

As I indicated earlier, I will leave the record open at this point until July 28th, which is a Friday, for post hearing submissions to the International President and from Local members who want to submit written statements. If there is a request to extend that timeline, please do so in writing. This hearing is now closed.

(Reporter's Transcript of Proceedings was recessed at 7:48 p.m.)

(International Exhibits 13, 15, and 16 were marked for identification.)

REPORTER'S CERTIFICATE

STATE OF NEVADA )
) ss
COUNTY OF CLARK )

I, Carla N. Bywaters, a duly certified court reporter licensed in and for the State of Nevada, do hereby certify:

That I reported the taking of the foregoing proceedings at the time and place aforesaid;

That I thereafter transcribed my shorthand notes into typewriting and that the typewritten transcript of said proceedings is a complete, true and accurate record of testimony provided at said time to the best of my ability.

I further certify that I am not a relative, employee or independent contractor of counsel of any of the parties involved in said action; nor a person financially interested in the action; nor do I have any other relationship with any of the parties or with counsel of any of the parties involved in the action that may reasonably cause my impartiality to be questioned.

IN WITNESS WHEREOF, I have hereunto set my hand in the County of Clark, State of Nevada, this 26th day of July 2017.

Carla N. Bywaters, CCR 866